## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| EL PASO COUNTY, TEXAS<br>500 E. San Antonio<br>El Paso, TX 79901, | ) ) ) ) | |
| BORDER NETWORK FOR HUMAN RIGHTS<br>2115 N Piedras St<br>El Paso, TX 79930, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:19-cv-66 |
| DONALD J. TRUMP, in his official capacity as<br>President of the United States of America<br>1600 Pennsylvania Avenue, NW<br>Washington, D.C. 20500, | ) ) ) ) ) | |
| PATRICK M. SHANAHAN, in his official capacity as<br>Acting Secretary of Defense<br>1000 Defense Pentagon<br>Washington, D.C. 20301, | ) ) ) ) ) | |
| KIRSTJEN M. NIELSEN, in her official capacity as<br>Secretary of Homeland Security<br>245 Murray Lane, SW, Mail Stop 0485<br>Washington, DC 20528-0485, | ) ) ) ) ) | |
| DAVID BERNHARDT, in his official capacity as<br>Acting Secretary of the Interior<br>1849 C Street, NW<br>Washington, DC 20240, | ) ) ) ) ) | |
| STEVEN T. MNUCHIN, in his official capacity as<br>Secretary of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, D.C. 20220 | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

### Introduction

1.      Plaintiffs El Paso County, Texas, and Border Network for Human Rights, Inc.

("BNHR"), bring this action seeking relief from the President's unlawful conduct in declaring a

national emergency and violating laws of Congress limiting funding for barriers at the United

States-Mexico border (the "southern border"). Plaintiffs ask this Court to provide redress by

declaring that the President's actions are unauthorized by, and contrary to, the Constitution and

laws of the United States, and by enjoining the Secretaries of Defense, Interior, Homeland

Security, and Treasury from taking any action pursuant to the President's Proclamation of

February 15, 2019, on Declaring a National Emergency Concerning the Southern Border of the

United States (the "Proclamation").[1]

2.      The Constitution grants Congress the exclusive power to decide how the

government spends money. "The United States Constitution exclusively grants the power of the

purse to Congress, not the President." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225,

1231 (9th Cir. 2018). The Constitution's Appropriations Clause provides that "No Money shall

be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const.

art. I, § 9, cl. 7. And the Spending Clause grants Congress alone the "Power To lay and collect

Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the

United States." U.S. Const. art. I, § 8, cl. 1. As James Madison wrote in *The Federalist Papers*,

"[t]he power over the purse may [be] the most complete and effectual weapon with which any

constitution can arm the immediate representatives of the people." THE FEDERALIST NO. 58.

Indeed, when "the decision to spend [is] determined by the Executive alone, without adequate

---

[1] Proclamation, Donald J. Trump, "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States" (Feb. 15, 2019), available at https://bit.ly/2UVgXfY.

control by the citizens' Representatives in Congress, liberty is threatened." *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring).

3.     The Constitution also grants Congress the exclusive power to make laws.  The President may *propose* measures to Congress (U.S. Const. art. II, § 3), and he must sign bills for them to go into law (U.S. Const. art. I, § 7), unless his veto is overridden. But otherwise the President's role in our system of checks and balances is to execute the laws Congress has enacted (U.S. Const. art. II, § 3), not to make the laws himself.

4.     The Constitution further charges Congress to conduct oversight of the military. Pursuant to this power, Congress passed the Posse Comitatus Act, 18 U.S.C. §1385, which bars the military from engaging in domestic law enforcement except where expressly authorized by the Constitution or Congress. This statute enshrines the democratic norm, which took root at this nation's founding, that the military shall not be used for domestic purposes.

5.     Domestic deployment of the military without legislative authority was such an affront to the Founders that they discussed it in the Declaration of Independence, in their catalog of George III's tyrannical conduct: "He has kept among us, in times of peace, Standing Armies, without the Consent of our legislatures." The Supreme Court has warned of the dangers of a President deploying the armed forces to disrupt the checks and balances in our Constitution. In *Youngstown Sheet & Tube Co. v. Sawyer*, Justice Robert Jackson observed that no doctrine could be "more sinister and alarming" than to allow a President to "vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture." 343 U.S. 579, 642 (1952) (Jackson, J., concurring).

6.     The architects of our Constitution understood that executive usurpation of legislative powers would lead to tyranny, and they saw the separation of powers as among the Constitution's primary safeguards against it. Madison cautioned that "[t]he accumulation of all

powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47.

7.      Pursuant to this constitutional framework, the President asked Congress to authorize and appropriate certain funding for barriers at the southern border.  After careful consideration and extensive political debate within each House and with the President, Congress enacted the 2019 Consolidated Appropriations Act.  It included $1.375 billion in funding for fencing in specific locations along the border, limiting the fencing to a previously deployed design.  President Trump signed this measure into law on February 15, 2019.

8.      The same day the President signed the Consolidated Appropriations Act, he also issued his Proclamation declaring a national emergency to access additional unappropriated funds for the unauthorized construction of a border wall.[2]

9.      The President's Proclamation and accompanying White House Statement[3] laid claim to $6.7 billion that Congress did not appropriate, for the purpose of building a border wall that Congress did not authorize. In an attempt to override the limits that Congress had enacted and he had signed, the President purported to issue his Proclamation under the National Emergencies Act ("NEA"), 50 U.S.C. §1601 *et seq*., citing 10 U.S.C. § 2808, the military construction statute, as a funding source. He also issued a White House Statement announcing that he would use—for the purpose of building a border wall—money that Congress had designated for use under different laws.  In particular, the Proclamation and White House Statement direct the use of funds under 10 U.S.C. § 284, which permits the Department of

---

[2] References to "border wall" in this Complaint refer to any barrier or border-related infrastructure and/or project relating to the construction of a barrier or border-related infrastructure along the southern border that President Trump has called for and has not been approved by Congress.
[3] Statement, White House, "President Donald J. Trump's Border Security Victory" (Feb. 15, 2019), available at https://bit.ly/2GLqvGD.

Defense to support drug interdiction activities, and the Treasury Department's Asset Forfeiture Fund, which is governed by 31 U.S.C. § 9705.  As explained below, none of these laws allow the President to spend funds on constructing a border wall.  That is all the more so because Congress addressed border-fence funding specifically in the appropriations law the President signed the same day he issued the Proclamation.  And under well-established rules of statutory construction, a specific law controls over more general laws.

10.     Beyond this, the Proclamation itself and the President's accompanying statements belie the notion that there is a qualifying "emergency" within the terms of the NEA.  While announcing the Proclamation in the White House Rose Garden, the President acknowledged that the "emergency" was his inability to persuade Congress to authorize the construction of a border wall or to appropriate funds to do so in the manner and amount he wants.  As the President said, "I could do the wall over a longer period of time.  I didn't need to do this.  But I'd rather do it much faster."[4]

11.     By declaring a national emergency where none exists, the Proclamation also violates long-standing laws prohibiting the military from engaging in domestic activity that Congress has not authorized.  Invoking 10 U.S.C. § 12302, the Proclamation purports to authorize the Secretary of Defense to deploy Ready Reserve Units to the border in contravention of laws limiting the military's ability to engage in domestic law enforcement. The President's Proclamation therefore represents a dangerous abuse of executive power of the sort the Framers of our Constitution sought to—and did—guard against.

12.     The issuance of the Proclamation imposed concrete and immediate harms on Plaintiffs El Paso County and the Border Network for Human Rights.  El Paso County is a

---

[4] President Donald J. Trump, Remarks from the White House Rose Garden (Feb. 15, 2019) available at https://bit.ly/2GAsKgG.

flourishing border community that has already been harmed by the President's declaration of an emergency and faces additional imminent harm from the actions authorized by the Proclamation. The BNHR likewise has sustained concrete harms to itself as an organization and to its members, hundreds of families and thousands of individuals living along the border where the President has declared an emergency, ordered the area's militarization, and authorized construction.

13.     Seeking redress for those harms, Plaintiffs come before this Court to ask it to fulfill its role in our constitutional system by saying what the law is and enforcing the plain meaning of statutes passed by Congress and the constitutional provisions on which they rest. When the President oversteps his authority and overrides the constitutional powers of the legislative branch, it is the appropriate role of the judicial branch to enforce the separation of powers. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417 (1998). The executive branch often seeks great deference from the courts in carrying out its discretionary functions, especially where "national security" is allegedly at stake. But no such deference is owed to the executive here, where the President is violating statutes and usurping the legislative branch's role. The only deference owed in this instance is to Congress and to the Constitution, which grants to Congress the powers that the President purports to exercise. Put another way, having seized the power of the legislative branch to make law and spend federal funds, the President may not attempt to sideline the judicial branch by arguing that it cannot interpret and apply the law. Plaintiffs urge this Court to reject any such entreaties. Otherwise, it would license the executive to accumulate all powers—legislative, executive, and judicial—in just the way the Framers feared.

## PARTIES

14.     Plaintiff, El Paso County, Texas, ("El Paso County") is a county recognized as a legal subdivision of the State. Tex. Const. art. 11, § 1. El Paso County has the constitutional and statutory authority to set policies and regulations, raise revenue, and administer programs for its

residents in certain areas, including administering its County judicial system and providing health and social services to many County residents regardless of their national origin.

15.     Plaintiff El Paso County is bilingual, bi-national, multicultural, and geographically distinct. El Paso County has over 800,000 residents, more than 82 percent of whom are Hispanic and more than 25 percent of whom are foreign born. It is part of the largest border community on the Rio Grande, and one of the safest communities in the nation. El Paso County takes great pride in protecting all its residents and its values, and has been a leader in the fight against discrimination of all types for decades, with a special focus on protecting the civil rights of its immigrant communities.

16.     Plaintiff Border Network for Human Rights is a community-based membership organization incorporated in Texas with 501(c)(3) tax-exempt status.  Founded in 1998, BNHR is one of the leading human rights advocacy and immigration reform organizations located at the southern border. BNHR has over 4,000 members in West Texas and southern New Mexico. It has been working with border communities for over 20 years with a mission to organize them through human rights education and to mobilize its members to ignite change in immigration and border enforcement policy and practice. BNHR facilitates the education, organizing, and participation of marginalized border communities in defending and promoting human and civil rights. BNHR supports these communities' work to create political, economic, and social conditions where every human being is equal in dignity and rights. BNHR brings this action on its own behalf and on behalf of its members, who live and work in El Paso County, as well as southern New Mexico.

17.     Defendant Donald J. Trump is the President of the United States, and is sued in his official capacity. He issued the Proclamation in contravention of the NEA, other statutes, and the United States Constitution.

18.     Defendant Patrick M. Shanahan is the Acting Secretary of the United States Department of Defense ("DOD"), and is sued in his official capacity. According to the Proclamation and White House announcement of February 15, 2019, Acting Secretary Shanahan is responsible for exercising military construction authority and spending under 10 U.S.C. § 2808, for reprogramming funds under 10 U.S.C. § 284, for deploying Ready Reserve units to the southern border under 10 U.S.C. § 12302, and for taking other action to use or support the use of those authorities, including, if necessary, the transfer and acceptance of jurisdiction over border lands.

19.     Defendant Kirstjen M. Nielsen is Secretary of the United States Department of Homeland Security ("DHS"), and is sued in her official capacity. According to the Proclamation, Secretary Nielsen is responsible for taking all appropriate actions to use or support the use of 10 U.S.C. § 2808 and 10 U.S.C. § 12302, including, if necessary, the transfer and acceptance of jurisdiction over border lands.

20.     Defendant David Bernhardt is Acting Secretary of the United States Department of the Interior ("DOI"), and is sued in his official capacity. According to the Proclamation, Acting Secretary Bernhardt is responsible for taking all appropriate actions to use or support the use of 10 U.S.C. § 2808 and 10 U.S.C. § 12302, including, if necessary, the transfer and acceptance of jurisdiction over border lands.

21.     Defendant Steven T. Mnuchin is Secretary of the United States Treasury, and is sued in his official capacity. According to the Proclamation and White House Statement of February 15, 2019, Secretary Mnuchin is responsible for directing money from the Department of Treasury Forfeiture Fund for use to build a wall at the southern border.

## JURISDICTION AND VENUE

22.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution, the Administrative Procedure Act ("APA"), the NEA, and other federal statutes.

23.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706, and its equitable powers.

24.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). A substantial part of the events giving rise to these claims occurred in this district, the Plaintiffs reside in this district, and each Defendant is an officer of the United States sued in his or her official capacity.

## RELEVANT STATUTORY BACKGROUND

**A.      The 2019 Consolidated Appropriations Act**

25.     Congress passed and the President signed into law the 2019 Consolidated Appropriations Act on February 15, 2019.  Congress enacted the measure after extensive debate, including a government shutdown, over the appropriate funding levels for border wall construction.

26.     In the Consolidated Appropriations Act, Congress authorized and appropriated the expenditure of $1.375 billion to repair certain existing border fencing or barriers and to provide for 55 miles of new fencing in the Rio Grande Valley Sector, using a previously deployed design.  This was less funding, fewer miles of fencing, and a different design than the President had proposed in his fiscal year 2019 budget request.

**B.     The National Emergencies Act**

27.     Congress enacted the NEA in 1976 with overwhelming majorities in both houses, out of a recognition that Presidents were overusing the powers that Congress had granted them to act quickly in situations where Congress lacked adequate time to do so. The NEA terminated existing emergencies (some of which had persisted for decades) and created a new framework to cabin the President's authority. 50 U.S.C. § 1601 *et seq*. The NEA's primary purpose was to prevent the President from exercising unbounded authority to declare emergencies and to continue states of emergency in perpetuity.

28.     The NEA provides: "with respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency." 50 U.S.C. § 1621.

29.     The NEA does not define the term "emergency," so it is construed "in accordance with [its] ordinary meaning.'" *Sebelius v. Cloer,* 569 U.S. 369, 376 (2013). In 1976, "emergency" was understood, as it is today, as an unforeseen combination of circumstances that calls for immediate action.

30.     The NEA further provides that when the President declares the emergency, he must specify which statutes authorize the acts he proposes to address it: "When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.

31.     The NEA thus permits the President to direct the use of certain resources, but only in a qualifying emergency and only in the manner and to the extent that Congress has previously authorized by statute. While the NEA gives the President broad authority to declare an emergency, it does not permit the President to do so when no emergency exists, or to fabricate an

improper or pretextual basis for the declaration. And even under a proper declaration of emergency, the NEA does not give the President the power to do anything he wants.

32. The statute's legislative history makes clear that the NEA was intended to ensure that "the extraordinary powers which now reside in the hands of the Chief Executive . . . could be utilized only when emergencies actually exist"; that "[r]eliance on emergency authority, intended for use in crisis situations would no longer be available in non-crisis situations"; and that "the United States travels a road marked by carefully constructed legal safeguards."[5] Senator Charles Mathias, Republican from Maryland and one of the Act's co-sponsors, called it a "safeguard" against abuses of presidential power.

## C.     The Specific Statutes and Authorities Invoked in the Proclamation

33. The Proclamation and accompanying White House Statement invoke 10 U.S.C. § 2808(a), which permits certain military construction activities during national emergencies; 10 U.S.C. § 284, which allows specified counterdrug activities for the Department of Defense; and the Department of Treasury Forfeiture Fund, which is governed by 31 U.S.C. § 9705. These statutes do not permit the President to override specific congressional appropriations for construction at the southern border or specific authorizations for the use of the United States military, either by their plain language or under the constitutional separation of powers.

### 1.     10 U.S.C. § 2808(a)

34. Article I enumerates congressional powers over the military and national defense. Congress has the power to make and limit military appropriations, raise and support armies, provide for and maintain a navy, declare war, and provide for organizing and calling forth the national guard. And Congress has taken specific action to enforce its powers to oversee the military, exercising extensive oversight and spending authority over military construction

---

[5] S. Rep. No. 94-1168, at 291 (1976), available at https://bit.ly/2UYaRvb.

through the enactment of the Military Construction Codification Act and the National Defense

Authorization Act.

35.     The Military Construction Codification Act provides a narrowly cabined

exception to the requirement of congressional authorization for all military construction projects.

It provides that, in the event the President declares war or a national emergency under the NEA

that "requires use of the armed forces," the Secretary of Defense "may undertake military

construction projects . . . not otherwise authorized by law that are necessary to support such use

of the armed forces." 10 U.S.C. § 2808(a).

36.     Under 10 U.S.C. § 2808(a), a President could order military construction to

support the use of U.S. troops that were deployed to respond to a national emergency of a kind

*requiring* use of the armed forces. But the statute vests the authority to make the determination

of whether the national emergency "requires use of the armed forces" in the Secretary of

Defense, not the President. *See* 10 U.S.C. § 2808(a) (authorizing the Secretary of Defense to take

certain actions "in the event of" a national emergency "that requires use of the armed forces"). A

President's attempt to make this determination in place of the Secretary of Defense is therefore

without force or effect. And any determination by the Secretary of Defense that "use of the

armed forces" is "require[d]" must be made consistent with the APA.

37.     Even if a President had authority to determine that the use of the Armed Forces is

required and could thereby unilaterally invoke the powers created by section 2808, any

invocation of the statute must be consistent with the statute's terms.  The statute authorizes a

construction project "necessary to support . . . use of the armed forces," 10 U.S.C. § 2808(a).  It

does not authorize deploying the armed forces for purposes of engaging in a domestic, non-

military construction project.  A non-military construction project does not become an authorized

exercise of the statute simply by deploying troops to do the work—that approach would turn the statute on its head.

38.     In addition, the statute defines "military construction" in subsection (a) of 10 U.S.C. § 2801 as a project "carried out with respect to a military installation." And "military installation" refers to "a base, camp, yard, center, or other activity under the jurisdiction of the Secretary of a military department."

39.     Decades of experience demonstrate the meaning of "military installation" for the purposes of 10 U.S.C. § 2808.  Presidents have twice invoked military construction authority pursuant to 10 U.S.C. § 2808 and the NEA. President George H.W. Bush invoked the pair of statutes during Operation Desert Shield, and President George W. Bush invoked them in the aftermath of the terrorist attacks of September 11, 2001. According to the Congressional Research Service, "from 2001 through 2014, the [Department of Defense] funded a total of 18 projects under 10 U.S.C. § 2808, after the President invoked the NEA, with a combined value of $1.4 billion. With the exception of one project dating from December 2001 related to security measures for weapons of mass destruction at sites in the continental United States, most of the projects took place at overseas locations."[6] Military construction projects funded under the NEA have included, *inter alia*, barracks and airport runways in Afghanistan and courthouse security at the U.S. Naval Base at Guantanamo Bay.

   ## 2.     10 U.S.C. § 284

40.     Congress authorized and funded the Department of Defense to support certain counterdrug activities under 10 U.S.C. § 284. Within limits, one type of support enumerated in

---

[6] Michael J. Vassalotti & Brendan W. McGarry, *Military Construction Funding in the Event of a National Emergency*, Congressional Research Service (Jan. 11, 2019), available at https://bit.ly/2Ipi3zi.

section 284 is "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7).

41.      In enacting 10 U.S.C. § 284, Congress authorized the Defense Secretary only "to provide *support*" for the counterdrug activities of other agencies, not to undertake a major construction project (emphasis added). The plain language of the statute makes that clear. Subsection (h)(1)(B) requires the Defense Secretary to give Congress fifteen-days' written notice before providing such support, including "a description of any *small scale construction project* for which support is provided" (emphasis added). The statute defines "small scale construction" as "construction at a cost not to exceed $750,000 for any project." Congress would not have required a description of "any small scale construction" projects if it was, at the same time, authorizing support for $2.5 billion of fences. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes.").

42.      The scale of the "[c]onstruction of road and fences . . . to block drug smuggling corridors across international boundaries" authorized by 10 U.S.C. § 284 must also be understood relative to the scale of the other types of "support" authorized by the statute. Those include providing maintenance and repair of equipment, transporting personnel, and "establish[ing] (including an unspecified *minor* military construction project) and operat[ing] bases of operations or training facilities for the purpose of facilitating counterdrug activities." 10 U.S.C. § 284(b)(4) (emphasis added). None of these are on the scale of constructing a multi-billion-dollar border wall.

43.      Furthermore, the entirety of the 1,954-mile southern border does not constitute a "drug smuggling corridor" under 10 U.S.C. § 284(b)(7). The term "corridor" refers to a passageway. At most, section 284(b)(7) allows support for up to $750,000 of fencing along

specific passageways across which drug smuggling is known to occur, not an extensive barrier along the international border.

### 3. The Treasury Department's Forfeiture Fund

44.     The President has announced that up to $601 million will be drawn from the Department of the Treasury Forfeiture Fund to fund the border wall.

45.     Congress, however, placed clear restrictions on the use of that Fund. Those restrictions are found in 31 U.S.C. § 9705. There, Congress expressly limited the Secretary of Treasury's use of the Treasury Forfeiture Fund to specific purposes, including maintaining the fund itself, paying overtime and salaries of law enforcement officers, paying informants, and upgrading law enforcement vehicles.

46.     Construction projects are not among the authorized uses of the Treasury Forfeiture Fund.

## FACTUAL ALLEGATIONS

A.     **After extensive debate, Congress has enacted, and the President has signed into law, appropriations for a limited amount of funding for border construction.**

47.     Since at least 1996, Congress has exercised its legislative authority with respect to issues surrounding the southern border and, more specifically, has limited the funding and construction of fencing along the border.

48.     In 1996, for example, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (Pub. L. 104-208, div. C), section 102 of which authorized no more than $12 million for construction of fencing and road improvements near the San Diego, CA border. IIRIRA Section 102(b)(4) also sets out express limitations on mileage, stating that "the Attorney General shall provide for the construction *along the 14 miles* of the international land border of the United States, starting at the Pacific Ocean and extending

15

eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences." (emphasis added).

49.     In 2006, Congress amended Section 102(b) of IIRIRA (Pub. L. 104 208; 8 U.S.C. § 1103) to mandate fencing in specific and geographically-defined places. For example, Congress mandated fencing extending only 10 miles west and 10 miles east of the Tecate, CA port of entry; 10 miles west of the Calexico, CA port of entry and five miles east of the Douglas, AZ port of entry; five miles west of the Columbus, NM port of entry and 10 miles east of the El Paso, TX port of entry; five miles northwest of the Del Rio, TX port of entry and five miles southeast of the Eagle Pass, TX port of entry; and 15 miles northwest of the Laredo, TX port of entry to the Brownsville, TX port of entry.[7]

50.     In 2007, Congress passed the Department of Homeland Security Appropriations Act of 2007 (H.R. 5441), appropriating $1,187,565,000 "for customs and border protection fencing, infrastructure, and technology."

51.     In 2008, Congress passed the Consolidated Appropriations Act of 2008 (Pub. L. 110-161, div. E), appropriating $1,225,000,000 for customs and border protection fencing, infrastructure, and technology, and directing the Secretary of Homeland Security to "construct reinforced fencing" only "where fencing would be most practical and effective."

52.     In 2018, Congress enacted the Consolidated Appropriations Act (H.R. 1625), again expressly setting limits as to both money and miles. Section 230 of this Act limited border funding to $1,571,000,000, for "[p]rocurement, [c]onstruction and [i]mprovements" along the southern border, to be distributed in specific amounts for specific projects at specific locations.

53.     Congress rejected numerous other proposed pieces of legislation for more funding for a border wall.

---

[7] Secure Fence Act of 2006, Pub. L. 109-367, §3 (2006).

54.     In early 2019, the President asked Congress to appropriate $5.7 billion for constructing border barriers.  He also asked Congress to approve border barrier construction in any location and using any design.  Congress considered these proposals in the "End the Shutdown and Secure the Border Act" (Senate Amendment 5 to H.R. 268), but the Senate rejected them.

55.     Instead, Congress enacted the 2019 Consolidated Appropriations Act (H.J. Res. 31) which provides $1.375 billion for "the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector," per Section 230. The Act does not provide any funding for fencing in or within hundreds of miles of El Paso, Texas.  The Act also restricts the fencing to that which uses a previously developed design, prohibits construction of fencing within several wildlife areas along the southern border, requires DHS and local officials to reach mutual agreement about the design and alignment of physical barriers within each border city, and provides for a notice and comment period.

56.     President Trump signed this bill into law on February 15, 2019.

**B.     After signing the Consolidated Appropriations Act, the President issued a Proclamation and Statement declaring an emergency and directing the government to spend additional funds on border fencing.**

57.     On the same day the President signed the Consolidated Appropriations Act, February 15, 2019, he also issued the Proclamation along with an accompanying White House Statement setting forth the authority under which he purported to act. The Proclamation seeks to declare a national emergency under the National Emergencies Act and to direct federal agencies to take action at the southern border under certain specified statutes. The White House Statement issued with the Proclamation further states that $6.7 billion additional funds "will be available to build the border wall" upon declaration of an emergency. This includes $601 million from the Treasury Forfeiture Fund; up to $2.5 billion under the Department of Defense funds transferred

from Support for Counterdrug Activities (10 U.S.C. § 284); and up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (10 U.S.C. 2808).  The White House Statement indicates that "[n]ew projects could include: new levee wall, new and replacement primary pedestrian barrier, new vehicle-to-pedestrian barrier, and new secondary barrier."[8]

58.     The Proclamation does not acknowledge the 2019 Consolidated Appropriations Act the President signed the very same day he issued the Proclamation.  Nor does it acknowledge other specific Acts of Congress, set forth above, which govern construction of border fencing.

**C.     The Proclamation does not meet the NEA's definition of "emergency."**

59.     As set forth above, the NEA permits the President to act in unforeseen situations that need action so immediate that only the President is capable of ordering it. That is the opposite of what the President has done here.

60.     As alleged, *supra*, Congress has acted repeatedly to make policy and to appropriate funds for construction on the southern border over a sustained period of time. And the President has repeatedly acknowledged that the situation at the border is not unforeseen and that he was not compelled to act with immediacy to respond to it.

61.     The President and Congress have disagreed over how to address immigration and drug enforcement issues at the southern border for the entirety of the President's time in office. President Trump campaigned on the promise of building a wall along the length of the southern border that Mexico would pay for. During the first two years of his presidency, after it became clear that Mexico would not be paying for the promised border wall, Congress declined to grant

---

[8] Statement, White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/.

the President's full requests for funding for new border barriers, notwithstanding that the President's party controlled both chambers of Congress.

62.    For fiscal year 2017, Congress voted to appropriate $341 million to DHS to replace existing barriers on the southern border.[9] For fiscal year 2018, Congress voted to appropriate $1.57 billion to build or replace fencing on the southern border.[10]

63.    The disagreement came to a head prior to the 2018 midterm elections and escalated after Democrats won control of the House of Representatives (but before the new, Democratic-controlled House, was sworn in). As part of his proposed 2019 budget for DHS, President Trump twice requested that Congress appropriate $1.6 billion for the construction of 65 miles of new border wall.[11] Congress three times rejected that request: twice before the 2018 midterm elections, when both houses of Congress were controlled by Republicans, and once after, when Democrats won control of the House of Representatives.

64.    There was no absence of action by Congress on border security policy.  There was no absence of action by Congress on funding for border fences.  And there was no lack of time for Congress to act.

65.    In December 2018 and January 2019, the President refused to sign a budget resolution that did not contain funding for construction of a border wall, resulting in a 35-day partial government shutdown.  The shutdown ended when the President agreed to sign a three-week continuing resolution with $1.6 billion in appropriations for border security, but no funds for new border wall construction.

---

[9] Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, 131 Stat. 433-34 (2017).
[10] Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, H.R. 1625—269 (2018).
[11] *See, e.g.*, Office of Mgmt. & Budget, *An American Budget: Budget of the U.S. Government—Fiscal Year 2019* (Feb. 12, 2018), available at https://bit.ly/2nTPE7s.

66.     On January 4, 2019, in the midst of the budget standoff, the President began threatening to reframe his policy dispute with Congress as an "emergency." On that day, the President asserted that if Congress did not give him the border wall funding he wanted, he would declare a national emergency as an alternative. He called the Proclamation "another way of doing it" if he could not achieve his agenda through "a negotiated process": "We can call a national emergency because of the security of our country, absolutely. No, we can do it. I haven't done it. I may do it. I may do it, but we could call a national emergency and build [the wall] very quickly, and it's another way of doing it. But if we can do it through a negotiated process, we're giving that a shot."

67.     Thereafter, on multiple occasions over the ensuing six weeks, the President publicly asserted that a he had the power to declare an emergency.  But he acknowledged both in his words and his actions that there was no immediate need to declare one, saying at various times that he would not do it "right now," or "so fast." Instead, the President characterized his claimed emergency power as a backup plan "if I can't make a deal with people [in Congress] that are unreasonable." This posture stands in direct contradiction with the purpose of the NEA, which is to empower the President to act when, because of the unforeseen nature of the emergency, Congress lacks the time to do so.

68.     Following a series of warnings over several weeks, the President finally declared an emergency at the southern border after signing the Consolidated Appropriations Act, which limited appropriations for border fencing to a lower amount and fewer miles than he wanted for construction of a border wall. During his announcement of his Proclamation declaring an emergency, and after recounting his disagreement with Congress over funding for a border wall, the President said that "I didn't need to do this."

69.     The President's Proclamation marks the first time a President has used the NEA to contravene the clearly expressed will of Congress on a policy and appropriations matter.

70.     The President's Proclamation states that the "emergency" at the southern border derives from the fact that the southern border is "a major entry point for criminals, gang members, and illicit narcotics." But this problem is not new, and in fact, most illegal drugs enter the country through legal ports of entry.[12] The President also cites "the problem of large-scale unlawful migration through the southern border," but acknowledges that it is "long-standing." Indeed, illegal crossings at the southern border have declined dramatically over time. He also cites a "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending." However, most migrants come to the border to present themselves for asylum, which they have a legal right to do under 8 U.S.C. § 1158(a). The Proclamation is thus based on false factual predicates.

71.     In addition, there is nothing unforeseen about the "emergency" the President's Proclamation describes at the southern border. Even if it were true, there is nothing unforeseen about the border being a "major entry point for criminals, gang members, and illicit narcotics." Moreover, the Proclamation describes "unlawful migration" as a "long-standing" problem.

72.     A President's wish for more money to build a border wall, based on decades-old issues, does not meet the definition of an emergency. And construction, in whatever form, is not an "immediate" solution to the longstanding "emergency" the President has discussed since he announced his candidacy in 2015.

---

[12] Alan Gomez, *Fact-Checking Trump Officials: Most Drugs Enter US Through Legal Ports of Entry, Not Vast, Open Border*, USA TODAY (Jan. 16, 2019), https://bit.ly/2GUa0I5.

73.     Furthermore, an "emergency" is not something that is addressed after a purposeful weeks-long delay.

74.     The President issued his Proclamation six weeks after first suggesting that he could use a national emergency for funding that Congress decided to withhold. During that time, Congress voted multiple times not to fund a border wall.

75.     President Trump's treatment of an emergency Proclamation as a back-up plan to be invoked only if Congress rejected his policy proposal, along with his usurpation of Congress's role on an appropriations issue, establish that the President's Proclamation does not address an "emergency" within the meaning of the NEA and that this Court should enjoin its implementation.

**D.     The Proclamation directs activities that are not authorized by the statutes it invokes.**

76.     Even if the Proclamation did lawfully invoke the NEA, the statutes and authorities cited in the Proclamation and White House Statement do not permit construction of a border wall.

77.     The principal funding statute cited in the Proclamation is 10 U.S.C. § 2808.  But this statute does not permit the President to fund border-barrier construction that Congress has not authorized.  To begin, because the 2019 Consolidated Appropriations Act, like the 2018 Act, specifically addresses border fencing, section 2808 simply does not apply.

78.     Moreover, section 2808 does not authorize border-barrier construction even if there were a bona fide emergency.  As set forth above, in the event of a declaration of an emergency that (1) "requires use of the armed forces," this statute permits the Secretary of Defense to (2) "undertake military construction projects . . . that are necessary to support such use of the armed forces."

79.     The Proclamation does not satisfy either of these two statutory requirements for invoking section 2808.  First, the Proclamation itself counters the claim that an emergency "requires use of the armed forces."  The Proclamation describes criminal law and humanitarian challenges, as well as long-standing civilian problems on the border—but does not articulate any situation that requires the use of the armed forces.

80.     Second, the construction of a border wall does not qualify as "military construction" as defined by subsection (a) of 10 U.S.C. § 2801, which describes "military construction" as a project "carried out with respect to a military installation." And in subsection (c)(4), "military installation" refers to "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."  But "[a] border wall, by contrast, is a civilian structure to be manned by civilian authorities to perform a civilian mission. The troops would not be creating a military fortification for military use."[13]

81.     The non-military nature of this construction project is reinforced by two decades of experience. Since 1996, hundreds of miles of southern border barriers have been built without any use of the armed forces. Likewise, policing the southern border has been the function of the Department of Homeland Security, and prior to that the Immigration and Naturalization Service, not the military.[14]

82.     Beyond that, the construction of a border wall is not (in the language of section 2808) "necessary to support [the required] use of the armed forces."  The Proclamation turns the statute on its head, seeking to mobilize the armed forces to engage in a civilian construction

---

[13] David French, *Trump's Emergency Declaration Is Contemptuous of the Rule of Law*, NATIONAL REVIEW (Feb. 15, 2019), https://bit.ly/2TWwY56.
[14] Federation for American Immigration Reform, *The Current State of the Border Fence*, (Jan. 2017), https://www.fairus.org/issue/national-security/current-state-border-fence.

project; not to engage in a construction project necessary to support the mobilization of the armed forces.

83.     Section 284 also does not permit using the funds Congress has designated for counterdrug programs for border-barrier construction.  As explained above, this statute only allows DOD to provide *support* for designated small-scale construction projects—not to fund its own large-scale construction.

84.     The Treasury Forfeiture Fund, invoked in the White House Statement, also cannot be used to fund barrier construction at the border.  The statute governing the Fund articulates certain lawful purposes—but construction is not one of them. 31 U.S.C. § 9705.

**E.     The Issuance of the Proclamation Injures Plaintiffs El Paso County and the BNHR.**

85.     The President's Proclamation, through its declaration of an emergency on the border and invocation of statutes allowing military mobilization, causes immediate and concrete injury to border communities, including Plaintiffs.

86.     During the latter half of the Twentieth Century, El Paso County, anchored by the City of El Paso, grew as a population and economic center. In addition to housing Fort Bliss, it was a center for copper mining, oil refining, and the garment industry. In the 1990s, the economy of the region underwent a significant shift with the signing of the North American Free Trade Agreement. Lower-wage manufacturing labor across the border displaced low-wage manufacturing, such as textiles, in El Paso County. El Paso County's services industry grew in its place. According to the Federal Reserve Bank of Dallas El Paso Branch, "The growth of the service sector . . . more than offset the decline in manufacturing employment."[15]

---

[15] Jesus Cañas, *A Decade of Change: El Paso's Economic Transition of the 1990s*, EL PASO BUSINESS FRONTIER (2002), https://bit.ly/2BLqhMh.

87.     El Paso County and the City within it emphasize tourism as a local economic driver and have various programs for the explicit purpose of attracting visitors to El Paso.  Since 2016, the County has invested $1,137,582 in tourist promotion, which includes promoting the historic Mission Trail. For that same time period, El Paso County has also spent $13,003,405 in operating the El Paso Coliseum, which, located approximately half a mile from the border, draws visitors from all over the country for various entertainment acts. The results of the County's promotion of tourism have been impressive. The number of people visiting El Paso has steadily increased since 2014.[16]  This has led to an increase in the number of jobs in the region dedicated to the travel and hospitality industries, as well as increases in government revenues stemming from tourism.

88.     The Rio Grande Council of Governments ("RGCOG"), which is an association of local governments established under state law that includes El Paso County, has recognized that: "The travel industry makes a substantial contribution to local government tax revenue across the [West] Texas counties. Local tax revenue is collected by counties and municipalities, as levied on applicable travel-related businesses and includes the transient lodging and local sales taxes. The economic impact of tourism in most [West] Texas Counties has increased consistently from 2010 to 2015."[17]  This increase includes El Paso County.

89.     A central driver of El Paso County's success has been the remarkable safety of the community, and just as importantly, the national perception of El Paso County and its environs as a safe destination to live, work, and travel. The City of El Paso, located within El Paso County, has been recognized as one of the top 10 safest cities in the country for two consecutive

---

[16] Michael Ikahihifo, *Tourism in El Paso Is on the Rise*, KFOX14 (Apr. 12, 2018), https://bit.ly/2GC2PVB.
[17] Rio Grande Council of Governments, *West Texas Economic Development District: 2016-2020 Comprehensive Economic Development Strategy* (Jan. 27. 2017), available at https://bit.ly/2NiIeWX.

years based on its low rates of violent crime and property crime.[18] El Paso's murder rate is approximately half that of the national average[19] and much lower than that of other major cities.[20]

90.     Although the President has claimed that El Paso's crime rate dropped when border barriers were constructed in El Paso, that is not true. Violent crime in the City of El Paso has fallen steadily since the mid-90s, mirroring crime trends around the country. Even while this trend has been national, El Paso's crime rates have been substantially lower than other areas its size.[21]

91.     These conditions have not just allowed for growth in tourism and revenue in recent years in El Paso County; they are the foundation upon which El Paso County has already planned for future growth. In 2017, the RGCOG's Board of Directors, which also serves as the West Texas Economic Development District ("WTEDD"), updated the 2016-2020 Comprehensive Economic Development Strategy ("CEDS") for the WTEDD. This Strategy lays out El Paso County's economic development plans for the next several years and informs County decision-making and local economic planning. It projects that the region "will become a preferred area for businesses creation and relocation looking for," among other things, "[h]igh quality of life for new and existing residents."[22] It bases this projection, in part, on an assessment that one of the "strengths" of the region is "[a]mple availability of land at affordable prices," and that an "opportunity" for the region is the "[i]ncrease[d] awareness of the region's strong

---

[18] Press Release, City of El Paso, *City of El Paso Named Second Safest City in America* (Aug. 2017), available at https://bit.ly/2TZkGsX.
[19] Jane C. Timm, *Fact Check: Trump Claims a Wall Made El Paso Safe. Data Shows Otherwise*, NBC NEWS (Feb. 11, 2019), https://nbcnews.to/2BxGyo2.
[20] Ames Grawert and Cameron Kimble, *Crime in 2018: Updated Analysis*, Brennan Center for Justice (Dec. 2018), https://bit.ly/2sWnQlh.
[21] *Id*.
[22] Rio Grande Council of Governments, *supra* note 17.

assets."[23] But it warns of several weaknesses that could impair growth, including "[n]egative perceptions of low quality and high crime," "[l]osses due to inefficiency in border crossings," and "[t]ourism slumps." And most notably and especially relevant to this complaint, it cites as a "threat" to future growth: "[p]erception of unrest along the Mexico border."[24]

92.     Prior to issuance of the Proclamation, President Trump's messages about El Paso were mixed.  Most dominantly, he has repeatedly warned of the crisis levels of drugs, gang violence, and crime taking place in border communities like El Paso. Yet he also has said that while El Paso was once one of the most dangerous places in the country, it is "one of America's safest cities now."[25]  He attributed that supposed change to the construction of border barriers within El Paso, but that is not true. El Paso was a low-crime area even before sections of wall were added in the 2000s.  When El Pasoans attempted to fact check the President's misleading claims about their region by pointing out that El Paso has long been one of the safest places in America, the President responded by accusing El Paso of trying to doctor crime data, saying at a February 11, 2019 political rally in El Paso: "they're full of crap."[26]

93.     The President then superseded this dispute with his emergency Proclamation, which described the southern border where both El Paso County and the Border Network for Human Rights are located as the site of a "humanitarian crisis that threatens core national security interests and constitutes a national emergency."[27] He went on to use the full force of the federal government to officially declare that "[t]he southern border is a major entry point for criminals, gang members, and illicit narcotics," and, contrary to his statements at the El Paso

---

[23] *Id.*
[24] *Id*.
[25] President Donald J. Trump, State of the Union Address (Feb. 5, 2019), available at https://bit.ly/2BmeYdo.
[26] Justin Wise, *Trump: People Saying Wall Hasn't Made Difference in El Paso Are 'Full of Crap'*, THE HILL (Feb. 11, 2019), https://bit.ly/2SJydar.
[27] Proclamation, *supra* note 1.

rally, that "the situation has worsened in certain respects in recent years." The White House issued a Statement calling the area "highly dangerous."[28] The President declared that the situation at the border where plaintiffs are located is so bad that it requires a militarization effort and the deployment of the Armed Forces.

94.     The President's Proclamation and the activity it directs by its very issuance create the negative perception the County has sought to counter. In particular, the Proclamation is an official government statement that the southern border is the site of crisis levels of crime and low quality of life.

95.     The President's re-appropriation of billions of dollars of funds to militarize the region sends an immediate message to businesses or travelers thinking of spending time or money in El Paso County that it will be a far less attractive place to work, visit, or live.

96.     Because the President's Proclamation has, by its very signing, materialized the weaknesses and threats identified by El Paso County as to what would derail future economic growth in its strategic economic plan for 2016-2020, the County must now repurpose resources to respond to the President's action, plan for revenue changes, and devote resources that would have gone to other activities and services for its residents to this planning and the actions it requires. County officials have already devoted significant amounts of human resource hours to planning a response to the Proclamation and its effects on the County's residents and economy.

97.     In addition, Plaintiff El Paso County is injured by the Proclamation's frustration of the County's national campaign to promote El Paso's history and culture and its ongoing efforts to attract visitors to the County who will spend money and engage in commerce. People all over the country are deterred from coming to El Paso County by the presidential designation of a national emergency there.

---

[28] White House Statement, *supra* note 3.

98.    Plaintiff El Paso County is further injured by the Proclamation's mandate for construction and the deployment of troops to the border. El Paso County relies on its geographic location, local history, environment, and natural beauty to attract development. El Paso County's resources and development efforts are harmed by disruptive construction, seizure of private property, noise and air pollution, and the blocking of aesthetic views of the local scenery.

99.    These collective harms, including reputational harm to El Paso County, result in a decline in revenue for the County, causing damage to the County fisc.

100.    During the period in which El Paso County was experiencing both a decline in crime and growth in economic activity and population, various community organizations were central players in the region's turnaround. One of those organizations is Plaintiff Border Network for Human Rights.

101.    Plaintiff BNHR provides a variety of services and programs for families living near the southern border. These services include working with the community and local and federal law enforcement to promote public safety, informing residents of their civil rights, and conducting campaigns to integrate residents of El Paso and neighboring communities into city government, public safety departments, and the local economy.  BNHR has devoted and continues to devote substantial resources to advocacy opposing additional construction of border barriers and militarization of the border in order to protect the interests of BNHR as an organization and of its members.

102.    The Proclamation's mandate for construction and the deployment of troops to the border injures BNHR in at least three ways.  First, it has forced BNHR to divert organizational resources from its normal programming to respond to the President's Proclamation. In the aftermath of the President's Proclamation, BNHR has been forced to spend resources responding to the consequences of the Proclamation, including counseling and responding to concerns from

members about the effects of the Proclamation on their well-being, their property and rights, and their opportunities to engage in public advocacy to mitigate the damage to BNHR members.  In addition, BNHR is shifting and spending resources to recruit and train attorneys to handle the increase in incoming complaints and concerns that the Proclamation is generating among its members. The demand for these resources is causing BNHR to divert resources from two programs that are central to its mission.  One is BNHR's immigration reform advocacy campaign.  The other is BNHR's annual Hugs Not Walls event, which aims to build trust between the community and law enforcement, including border patrol. For years, border patrol granted BNHR a permit to reunite families—for a day—along the Rio Grande canal. Due to the Proclamation and the diversion in resources it is requiring, BNHR has been forced to cancel the event for 2019. The Proclamation, therefore, has caused the waste of both human and monetary resources that BNHR spent in preparation for upcoming Hugs Not Walls events.

103.    Second, the Proclamation's mandate for construction and the deployment of troops to the border injures BNHR's organizational mission.  As alleged above, the Proclamation is impairing BNHR's key programs of immigration reform advocacy and initiatives to build trust and engagement between law enforcement and community members.  The Proclamation has stigmatized BNHR's community members, reducing their ability and willingness to cooperate with local and federal law enforcement.  This stigmatization frustrates BNHR's mission and campaigns, and increases the public safety risk for its members.  And the President's order that additional Armed Forces are necessary at the border is requiring BNHR to prepare and plan for how it will achieve its mission of building trust between its members and law enforcement when it now expects an influx of law enforcement and military personnel from outside the community with whom it will need to start its mission-based activities anew.

104.    Third, the Proclamation's mandate for border wall construction and deployment of troops harms BNHR's member families' quality of life by creating public safety issues and high levels of noise and other forms of pollution from military and construction activity.  The Proclamation and wall construction also impair BNHR members' ability to enjoy the natural environment in which they have made their homes.  And lastly, the Proclamation and accompanying White House Statement in intent and effect have stigmatized immigrant communities, heightening racial tensions and causing fear among BNHR's member families. The President's Proclamation and pledge to militarize the area because of threats he claims are caused by immigrants at the border have caused BNHR's member families to suffer.  They reasonably fear race-based violence towards them as a result of the false claims on which the Proclamation is based.  They also reasonably fear an influx of law enforcement with whom they have not built up the levels of trust that BNHR has worked for years to cultivate in the El Paso community. The President's Proclamation will thus put BNHR's member families at greater risk of rights violations. As a result of all of this, they fear increased public safety risks for children and for the community, which they must takes steps now to mitigate unless and until the President's unlawful action is stopped.

105.    For at least these reasons, the Proclamation has caused immediate and concrete injury to El Paso County and to BNHR. That injury would be remedied by a declaration from this Court that the President's Proclamation is unlawful and by an order from this Court enjoining the Proclamation from taking any effect or federal officials from acting upon it**.**

## CLAIMS FOR RELIEF

### COUNT I

**(*Ultra Vires* Action in Violation of Federal Funding Statutes, the National Emergencies Act, 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705)**

106.    The foregoing allegations are realleged and incorporated by reference herein.

107.    Congress has enacted a series of specific statutes that limit the location, type, and funding of additional fencing at the southern border. In particular, Congress enacted and the President signed into law the 2019 Consolidated Appropriations Act, which specifically limited the level and nature of appropriations for border fencing, the location of new fencing, and the design of new fencing.  The Proclamation and accompanying White House Statement direct construction of a wall that violates each of these limits on new border fencing appropriations, locations, and design. As such, they are *ultra vires*.

108.    The Defendants' *ultra vires* invocation of general statutes to override the relevant and specific limits in the Consolidated Appropriations Act inflicts ongoing harm upon the Plaintiffs.

109.    The Defendants' invocation of the NEA to justify spending that Congress refused to authorize is also *ultra vires*.

110.    The Defendants' invocation of 10 U.S.C. § 2808 to undertake military construction—*i.e.*, a border wall—at the U.S.-Mexico border is *ultra vires* because it is not a construction project that supports the use of the armed forces and is it not "military construction."

111.    The White House announced on February 15, 2019, that it would also fund $2.5 billion of additional wall pursuant to 10 U.S.C. § 284. But $2.5 billion in funding is not "support" under that statute, which permits only support of small-scale construction projects, not to exceed $750,000, such as fencing along specific "drug smuggling corridors."

112.    The President also cannot fund $601 million of the border wall from the Department of the Treasury Forfeiture Fund because 31 U.S.C. § 9705 restricts use of those funds to specified purposes, none of which include construction projects, much less projects for which there have been appropriations in limited amounts under other statutes.

113.    The Proclamation is also *ultra vires* because it exceeds the President's authority to declare a national emergency under the NEA.  The NEA provides that "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency." 50 U.S.C. § 1621(a). An "emergency" must be an unforeseen combination of circumstances that calls for immediate action. The President's declaration of emergency does not meet this or any other reasonable definition.

114.    Plaintiffs have a right of action to redress unlawful action by the President that exceeds his statutory authority.

115.    Defendants' *ultra vires* violation of the NEA and specific and general funding statutes inflicts ongoing harm upon the Plaintiffs.

## COUNT II
### (Article I, Section 8, Clause 1—Spending Clause)

116.    The foregoing allegations are realleged and incorporated by reference herein.

117.    Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires*.

118.    The Constitution grants to Congress the exclusive power to spend money on behalf of the United States and the exclusive power to enact and pass laws in accordance with the general welfare of the United States.

119.    Article I, Section 8, Clause 1 provides "[t]he Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

120.    President Trump's Proclamation violates the Spending Clause and is *ultra vires* by misusing the NEA and other statutes to override Congress's express refusal to pass legislation funding the very physical barrier at the southern border that President Trump now seeks to build.

121.    Defendants' violation of the Spending Clause inflicts ongoing harm upon the Plaintiffs.

**COUNT III**
**(Article I, Section 9, Clause 7—Appropriations Clause)**

122.    The foregoing allegations are realleged and incorporated by reference herein.

123.    Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires*.

124.    The Constitution grants to Congress the exclusive power to spend money on behalf of the United States and to designate the purpose for which the money shall be spent.

125.    Article I, Section 9, Clause 7 provides "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

126.    President Trump's Proclamation violates the Appropriations Clause and is *ultra vires* by misusing the NEA and other statutes to override Congress's express refusal to pass legislation appropriating funds very physical barrier at the US-Mexico border that President Trump now seeks to build.

127.    Defendants' violation of the Appropriations Clause inflicts ongoing harm upon the Plaintiffs.

## COUNT IV
### (Articles I, II, Article III – Separation of Powers)

128.    The foregoing allegations are realleged and incorporated by reference herein.

129.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful

official action that is *ultra vires*.

130.    The Spending Clause grants Congress the "Power To lay and collect Taxes . . . to

pay the Debts and provide for the common Defence and general Welfare of the United States."

U.S. Const. art. I, § 8, cl. 1.

131.    The Appropriations Clause of the U.S. Constitution provides that "No Money

shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S.

Const. art. I, § 9, cl. 7.

132.    The Constitution grants the President neither such power, per established

separation of powers principles. *See, e.g.,* U.S. Const. art. II, § 3.

133.    Defendants have purported to exercise powers that Congress repeatedly and

specifically withheld, and in direct transgression of specific limits imposed by validly enacted

statutes, thereby violating the constitutional principle of Separation of Powers.

134.    Defendants' violation of the Separation of Powers inflicts ongoing harm on the

Plaintiffs.

## COUNT V
### (Violation of the Administrative Procedure Act Through Violations of the Constitution, the NEA, 10 U.S.C. § 2808, and Arbitrary and Capricious Action)

135.    The foregoing allegations are realleged and incorporated by reference herein.

136.    The APA requires courts to hold unlawful and set aside any agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary

to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C). Defendants have

acted contrary to the Spending and Appropriations Clauses of Article I of the United States Constitution, the NEA, and the statutes purportedly authorizing action under the Proclamation.

137.    Further, upon information and belief, in enacting and implementing the President's Proclamation, Defendants have acted arbitrarily and capriciously. Among other arbitrary actions and omissions, Defendants have not explained the rational nexus between construction of the border wall and any "emergency" conditions that would be remedied immediately.

138.    Through their actions as described in this Complaint, Defendants have violated the substantive requirements of the APA. Defendants' violations inflict ongoing harm upon the Plaintiffs.

## COUNT VI
### (The Take Care Clause)

139.    The foregoing allegations are realleged and incorporated by reference herein.

140.    The Proclamation violates the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3, cl. 5.  The Supreme Court has called this duty the President's "most important constitutional duty." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992).

141.    This duty of "faithful" execution of the laws imposes on the President a duty to act in good faith in his execution of the laws.  That encompasses an obligation to act honestly— in good faith—in rendering declarations, determinations, and findings that he may only render because of a delegation of authority from Congress.

142.    The President has not acted in good faith in his declaration that there exists a national emergency of the type described in the NEA.  President Trump has access to information sources that renders in bad faith his repeated reliance on demonstrably false claims to support a declaration of a national emergency and to support other findings or determinations.

143.    The President has not acted in good faith in rendering his determination that the purported national emergency "requires" the use of the military.  President Trump's public statement that "I didn't need to" declare a national emergency shows that his purported determination that the situation at the southern border "requires" use of the armed forces is not made in good faith.  Moreover, by declaring an emergency as an express response to legislation enacted by Congress, that specifically limits border fence funding, President Trump has not acted in good faith.

144.    The President's issuance of the Proclamation in violation of the duty to faithfully execute the laws inflicts ongoing harm on Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

A.    Declare that the President's Proclamation of February 15, 2019 is unauthorized by, and contrary to, the Constitution and laws of the United States;

B.    Enjoin Defendants from taking any action pursuant to the Proclamation, the NEA, or any statutes cited in the Proclamation or the White House Statement issued February 15, 2019; and

C.    Award such additional relief as the interests of justice may require.

Dated: February 20, 2019

By: */s/ John C. Padalino*
John C. Padalino (Texas State Bar No. 24041638)
401 Congress Avenue, Suite 1540
Austin, Texas 78701
Telephone: (512) 596-2944
Facsimile: (512) 596-2944
john@padalinolaw.com

Kristy Parker (*Pro hac vice* forthcoming)
Justin Florence (*Pro hac vice* forthcoming)
Erica Newland (*Pro hac vice* forthcoming)
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Avenue., NW, #163
Washington, DC 20006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428

justin.florence@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Deana K. El-Mallawany (*Pro hac vice* forthcoming)
THE PROTECT DEMOCRACY PROJECT, INC.
10 Ware Street
Cambridge, MA 02138
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
deana.elmallawany@protectdemocracy.org

Stephanie Llanes (*Pro hac vice* forthcoming)
THE PROTECT DEMOCRACY PROJECT, INC.
222 Broadway, 19th Floor
New York, NY 10038
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
stephanie.llanes@protectdemocracy.org

David Bookbinder (*Pro hac vice* forthcoming)
NISKANEN CENTER
820 First Street, NE
Washington, DC 20002
Telephone: (301) 751-0611
dbookbinder@niskanencenter.org

Richard Mancino (*Pro hac vice* forthcoming)
Shaimaa M. Hussein (*Pro hac vice* forthcoming)
Matthew Dollan (*Pro hac vice* forthcoming)
Samantha G. Prince (*Pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
RMancino@willkie.com
SHussein@willkie.com
MDollan willkie.com
SPrince@willkie.com

Stuart Gerson (*Pro hac vice* forthcoming)
EPSTEIN BECKER GREEN
1227 25th Street, NW
Washington, DC 20037
Telephone: (202) 861-4180
Email: SGerson@ebglaw.com

Laurence H. Tribe (*Pro hac vice* forthcoming)
Carl M. Loeb University Professor and
Professor of Constitutional Law
HARVARD LAW SCHOOL*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767
Email: tribe@law.harvard.edu

*Affiliation noted for identification purposes only

*Counsel for Plaintiffs*