# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| EL PASO COUNTY, TEXAS, and <br><br> BORDER NETWORK FOR HUMAN RIGHTS, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, <br><br> PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense, <br><br> KEVIN McALEENAN, in his official capacity as Acting Secretary of Homeland Security, <br><br> TODD T. SEMONITE, in his official capacity as Commanding General United States Army Corps of Engineers <br><br> DAVID BERNHARDT, in his official capacity as Acting Secretary of the Interior, and <br><br> STEVEN T. MNUCHIN, in his official capacity as Secretary of the Treasury, <br><br> Defendants. | Civil Action No. 3:19-cv-66 <br><br><br> **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS
(continued)

**Page**

INTRODUCTION ................................................................. 1

STATEMENT OF UNDISPUTED FACTS ................................................. 3

    A.    For Decades, Congress Addresses Border Security.................................. 3

    B.    President Trump Makes a Border Wall His Signature Issue ................... 3

    C.    President Trump Shuts Down the Government for a Border Wall........... 4

    D.    President Trump Raises the Possibility of Declaring a National
    Emergency .................................................................. 5

    E.    Congress Passes the 2019 Consolidated Appropriations Act ................... 5

    F.    President Trump Declares a National Emergency and Announces a
    Plan to Fund a Border Wall ............................................... 6

    G.    Defendants Begin the Wall Construction Process ................................... 7

    H.    Proceedings ................................................................. 8

ARGUMENT ........................................................................ 8

    I.    PLAINTIFFS HAVE STANDING................................................ 9

        A.    El Paso County Has Standing ............................................ 10

        B.    BNHR Has Standing ..................................................... 16

    II.    THE PRESIDENT'S PROCLAMATION IS UNLAWFUL............................. 19

        A.    The Proclamation Exceeds the President's Authority Under the
        NEA ..................................................................... 19

        B.    If Read to Authorize the Proclamation, the NEA Is
        Unconstitutional.......................................................... 26

    III.    DEFENDANTS' USE OF FUNDS TO BUILD A BORDER WALL
    VIOLATES THE APPROPRIATIONS CLAUSE ................................... 30

        A.    Defendants' Wall-Funding Plan Violates the CAA............................ 33

        B.    Section 2808 Does Not Authorize Defendants' Border-Wall
        Expenditures ............................................................. 36

        C.    Section 284 Does Not Authorize Defendants' Border-Wall
        Expenditures ............................................................. 40

    IV.    DEFENDANTS' ACTIONS VIOLATE THE ADMINISTRATIVE
    PROCEDURE ACT........................................................... 44

        A.    Defendants' Determination to Spend Funds on a Border Wall
        Violates the APA ......................................................... 45

        B.    DOD's Fund Transfers Violate the APA ................................... 46

i

**TABLE OF CONTENTS**
(continued)

Page

V.    EVEN IF A PERMANENT INJUNCTION WERE NOT YET
      WARRANTED, PLAINTIFFS ARE ENTITLED TO A PRELIMINARY
      INJUNCTION ................................................................................................. 48

CONCLUSION ............................................................................................................. 50

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935)................................................................................29

*Alvarez v. Trump,*
    No. 19-00404 (Apr. 2, 2019) (D.D.C.) ...........................................19

*Ass'n of Cmty Organizations for Reform Now v. Fowler,*
    178 F.3d 350 (5th Cir. 1999) .................................................9, 16, 17

*Bauer v. Albemarle Corp.,*
    169 F.3d 962 (5th Cir. 1999) ..............................................................8

*Bennett v. Spear,*
    520 U.S. 154 (1997)...............................................................................15

*Bond v. United States,*
    564 U.S. 211 (2011)...............................................................................29

*Busic v. United States,*
    446 U.S. 398 (1980)...............................................................................33

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017)..............................................................15

*Chamber of Commerce v. Dep't of Labor,*
    885 F.3d 360 (5th Cir. 2018) .......................................................40, 43

*Cincinnati Soap Co. v. United States,*
    301 U.S. 308 (1937)...............................................................................31

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ......................................................23, 30

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000).................................................................................37

*Clinton v. City of New York,*
    524 U.S. 417 (1998)...........................................................................2, 30

*Crowell v. Benson,*
    285 U.S. 22 (1932).................................................................................24

*Duarte ex rel. Duarte v. City of Lewisville,*
    759 F.3d 514 (5th Cir. 2014) ...........................................................10

*Duncan v. Walker,*
    533 U.S. 167 (2001)...............................................................................43

**TABLE OF AUTHORITIES**
(continued)

<b>Page(s)</b>

*Foretich v. United States*,
    351 F.3d 1198 (D.C. Cir. 2003) ...................................................................11, 16

*Gladstone Realtors v. Village of Bellwood*,
    441 U.S. 91 (1979)........................................................................................14

*Greater Boston Television Corp. v. FCC*,
    444 F.2d 841 (D.C. Cir. 1970)......................................................................48

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977).......................................................................32

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..........................................................................16, 17, 18

*Industrial Union Dept., AFL-CIO v. American Petroleum Inst.*,
    448 U.S. 607 (1980)..........................................................................24, 25, 26

*INS v. St. Cyr*,
    533 U.S. 289 (2001)......................................................................................24

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928)......................................................................................26

*Jones v. Tex. Dep't of Criminal Justice*,
    880 F.3d 756 (5th Cir. 2018) ..........................................................................8

*K.P. v. LeBlanc*,
    627 F.3d 115 (5th Cir. 2010) ........................................................................13

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)......................................................................................44

*Louisiana State v. U.S. Army Corps of Engineers*,
    834 F.3d 574 (5th Cir. 2016) ........................................................................44

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992)..........................................................................9, 10, 26

*Marbury v. Madison*,
    5 U.S. 137 (1803)............................................................................................2

*McCardell v. Dep't of Hous. & Urban Devel.*,
    794 F.3d 510 (5th Cir. 2015) .....................................................................9, 13

*Meese v. Keene*,
    481 U.S. 465 (1987)..................................................................................11, 12

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)......................................................................................12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
 463 U.S. 29 (1983)................................................................................................48

*N.E. Associated Gen. Contractors v. City of Jacksonville*,
 508 U.S. 656 (1993)..............................................................................................14

*NCAA v. Governor of New Jersey*,
 730 F.3d 208 (3d Cir. 2013), *rev'd on other grounds sub nom.*, 138 S. Ct.
 1461 (2018)......................................................................................................11, 12

*Nevada v. Dep't of Energy*,
 400 F.3d 9 (D.C. Cir. 2005)..............................................................................33, 34

*NLRB v. CNN Am., Inc.*,
 865 F.3d 740 (D.C. Cir. 2017).............................................................................48

*OCA-Greater Houston v. Texas*,
 867 F.3d 604 (5th Cir. 2017)............................................................................17, 18

*Old Dominion Branch No. 496 v. Austin*,
 418 U.S. 264 (1975)..............................................................................................23

*OPM v. Richmond*,
 496 U.S. 414 (1990)..............................................................................................31

*Panama Refining Co. v. Ryan*,
 293 U.S. 388 (1935).....................................................................................27, 28, 29

*Planned P'hood of Gulf Coast Inc. v. Gee*,
 862 F.3d 445 (5th Cir. 2017) ............................................................................49, 50

*Plaut v. Spendthrift Farm, Inc.*,
 514 U.S. 211 (1995)................................................................................................2

*Ramah Navajo Sch. Bd. v. Babbitt*,
 87 F.3d 1338 (D.C. Cir. 1996).............................................................................45

*Roberts v. Sea-Land Servs., Inc.*,
 566 U.S. 93 (2012)................................................................................................41

*Salinas v. United States*,
 522 U.S. 52 (1997)................................................................................................42

*SBA List v. Driehaus*,
 573 U.S. 149 (2014)......................................................................................9, 13, 15

*Scott v. Schedler*,
 771 F.3d 831 (5th Cir. 2014) ............................................................................17, 18

*Sebelius v. Cloer*,
 569 U.S. 369 (2013)..............................................................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*SEC v. Sethi*,
   910 F.3d 198 (5th Cir. 2018) ...............................................................................8

*Taylor v. Bair*,
   414 F.2d 815 (5th Cir. 1969) .............................................................................21

*Tesfamichael v. Gonzales*,
   411 F.3d 169 (5th Cir. 2005) .............................................................................49

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .............................................................................11

*Thompson v. Cherokee Nation of Okla.*,
   334 F.3d 1075 (Fed. Cir. 2003)..........................................................................46

*U.S. Dep't of Navy v. FLRA*,
   665 F.3d 1339 (D.C. Cir. 2012).....................................................................30, 31

*UARG v. EPA*,
   573 U.S. 302 (2014)........................................................................................42, 43

*United States v. Bloom*,
   112 F.3d 200 (5th Cir. 1997) ...............................................................................8

*United States v. Foreman*,
   369 F.3d 776 (4th Cir. 2004) .............................................................................44

*United States v. Govt. of VI*,
   363 F.3d 276 (3d Cir. 2004)...........................................................................21, 22

*United States v. MacCollom*,
   426 U.S. 317 (1976)...........................................................................31, 33, 34

*United States v. Pino*,
   855 F.2d 357 (6th Cir. 1988) .............................................................................44

*United States v. Powell*,
   137 Fed. Appx. 701 (5th Cir. 2005)...................................................................44

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
   412 U.S. 669 (1973).............................................................................................9

*United States v. Vasquez*,
   298 F.3d 354 (5th Cir. 2002) .......................................................................43, 44

*United States v. Whaley*,
   577 F.3d 254 (5th Cir. 2009) .......................................................................26, 29

*Van de Walle v. Am. Cyanamid Co.*,
   477 F.2d 20 (5th Cir. 1973) ...............................................................................21

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Walker v. City of Mesquite,*
    129 F.3d 831 (5th Cir. 1997) ..................................................................................11

*Wayman v. Southard,*
    23 U.S. (10 Wheat.) 1 (1825)................................................................................27

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001)...................................................................................... *passim*

*Yakus v. United States,*
    321 U.S. 414 (1944)................................................................................26, 28

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)..........................................................................26, 29, 38

*Zavydas v. Davis,*
    533 U.S. 678 (2001)..........................................................................................24

**Statutes**

1 U.S.C. § 105...............................................................................................................36

2 U.S.C. § 622(5)..........................................................................................................36

5 U.S.C. § 552...............................................................................................................29

5 U.S.C. § 553...............................................................................................................29

5 U.S.C. § 706...............................................................................................................29

5 U.S.C. § 706(2)...............................................................................................44, 45, 48

5 U.S.C. § 706(2)(A).....................................................................................................48

6 U.S.C. § 202...............................................................................................................37

6 U.S.C. § 202(2)..........................................................................................................39

6 U.S.C. § 251...............................................................................................................37

8 U.S.C. § 1103...............................................................................................................3

8 U.S.C. § 1103(a)(5)....................................................................................................37

8 U.S.C. § 1103(a)(10)..................................................................................................37

10 U.S.C. § 275.............................................................................................................38

10 U.S.C. § 284..................................................................................................... *passim*

10 U.S.C. § 284(i)(3).....................................................................................................42

10 U.S.C. § 284(a) ...................................................................................................33, 41

10 U.S.C. § 284(a)(7)....................................................................................................33

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

10 U.S.C. § 284(b) ..................................................................................41

10 U.S.C. § 284(b)(1)-(10) ......................................................................41

10 U.S.C. § 284(b)(7) .........................................................................41, 43

10 U.S.C. § 284(h) ..................................................................................41

10 U.S.C. § 284(h)(1)(B) ....................................................................41, 42

10 U.S.C. § 2801(a) ...........................................................................38, 39

10 U.S.C. § 2801(c)(4) .......................................................................38, 39

10 U.S.C. § 2808 ............................................................................... *passim*

10 U.S.C. § 2808(a) .................................................................................35

18 U.S.C. § 1385 .....................................................................................38

21 U.S.C. § 360bbb-3 ..............................................................................25

31 U.S.C. § 1301 ................................................................................32, 34

31 U.S.C. § 1301 *et seq.* ..........................................................................31

31 U.S.C. § 1341 .....................................................................................32

31 U.S.C. § 1532 ................................................................................32, 46

47 U.S.C. § 606(c) ...................................................................................25

50 U.S.C. § 1621 ................................................................................20, 27

Consolidated Appropriations Act, Pub. L. No. 110-161, 121 Stat. 1844 (2008)................3, 22, 38

Consolidated Appropriations Act, Pub. L. No. 115-31, 131 Stat. 135 (2017).........................4, 36

Consolidated Appropriations Act, Pub. L. No. 115-141, *to be printed at* 132 Stat. 348 (2018)....................................................................................4

Consolidated Appropriations Act, Pub. L. No. 116-6, § 230 (2019)......................................34, 47

Consolidated Appropriations Act, Pub. L. No. 116-6, § 230(a) (2019) ..........................................32

Consolidated Appropriations Act, Pub. L. No. 116-6, § 230(a)(1) (2019).....................................5

Consolidated Appropriations Act, Pub. L. No. 116-6, § 231 (2019)................................... *passim*

Consolidated Appropriations Act, Pub. L. No. 116-6, § 739 (2019)......................................33, 34

Consolidated Appropriations Act, Pub. L. No. 116-6, *to be printed at* 133 Stat. 13 (2019)............................................................................5

Department of Defense Appropriations Act, Pub. L. No. 115-245 (2019)...........................35, 46

Department of Defense Appropriations Act, Pub. L. No. 115-245, Title VI (2019)...................46

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Further Additional Continuing Appropriations Act, 2019, Pub. L. No. 116-5, *to be printed at* 133 Stat. 10 (2019)..................................................................................5

Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996)..............................................................................3, 22, 38

Invoking the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976)..........................................................................................................18

Military Construction Codification Act, Pub. L. No. 97-124, 96 Stat. 153-177 (1982)......................................................................................................35, 36

National Defense Authorization Act, Pub. L. No. 114-328, 130 Stat. 2000 (2016).....................36

Secure Fence Act, Pub. L. No. 109-367, 120 Stat. 2368 (2006)..............................................22, 38

**Other Authorities**

2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858) ..........................31

Antonin Scalia, Testimony to the House of Representatives, Subcommittee on Administrative Law and Government Relations of the Committee on the Judiciary (Apr. 9, 1975).................................................................................20, 24

*CBP Enforcement Statistics FY 2019*, U.S. Customs & Border Protection, https://tinyurl.com/CBPFY19Stats ..........................................................................22

*Corridor*, American Heritage Dictionary (4th ed. 2006)..............................................................43

Department of Defense Appropriations Act, H.R. 695, 115th Cong. (2018) ..................................5

*Efforts by DHS to Estimate Southwest Border Security Between Ports of Entry*, U.S. Dep't of Homeland Security Off. of Immigr. Stat., 17 (Sept. 2017), http://tinyurl.com/DHSOISReport...........................................................................22

*Emergency*, American Heritage Dictionary (1st ed. 1976)..........................................................20

*Emergency*, Webster's New Collegiate Dictionary (8th ed. 1976)...............................................20

Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks ..........................23

The Federalist No. 58 (James Madison) ........................................................................................31

H.R. 1625, 115th Cong. (2018)........................................................................................................3

H.R. 5441, 110th Cong. (2007)........................................................................................................3

Janet A. McDonnell, *After Desert Storm* 221-22 (Dep't of the Army 1999), https://tinyurl.com/McDonnellAfterDesertStorm...................................................39

Michael J. Vassalotti & Brendan McGarry, Cong. Research Serv., IN11017, *Military Construction Funding in the Event of a National Emergency* 3 (2019), https://tinyurl.com/CRS-MilConFunding ...................................................39

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Press Release, City of El Paso, *City of El Paso Named Second Safest City in America* (Aug. 2017), available at https://bit.ly/2TZkGsX ........................9

*Project*, Merriam-Webster's Dictionary (10th ed. 1998)..............................35

*Remarks by President Trump After Meeting With Congressional Leadership on Border Security*, White House (Jan. 4, 2019), https://tinyurl.com/TrumpJan4Remarks ....................................23

S. 3109, 115th Cong. (2018)...........................................................4

S. Rep. No. 93-1170 (1974)..........................................................19

S. Rep. No. 94-1168 (1976)......................................................20, 24

*Support*, Oxford English Dictionary Online (last visited Apr. 25, 2019)......................42

*To Secure the Border and Make America Safe Again, We Need to Deploy the National Guard*, Department of Homeland Security, https://www.dhs.gov/news/2018/04/04/secure-border-and-make-america-safe-again-we-need-deploy-national-guard ........................22

White House Fact Sheet (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/ ..............35

**Rules**

Fed. R. Civ. P. 56(e) .................................................................9

**Regulations**

82 Fed. Reg. 8793, § 2(a)............................................................35

82 Fed. Reg. 8793, § 3(a)............................................................35

Exec. Order No. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990) ......................39

Exec. Order No. 12,734, 55 Fed. Reg. 48,099 (Nov. 14, 1990) .....................39

Exec. Order No. 13,235, 66 Fed. Reg. 58,343 (Nov. 16, 2001) .....................39

Exec. Order No. 13,767, 82 Fed. Reg. 8793 (Jan. 25, 2017)..........................3

**Constitutional Provisions**

U.S. Const. art. 1, § 1 .............................................................26

U.S. Const. art. I, § 9, cl. 7.........................................................31

U.S. Const. art. II, § 3 ..............................................................26

## INTRODUCTION

After failing to persuade Congress to fund a wall along the southern border, President Trump and his co-Defendants have adopted a novel plan to try to obtain that funding anyway. The plan began with President Trump's declaration of a "national emergency" at the southern border under the National Emergencies Act (NEA). And it continued with the invocation of two other statutes that supposedly authorize wall funding. Both elements of this plan are egregiously unlawful.

Begin with the emergency declaration. Courts construe statutory terms in accordance with their ordinary meaning, and the word "emergency" means an unforeseen circumstance calling for immediate action. The current situation at the southern border does not come close to fitting within this definition: the President's emergency declaration itself acknowledges that the issue of unlawful immigration is "long-standing," and Congress has rejected the notion that it requires immediate action in the form of a border wall. In truth, President Trump has declared a faux emergency because he could not achieve the result he wanted through the legislative process. The government's principal argument in response to this point has been the following: because the NEA does not define "emergency," it must grant the President unreviewable discretion to determine when an emergency exists. If adopted, that reading of the statute would render it unconstitutional, in violation of the non-delegation doctrine. That reading should accordingly be avoided.

Next take the second part of Defendants' border-wall plan. Setting aside the NEA, Defendants invoke two obscure statutes that they say enable them to spend congressionally appropriated funds on a border wall. But by their terms, neither of the statutes they invoke comes close to authorizing such expenditures. That should be no surprise, since government interpretations are usually flawed where, as here, an agency suddenly finds an expansive power in

a long-dormant statutory provision.

In the end, Defendants' actions amount to a brazen attempt to defy statutory text and arrogate legislative power to themselves.  The separation of powers, however, "establish[es] high walls and clear distinctions."  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995).  After all, the "[c]oncentration of power in the hands of a single branch" is "the very definition of tyranny." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) (quoting The Federalist No. 47 (James Madison)).  To vindicate these principles, the Judiciary must deploy its power to "say what the law is" and rebuke Defendants' Executive power grab.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

## STATEMENT OF UNDISPUTED FACTS

### A.    For Decades, Congress Addresses Border Security

The issue of unlawful immigration across the U.S.-Mexico border is not new, and it has not been lost on Congress.   In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009-554-55, appropriating $12 million for construction of border fencing near San Diego, California.   A decade later, it added new fencing in discrete border areas of California, Arizona, New Mexico, and Texas.   *See* Pub. L. No. 104-208; 8 U.S.C. § 1103.   From 2007-2008, Congress appropriated over $3 billion for border security infrastructure and technology.   *See* H.R. 5441, 109th Cong. (2007); Consolidated Appropriations Act, Pub. L. No. 110-161, 121 Stat. 1844, 2094 (2008).   And in 2018, Congress appropriated $1.5 billion for "[p]rocurement, construction, and improvements" in particular areas along the southern border.   H.R. 1625, 115th Cong. (2018).

### B.    President Trump Makes a Border Wall His Signature Issue

On the first day of his presidential campaign, then-candidate Trump promised that he "would build a great wall" along the U.S.-Mexico border that Mexico would pay for.   Ex. 1, at 2.[1] According to then-candidate Trump, a wall was necessary because "the worst elements in Mexico" were "being pushed into the United States," bringing "infectious disease," "drugs[,] and death." Ex. 2, at 3.   At campaign rallies, supporters would erupt in chants of "Build the wall!"   Ex. 3, at 12.

Soon after his election, President Trump again promised "[w]e're going to build a wall." Ex. 4, at 19.   "I could wait about a year-and-a-half until we finish our negotiations with Mexico," he explained, "but . . . I don't feel like waiting a year or a year-and-a-half."   *Id.*   Five days after

---

[1] All references to "Ex. __" refer to exhibits to the declaration of Kristy Parker, attached hereto.  All page numbers refer to PDF page numbers, rather than internal page numbers.

President Trump's inauguration, he issued an executive order directing the Secretary of Homeland Security to "take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border." Exec. Order No. 13,767, 82 Fed. Reg. 8793, 8794 (Jan. 25, 2017) (Ex. 5, at 2).

In 2017, President Trump requested $999 million in congressional appropriations for "the first installment of the border wall." Ex. 6, at 5. A Republican-controlled Congress instead provided the Department of Homeland Security (DHS) with $341.2 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border." Consolidated Appropriations Act, Pub. L. No. 115-31, 131 Stat. 135, 434 (2017). In 2018, President Trump requested $1.6 billion in congressional appropriations for 74 miles of new or replacement border wall. Ex. 7, at 3. In response, Congress appropriated $1.571 billion for new border security technology and new and replacement fencing in specified areas on the southern border. Consolidated Appropriations Act, Pub. L. No. 115-141 (2018) (to be printed at 132 Stat. 348, 616).

### C.   President Trump Shuts Down the Government for a Border Wall

In February 2018, President Trump issued his fiscal year 2019 budget request, seeking "$1.6 billion to construct approximately 65 miles of border wall." Ex. 8, at 58. Near the end of 2018, Congress began working on a fiscal year 2019 appropriations bill, to be enacted before the December 22, 2018 deadline when federal funding would expire for nine governmental departments. The initial Senate appropriations bill included the exact amount that the President had requested in February 2018: $1.6 billion for 65 miles of border fencing. S. 3109, 115th Cong. (2018).

On December 11, 2016, President Trump met with then-House Minority Leader Nancy Pelosi and Senate Minority Leader Chuck Schumer to discuss the impending funding deadline. At

4

that meeting, President Trump stated that he wanted $5 billion for a border wall and would be "proud to shut down the government for border security."  Ex. 9, at 11.  On December 19, 2018, two days before the funding deadline, the Senate passed a continuing resolution funding the government through February 8, 2019.  Department of Defense Appropriations Act, H.R. 695, 115th Cong. (2018).  Because that continuing resolution contained no border wall funding, however, the President refused to support it.  On December 22, 2018, federal funding for a substantial portion of the government expired, precipitating the longest government shutdown in American history.

### D.    President Trump Raises the Possibility of Declaring a National Emergency

On January 4, 2019, in the midst of the government shut down, President Trump raised a new idea:  If the "negotiated process" with Congress did not lead to border wall funding, he explained, he could "call a national emergency and build [the wall] very quickly."  Ex. 10, at 25.  Five days later, President Trump stated that he has "an absolute right to do [a] national emergency if [he] want[s]," and that the "threshold" for declaring an emergency would be if "I can't make a deal with people that are unreasonable."  Ex. 11, at 1; Ex. 12, at 4.  Three days after that, the President noted that "the easy solution is for me to call a national emergency," and that if Congress "can't do it, I will declare a national emergency."  Ex. 13, at 2, 15.

After the government shut down had lasted for over a month, the President finally agreed to end it on January 25, 2019.  He signed a continuing resolution funding the government through February 15, 2019.  *See* Further Additional Continuing Appropriations Act, Pub. L. No. 116-5 (2019) (to be printed at 133 Stat. 10).  That continuing resolution provided no additional border wall funding.  *Id.*

### E.    Congress Passes the 2019 Consolidated Appropriations Act

On February 14, 2019, Congress passed the 2019 Consolidated Appropriations Act (CAA),

Pub. L. No. 116-6 (2019) (to be printed at 133 Stat. 13).  The CAA provides $1.375 billion for "the construction of primary pedestrian fencing" in "the Rio Grande Valley Sector."  CAA, § 230(a)(1).  And it states that none of the funds appropriated by the Act can be used "for the construction of pedestrian fencing" in any of five areas of the border.  *Id.* § 231.  On February 15, 2019, President Trump signed the CAA into law.

### F. President Trump Declares a National Emergency and Announces a Plan to Fund a Border Wall

On the same day that President Trump signed the CAA, he issued a Proclamation declaring "the current situation at the southern border" to be a "national emergency." Ex. 14, at 1.  According to the Proclamation, "[t]he problem of large-scale unlawful migration across the southern border is long-standing," requiring deployment of the military to the border and construction of a wall there.  *Id.*  When announcing his Proclamation, President Trump noted that he "could do the wall over a longer period of time" and "didn't need to do this."  Ex. 15, at 6.  But, he said, "I'd rather do it much faster."  *Id.*

In addition to declaring a national emergency, the President announced a plan, to be carried out by Defendant Acting Secretaries of Defense and Homeland Security, to use funds Congress appropriated for other purposes to build a border wall.  As relevant, the White House directed those Acting Secretaries to use:  (1) $2.5 billion of Department of Defense (DOD) funds for Support for Counterdrug Activities under 10 U.S.C. § 284; and (2) $3.6 billion of DOD funds for "military construction projects" under 10 U.S.C. § 2808.[2]

Less than two weeks after the President's Proclamation, Congress repudiated his emergency declaration.  Both the House of Representatives and the Senate passed a resolution

---

[2] *President Donald J. Trump's Border Security Victory*, White House Fact Sheet (Feb. 15, 2019) ("Fact Sheet"), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/.

terminating that declaration.  Exs. 16-17.  The President then vetoed the disapproval resolution.
Ex. 18.

### G.       Defendants Begin the Wall Construction Process

Since President Trump's Proclamation, Defendants have begun the process of building a
wall along the southern border.  On February 25, 2019, DHS officially requested that DOD supply
it with funds under § 284 to build approximately 200 miles of barriers along the border.  Ex. 19.
DOD then informed Congress that it was preparing to reprogram funds from its Military Personnel
Account into its Drug Interdiction and Counter-Narcotics Activities Account ("Drug Interdiction
Account"), so that it would have sufficient funds to transfer to DHS for the border wall.  Ex. 20,
at 1.  The reprogramming was necessary because DOD had already spent over 90% of the $881.5
million appropriated to the Drug Interdiction Account in 2019.  *Id.*

On March 18, 2019, DOD sent Congress a "Fact Sheet" identifying "military construction"
funds available under § 2808 to build a border wall.  Ex. 21.  Among the funds DOD identified
was $52.3 million for three projects at the Fort Bliss Army Base in El Paso County, Texas.  *Id.* at
4, 13.  On March 25, 2019, DOD confirmed the reprogramming of $1 billion from its Military
Personnel Account to its Drug Interdiction Account, for eventual transfer to DHS.  Ex. 22, at 1.
That same day, DOD also confirmed in a letter that DOD and DHS "ha[d] decided to undertake
Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 by constructing 57 miles of 18-foot-
high pedestrian fencing."  Ex. 23.  El Paso Sector Project 1 involves the construction of 46 miles
of new or replacement border walls in southern New Mexico, in the nearby vicinity of El Paso
County, Texas.  Ex. 19, at 9.

On April 9, 2019, DOD announced the award of a $789 million contract to a private
company "for border replacement wall construction."  Ex. 24, at 1.  It further announced that
"[w]ork will be performed in Santa Teresa, New Mexico, with an estimated completion date of

October 1, 2020." *Id.*  The Santa Teresa port of entry is only twenty minutes from downtown El Paso, Texas.  Ex. 26, Samaniego Decl. ¶ 17.

### H.      Proceedings

Plaintiffs El Paso County, Texas ("the County") and the Border Network for Human Rights ("BNHR") filed a complaint in this Court on February 20, 2019.  *See* No. 3:19-cv-66, Doc. 1.  On April 25, 2019, Plaintiffs filed an amended complaint.  Plaintiffs now hereby move for summary judgment or, alternatively, a preliminary injunction, on all seven claims in the amended complaint.

### ARGUMENT

As shown below, this Court should grant Plaintiffs summary judgment and permanent declaratory and injunctive relief on the seven claims in their amended complaint.  "Summary judgment is appropriate where there is no genuine issue of material fact and the parties are entitled to judgment as a matter of law."  *SEC v. Sethi*, 910 F.3d 198, 202 (5th Cir. 2018).  Because this case involves solely legal questions, no discovery is necessary to resolve it.  And with no genuine issues of material fact present, summary judgment is warranted.  *See, e.g.*, *Bauer v. Albemarle Corp.*, 169 F.3d 962, 968 (5th Cir. 1999) ("[A] summary judgment motion can be decided without any discovery."); *United States v. Bloom*, 112 F.3d 200, 205 n.17 (5th Cir. 1997) ("The summary judgment rule does not require that any discovery take place before summary judgment can be granted.").

Even if a permanent injunction were not yet warranted, however, this Court should grant Plaintiffs a preliminary injunction against Defendants' unlawful actions.  As explained *infra*, Plaintiffs have "a substantial likelihood of success on the merits"; they will suffer "irreparable injury if the injunction is not issued"; "the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted"; and "the grant of an injunction will not disserve the public interest."  *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir.

2018) (quotations omitted).

## I.    PLAINTIFFS HAVE STANDING

"To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quotations omitted).  "[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Ass'n of Cmty Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357-58 (5th Cir. 1999).  So while an "injury must be (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, to pass constitutional muster," it "need not measure more than an identifiable trifle." *Id.* at 358 (citations and quotations omitted); *see United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 690 n.14 (1973) (noting that the Court has upheld standing where plaintiffs have "no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax").

When a plaintiff "challeng[es] the legality of government action," the "nature and extent of facts that must be averred" to establish standing "depends considerably upon whether the plaintiff is [itself] an object of the action" at issue.  *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561-62 (1992).  If it is, "there is ordinarily little question that the action . . . has caused [it] injury, and that a judgment preventing . . . the action will redress [that injury]." *Id.*

At the summary-judgment stage, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts'" to establish their standing.  *Id.* at 561 (quoting Fed. R. Civ. P. 56(e)).  When evaluating plaintiffs' standing, courts must "take as true" the factual evidence plaintiffs submit. *McCardell v. Dep't of Hous. & Urban Dev.*, 794 F.3d 510, 520 (5th Cir. 2015); *see Lujan*, 504 U.S. at 561.

### A.      El Paso County Has Standing

El Paso County is located in west Texas, squarely on the U.S.-Mexico border.  A vibrant, multicultural community, the County is "defined by [its] relationship with Mexico and the presence of [its] many immigrant residents."  Ex. 25, Keller Decl. ¶ 5.  It ranks as one of the nation's safest communities.  *Id.*; *see also* Press Release, City of El Paso, *City of El Paso Named Second Safest City in America* (Aug. 2017), available at https://bit.ly/2TZkGsX.

The County's economy relies heavily on tourism and commercial development.  Ex. 25, Keller Decl. ¶ 4.  It recently entered a three-year, multi-million-dollar tourism campaign with the City of El Paso aimed at increasing the City's and County's shares of the Texas tourism market. Ex. 26, Samaniego Decl. ¶ 9; Ex. 25, Keller Decl. ¶ 10.  And it has secured the opening of new downtown hotels and refurbished historical sites "as part of a strategic plan to bring tourism and its attendant revenue to the county."  Ex. 26, Samaniego Decl. ¶ 9.  As a primary selling point to tourists and investors, the County seeks to market itself as a safe, aesthetically beautiful, multicultural border community.  *Id.* ¶ 4.  To that end, the County has contracted with a private company to run "an advertising campaign that would promote a positive image of El Paso and the border community."  Ex. 25, Keller Decl. ¶ 10.  The County's efforts have begun to pay off:  its current annual budget projects that it will earn $4 million in tax revenue from tourism.  Ex. 26, Samaniego Decl. ¶ 5.

In this case, the County "challeng[es] the legality of government action," *Lujan*, 504 U.S. at 561—namely, the President's Proclamation and Defendants' attendant actions to build a wall along the southern border.  Those actions make the County, and all such border communities, their direct "object."  *Id.*; *see* Ex. 14, at 1 (Proclamation defines the national emergency as the "current situation at the southern border").  As a result, there is "little question" that the County has standing to challenge those actions.  *Lujan*, 504 U.S. at 561; *see Duarte ex rel. Duarte v. City of Lewisville*,

10

759 F.3d 514, 518 (5th Cir. 2014) ("It follows from *Lujan* that if a plaintiff is an object of a government regulation, then that plaintiff ordinarily has standing to challenge that regulation.").

And indeed, the County has demonstrated two interconnected, concrete injuries stemming from Defendants' actions.  First, the County has shown an injury to its reputation.  "[I]njury to reputation can constitute a cognizable injury sufficient for Article III standing." *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003); *see Walker v. City of Mesquite*, 129 F.3d 831, 832-33 (5th Cir. 1997).  "[W]here reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to challenge that action." *Foretich*, 351 F.3d at 1213.  Even "the need to take . . . affirmative steps to avoid the risk of harm to [one's] reputation constitutes a cognizable injury." *Meese v. Keene*, 481 U.S. 465, 475 (1987).

In *Meese*, for instance, the Supreme Court held that a plaintiff had standing, based on reputational injury, to challenge a federal law classifying films he wished to show as "political propaganda." *Id.* at 472-77.  By forcing the plaintiff to "choose between exhibiting the films and incurring the risk that public perception of this [legal] scheme will harm [his] reputation," the law inflicted concrete injury.  *Id.* at 477.  And in *NCAA v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013), *rev'd on other grounds sub nom.*, 138 S. Ct. 1461 (2018), whose standing analysis the Fifth Circuit has favorably cited, *see Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015), the court held that sports leagues had standing, based on reputational injury, to challenge a state law legalizing sports gambling, *NCAA*, 730 F.3d at 220.  The court held that the leagues had shown cognizable reputational injury on the ground that "they are harmed by their unwanted association with an activity they (and large portions of the public) disapprove of—gambling." *Id.*

Here, the President's Proclamation and Defendants' actions carrying it out have caused the

County cognizable reputational injury.  According to County officials, El Paso County takes pride in its "reputation as a safe place to live, work, and visit," and as a vibrant "bilingual, bi-national, multicultural" community.  Ex. 26, Samaniego Decl. ¶¶ 3-4.  But Defendants' actions have "falsely told the world the exact opposite":  "that El Paso County and the Southern border are crime-ridden and dangerous, that [its] immigrant community comprises criminals and drug traffickers . . ., that [its] proximity to Mexico is an existential threat, and that [it] can be rescued only through the blight of massive wall construction and militarization." *Id.* ¶ 8; *id.* ¶ 10 ("I have already heard personally from people who have a false impression that El Paso County is a dangerous place and who do not want to come here [because of the President's Proclamation].").  Indeed, Defendants' actions amount to a message "transmitted all over the world" that "all of [the County's] strengths are actually weaknesses" and that the County is "so endangered by immigrants and [its] closeness to Mexico that [it] need[s] a wall to protect [it]."  Ex. 25, Keller Decl. ¶ 6.  Because of Defendants' actions, County officials now must "not only promot[e] El Paso's image, but actively defend[] it." *Id.*  As those officials have explained, "every meeting anyone promoting El Paso has now must include extra efforts to persuade people that El Paso County is a good place to invest in and visit." Ex. 26, Samaniego Decl. ¶ 11; *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154 (2010) (finding standing based on plaintiffs' need "to take certain measures to minimize the likelihood" of harm).

The County's reputational injuries track those found sufficient for standing in *NCAA* and *Meese*.  Just as the sports leagues in *NCAA* were "harmed by their unwanted association" with gambling, the County is "harmed by [its] unwanted association" with crime, danger, construction, and militarization.  730 F.3d at 220.  And just as the plaintiff in *Meese* had to take "affirmative steps to avoid the risk of harm to his reputation" posed by the challenged law, 481 U.S. at 475, the

County must now take steps to "actively defend[]" its reputation against the depiction of the border conveyed by the Proclamation and Defendants' subsequent actions, Ex. 25, Keller Decl. ¶ 6; *see* Ex. 26, Samaniego Decl. ¶ 12 ("I have spent approximately 30% of my time [as County Judge] . . . defending El Paso's reputation").

Second, the County's reputational injury—though alone sufficient for standing—is intimately tied to "a direct pecuniary injury that generally is sufficient to establish injury-in-fact." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010) (quotations omitted). By treating the border as a danger zone requiring military occupation and a wall, Defendants' actions have already begun to discourage tourism and commercial development in the County. As the County's Chief Administrator explained, "[t]here is nothing more detrimental to a drive to bring in tourists than the perception that a community is chaotic and dangerous and that the tourists['] access to historical and scenic destinations will be impeded by construction." Ex. 25, Keller Decl. ¶ 8; *see id.* at ¶¶ 12-13 (describing economic effects of impending construction in the County's nearby vicinity); Ex. 26, Samaniego Decl. ¶ 6 ("[T]he President's Proclamation declaring an emergency at the Southern border is a serious threat to both tourism and economic development because of the false and negative impression of El Paso that it creates."). And as the El Paso County Judge likewise emphasized, recent meetings with "local business leaders" have indicated that Defendants' actions are "generating fears of potential investors that the community will be mired in a long-term state of chaos that includes . . . violent crime, the blight of construction, and impediments to crossing back and forth across the border." *Id.* ¶ 11.[3]

While the County has already suffered economic harm flowing from Defendants' actions,

---

[3] In addition, the reputational harm inflicted by the Proclamation and attendant border militarization have hindered the County's efforts to attract qualified applicants for important government posts. Ex. 25, Keller Decl. ¶ 11.

much more is "certainly impending." *Driehaus*, 573 U.S. at 158 (quotations omitted); *see LeBlanc*, 627 F.3d at 122 (finding injury in fact where economic harm "ha[d] not yet materialized"); *McCardell*, 794 F.3d at 520 (finding injury in fact where the "asserted injury would be concretely felt in the logical course of probable events flowing from an unfavorable decision by this court"). The longer the President's Proclamation remains in effect, the more the County's reputation will be tarnished in the eyes of tourists and developers, and the more hours County officials will have to devote to combating negative messaging, as opposed to "meeting directly with business leaders to bring business to El Paso."  Ex. 26, Samaniego Decl. ¶ 12.  Any drop in the $4 million tax revenue the County earns from tourism "would significantly damage the county's financial health."  *Id.* ¶ 5; *see Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110-11 (1979) (municipality's "diminish[ed] . . . tax base" constitutes injury in fact).

Moreover, if the planned wall construction in the County's nearby vicinity is allowed to progress, noise and traffic will surely disrupt the County's "regional economy."  Ex. 25, Keller Decl. ¶ 13 (describing impact of planned wall construction "only 15 miles from downtown El Paso").  That disruption will, in turn, thwart the County's "ability to compete for business investment and tourism."  Ex. 26, Samaniego Decl. ¶ 18.

Finally, Defendants have identified $52.3 million appropriated for "military construction projects" at Fort Bliss, an El Paso army base, for diversion toward the border wall.  Ex. 21.  "Fort Bliss is the lifeblood of the El Paso economy," contributing billions of dollars and creating thousands of jobs.  Ex. 26, Samaniego Decl. ¶ 15.  Losing funds that had been appropriated for use at Fort Bliss "creates the imminent prospect of economic harm to El Paso County."  *Id.* ¶ 16.  That loss of funds also represents a missed opportunity to "obtain a benefit," which can suffice to show injury in fact.  *N.E. Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

With the County's injury in fact established, standing doctrine's final two requirements—causation and redressability—easily follow.  To begin, the causation element is satisfied because the County's reputational and economic injuries are "fairly traceable" to Defendants' actions. *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  The President's Proclamation expressly declares a "national emergency" on the "southern border"—including El Paso County—based on its status as a "major entry point for criminals, gang members, and illicit narcotics."  Ex. 14, at 1.  And Defendants' recent deployment of the military to build a border wall reinforces the County's image as dangerous and uninviting, while threatening to increase noise and congestion in the area.

As County officials explained, these precise actions bear a "causal connection" to the County's reputational and economic injuries described above.  *Driehaus*, 573 U.S. at 158; *see* Ex. 25, Keller Decl. ¶ 6 ("The President's Proclamation . . . is an official government statement that damages El Paso County's ability to compete for business investment and tourism."); *id.* ¶ 10 ("Because of the President's Proclamation, we are now in the process of strategizing how to combat a falsely negative image."); *id.* ¶¶ 12-13 (impending wall construction will create a "massive construction zone," deterring "tourism and business development"); Ex. 26, Samaniego Dec. ¶ 10 ("The President's Proclamation has falsely told the world the exact opposite of who we are and what we promote"); *id.* ¶ 16 (diversion of funds from Fort Bliss "creates the imminent prospect of economic harm").

Finally, where, as here, a plaintiff challenges government action, "[c]ausation and redressability typically overlap as two sides of a causation coin."  *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017).  "After all, if a government action causes an injury, enjoining the action usually will redress that injury."  *Id.*  That is true here.  As to the County's reputational injuries, enjoining Defendants' actions will countermand the negative image of the

County that those actions have perpetuated and allow County officials to refocus their resources on *improving* tourism and commerce, not *defending* the County against Defendants' attacks. *See Foretich*, 351 F.3d at 1214 (invalidating government action from which "reputational injury . . . derives" "provide[s] meaningful relief"). And as to the County's pecuniary injuries, enjoining Defendants' actions will help restore the County's image in the eyes of tourists and investors and forestall disruptive border wall construction. Accordingly, the County has standing to bring its claims.

### B.     BNHR Has Standing

Founded in 1998, BNHR is a community organization headquartered in El Paso, Texas. Ex. 27, Garcia Decl. ¶¶ 2-3. It consists of about 5,000 members who live and work in west Texas, metropolitan El Paso, and southern New Mexico. *Id.* ¶ 4. BNHR's mission is to "organize border communities through human rights education" and "mobilize [its] members to advocate for positive change in policies" affecting "the immigrant community." *Id.* ¶ 3. To fulfill that mission, BNHR "educate[s] [its] own members about their rights" and "train[s] them to educate and organize other members of the immigrant community." *Id.* It also works to forge bonds between its members and the area's law-enforcement officials. *Id.* ¶ 10.

"An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Fowler*, 178 F.3d at 356. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that an organization devoted to counseling low-income home buyers met that test, enabling it to challenge defendants' "racial steering practices." *Id.* at 379. The Court found sufficient the organization's allegation that it "had to devote significant resources to identify and counteract" defendants' unlawful practices. *Id.* If defendants' "steering practices have perceptibly impaired [the organization's] ability to provide" its services, the Court explained, "there can be no question that the organization has suffered injury in fact." *Id.* "Such

concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Applying *Havens Realty*, the Fifth Circuit has announced the following rule:  "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Fowler*, 178 F.3d at 360; *see Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014).  In *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), for instance, the Fifth Circuit held that an advocacy organization had standing to challenge a Texas law restricting the "interpretation assistance that English-limited voters may receive." *Id.* at 606, 612.  Because the organization "went out of its way to counteract the effect of Texas's allegedly unlawful" restriction—for instance, by "educat[ing] voters" about it—the organization had suffered cognizable injury, even if that "injury was not large." *Id.* at 612.  Similarly, in *Scott*, the Fifth Circuit held that the Louisiana NAACP had standing to challenge Louisiana's alleged failure to comply with the National Voter Registration Act.  771 F.3d at 837.  Because one NAACP member "devoted resources to counter[acting] [the State's] allegedly unlawful practices" by conducting "voter- registration drives," the NAACP "suffered injury in fact." *Id.*

BNHR has standing under the foregoing precedents.  In normal circumstances, BNHR dedicates its resources to "its core mission" of human rights education and "promoting immigration reform." Ex. 27, Garcia Decl. ¶ 13.  Because of Defendants' emergency declaration and attendant border militarization, however, BNHR has had to "divert resources" away from that core mission, and toward "counsel[ing] community members who are fearful," "organizing [its] community in opposition to the President's declaration," and "opposing the illegal [border wall] construction." *Id.* ¶¶ 13, 37.  BNHR has held and scheduled Proclamation-related weekend events

17

that it would not otherwise hold, and has increased the frequency of its "Know Your Rights" presentations approximately five-fold.  *Id.* ¶¶ 14-15.  It has also hired an additional policy consultant (costing $14,400) to deal with its increased advocacy workload in light of the Proclamation, and has sent delegations to discuss the Proclamation's effects with congressional members in Washington, D.C.  *Id.* ¶¶ 16, 19.  In short, as the organization's Executive Director stated in his declaration, the Proclamation and Defendants' subsequent actions have "required BNHR to expend significant resources that could have, and would have, gone elsewhere," leading to a total of $23,956 in additional organizational expenses.  *Id.* at ¶¶ 16, 21.[4]

In addition to draining BNHR's resources, the Proclamation has forced BNHR to end one of its "major initiatives" to build trust between the immigrant community and law enforcement, called the "Hugs Not Walls" campaign.  *Id.*  ¶ 32.  That campaign's signature event has now been cancelled.  *Id.*

Like the organizational plaintiffs in *Havens Realty*, *OCA-Greater Houston*, and *Scott*, BNHR has standing to challenge Defendants' actions.  As shown, BNHR has gone "out of its way to counteract" those actions, *OCA-Greater Houston*, 867 F.3d at 612, by diverting resources from its traditional activities toward "counsel[ing]" and "organizing" community members in relation to the national emergency and border wall, Ex. 27, Garcia Decl. ¶¶ 13, 37.  And Defendants' actions have inflicted "demonstrable injury to the organization's activities," because those actions have forced BNHR to cancel initiatives it would otherwise spearhead.  *Havens Realty*, 455 U.S. at 379.  All of BNHR's organizational injuries, moreover, have a "causal nexus" to Defendants' actions, and would be redressed if this Court were to enjoin those actions.  *See Scott*, 771 F.3d at

---

[4] Beyond these monetary costs, BNHR staff members have faced longer hours and a more burdensome workload as a result of Defendants' actions.  *See id.* ¶ 22.

838-39.  BNHR has standing.

## II.    THE PRESIDENT'S PROCLAMATION IS UNLAWFUL

Invoking the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), President Trump's Proclamation declares a "national emergency" at "the southern border."  Based on that declaration, Defendants plan to use $3.6 billion in funds appropriated for "military construction projects" to build a border wall.  10 U.S.C. § 2808.  But to properly rely on the NEA, a president must identify an actual "emergency"—*i.e.*, an unforeseen combination of circumstances requiring immediate action.  Because the "current situation at the southern border" does not qualify as an "emergency" under that definition, the Proclamation exceeds the President's authority under the NEA.  As a result, the Proclamation should be declared unlawful, and Defendants should be enjoined from using § 2808 "military construction" funding for a border wall.

To avoid this straightforward conclusion, Defendants have argued in other courts that the NEA grants the President complete discretion in determining whether an "emergency" exists.  *See* Defendants' Motion to Dismiss at 21, *Alvarez v. Trump*, No. 19-00404 (D.D.C. Apr. 2, 2019) ("Defs.' MTD").  If this Court were to adopt that reading, the NEA would violate the nondelegation doctrine, which prohibits Congress from transferring its legislative power to the Executive Branch.  In that scenario, the NEA and Proclamation should be declared unconstitutional, and Defendants should similarly be enjoined from using "military construction" funding for a border wall.

### A.    The Proclamation Exceeds the President's Authority Under the NEA

From the 1930s through the 1960s, Presidents exercised unfettered discretion in declaring national emergencies, pursuant to over 400 separate "emergency statutes."  S. Rep. No. 93-1170, at 2 (1974).  By 1974, hundreds of such emergencies were in effect, four of which had existed continuously for close to forty years.  *Id.* at 1.  Each of these emergencies authorized the President

to wield "extraordinary powers" and "manage every aspect of the lives of all American citizens." *Id.* at 2.

To narrow the concept of "emergency" and prevent presidential abuse, Congress passed the NEA.  The NEA "would end the states of emergency under which the United States has been operating for more than 40 years."  S. Rep. No. 94-1168, at 2 (1976).  And it would "insure that the extraordinary powers which now reside in the hands of the Chief Executive . . . could be utilized only when emergencies actually exist, and then, only under safeguards of congressional review." *Id.*  Testifying on behalf of the Justice Department in support of the NEA, then-Assistant Attorney General Antonin Scalia stated that "[t]hose powers which society really no longer views as emergency powers should not be called that."  Antonin Scalia, Testimony to the House of Representatives, Subcommittee on Administrative Law and Government Relations of the Committee on the Judiciary, at 95 (Apr. 9, 1975) ("Scalia Testimony").  "[W]e have to be careful not to slap that label on something that doesn't merit it," Scalia warned.  *Id.*

The NEA's core provision states that, "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such emergency."  50 U.S.C. § 1621.  Once a President declares a national emergency pursuant to § 1621, he gains "special or extraordinary power[s]" under a broad swath of separate statutes, including 10 U.S.C. § 2808, which the President has invoked here.

The NEA does not define the term "emergency," so it must be construed "in accordance with [its] ordinary meaning."  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013).  The ordinary meaning of "emergency" is an "unforeseen combination of circumstances or the resulting state that calls for immediate action."  Webster's New Collegiate Dictionary 372 (8th ed. 1976); *see also* American

Heritage Dictionary 427 (1st ed. 1976) (defining "emergency" as "[a] situation or occurrence of a serious nature, developing suddenly and unexpectedly, and demanding immediate action"). Interpreting the term "emergency" in other contexts, courts (including the Fifth Circuit) have long adhered to this ordinary meaning. *See, e.g.*, *Van de Walle v. Am. Cyanamid Co.*, 477 F.2d 20, 23 (5th Cir. 1973) (because employee's shift "was neither unfamiliar nor unexpected," it could "hardly be characterized as an 'emergency' as that term is commonly used"); *Taylor v. Bair*, 414 F.2d 815, 821 (5th Cir. 1969) (an "emergency" is "a condition arising suddenly and unexpectedly . . . and which calls for immediate action . . . without time for deliberation"). Indeed, the Third Circuit applied this very definition when invalidating an emergency declaration issued by the Government of the Virgin Islands, holding that a wastewater problem was not an "emergency" because it was longstanding and "could not be construed as surprising or unexpected." *United States v. Gov't of V.I.*, 363 F.3d 276, 289 n.10 (3d Cir. 2004).

Invoking NEA § 1621, President Trump's Proclamation declares "[t]he current situation at the southern border . . . a national emergency." Ex. 14, at 1. Specifically, it claims that "[t]he southern border is a major entry point for criminals, gang members, and illicit narcotics." *Id.* And, it adds, "recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending." *Id.* Based on this "emergency," the Proclamation invokes 10 U.S.C. § 2808 for purposes of building a border wall. *Id.*

The Proclamation exceeds the President's authority under the NEA because the "current situation at the southern border" does not qualify as an "emergency" under that word's ordinary meaning: it is not "unforeseen," and it does not "call for immediate action" in the form of a border wall.

First, the Proclamation itself acknowledges that the "current situation at the southern border" is not unforeseen, emphasizing that "[t]he problem of large-scale unlawful migration through the southern border is *long-standing*." *Id.* (emphasis added); *see Gov't of V.I.*, 363 F.3d at 289 n.10 (longstanding issue cannot be "emergency").  The political branches have grappled with unlawful immigration for decades, and Congress has repeatedly acted to address the issue.[5] Unlawful immigration across the southern border thus presents a decades-old, political dilemma requiring inter-branch solutions, not a sudden or unforeseen event necessitating a unilateral executive response.

Second, the "current situation" does not "call for immediate action" in the form of a wall stretching the length of the U.S.-Mexico border.  Congress considered and rejected such a proposal, instead determining that targeted fencing in the Rio Grande Valley area was the appropriate course.  *See* CAA, § 231.  That narrower approach reflects the facts on the ground, as evidenced by the government's own data.  DHS recently estimated a "91 percent decline" in illegal border crossings between 2000 and 2016.[6]  The amount of drugs Customs and Border Protection (CBP) seized between ports of entry has decreased from 2014 to 2018.[7]  And family migration occurs mostly at ports of entry, where families turn themselves in and seek asylum.[8]  The

---

[5] *See, e.g.*, Consolidated Appropriations Act, Pub. L. No. 110-161, 121 Stat. 1844, 2090 (2008); Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2368 (2006); Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

[6] *Efforts by DHS to Estimate Southwest Border Security Between Ports of Entry*, U.S. Dep't of Homeland Security Off. of Immigr. Stat., 17 (Sept. 2017), http://tinyurl.com/DHSOISReport.

[7] *CBP Enforcement Statistics FY 2019*, U.S. Customs & Border Protection, https://tinyurl.com/CBPFY19Stats (showing the amount of drugs seized annually at and between ports of entry from 2014 to 2018).

[8] *See To Secure the Border and Make America Safe Again, We Need to Deploy the National Guard*, Department of Homeland Security (Apr. 4, 2018), https://www.dhs.gov/news/2018/04/04/secure-border-and-make-america-safe-again-we-need-deploy-national-guard.

President's disagreement with how Congress has dealt with a problem does not create an "emergency."

President Trump's own words also belie the notion that the "current situation at the southern border" calls for immediate action.  *See, e.g.*, *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 274-75 (1975) (considering presidential announcement accompanying signing of executive order); *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1242-43 (9th Cir. 2018) (considering presidential statements when construing executive order).  Before issuing the Proclamation, President Trump characterized an emergency declaration as "another way" of building a wall that he would use "if I can't make a deal with people [in Congress] that are unreasonable."  Ex. 11, at 1; Ex. 12, at 4.  And during his Rose Garden announcement of the emergency declaration, President Trump stated that he "could do the wall over a longer period of time" and "didn't need to do this," but would "rather do it much faster."  Ex. 15, at 4.  By definition, an "emergency" is not something one can opt to address "over a longer period of time" or "didn't need to" address at all.

To be sure, since its enactment, Presidents have invoked the NEA numerous times in various contexts, but that history does not validate President Trump's unique power grab.  As an initial matter, most presidential emergency declarations have gone unchallenged, so the mere fact that many other emergencies have been declared does not suggest that those declarations were uniformly lawful.  In any event, the government has not identified another instance in which the President has wielded his emergency power to claim funding that Congress has expressly denied. And lest there be any doubt that is what occurred here, recall that President Trump stated that the emergency declaration was "another way" of building a wall if "a negotiated process" failed to bear fruit.  Ex. 10, at 25. Treating an emergency declaration as a political tool to effectuate an agenda repudiated by Congress mocks the NEA, which was designed for instances "when

emergencies actually exist."  S. Rep. No. 94-1168, at 2 (1976).  In the words of Antonin Scalia,

President Trump's emergency declaration "debases the currency" and "distorts our whole process"

by "slap[ping] [the] label [of emergency] on something that doesn't merit it."  Scalia Testimony,

at 95.

Even if the NEA's text could be read to permit this emergency declaration (it cannot), that

reading should be avoided because it would raise "a serious doubt" about the NEA's

constitutionality.  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quoting *Crowell v. Benson*, 285

U.S. 22, 62 (1932)).   The nondelegation doctrine prohibits Congress from transferring its

legislative power to the Executive Branch.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457,

472 (2001).  As explained *infra*, Defendants' proposed reading of the NEA—as an "intentional

decision [by Congress] to leave to the President the determination about when and under what

circumstances to declare a national emergency," Defs.' MTD at 21—would violate the

nondelegation doctrine.  But at a minimum, that reading "would raise serious constitutional

problems," requiring the Court to adopt Plaintiffs' "alternative interpretation of the statute" as long

as it is "fairly possible."  *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (quotations omitted).  Here,

Plaintiffs' proposed reading, *viz.*, that an "emergency" under the NEA is an unforeseen

circumstance requiring immediate action, is "fairly possible," *id.*, given that it comports with the

term's ordinary meaning and past judicial interpretations.

The Supreme Court employed this canon to avoid nondelegation concerns in *Industrial*

*Union Department., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980).  There, the

government took the "extreme position" that a statutory command to "set a standard 'which most

adequately assures . . . that no employee will suffer material impairment of health'" required it to

"impose standards that either guarantee workplaces that are free from any risk of material health

impairment, however small, or that come as close as possible to doing so without ruining entire industries." *Id.* at 641 (plurality op.).  A plurality held that "[i]n the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [executive] the unprecedented power" it claimed, because "the statute would make such a sweeping delegation of legislative power that it might be unconstitutional." *Id.* at 645-46 (citations and quotation marks omitted).  According to the plurality, "[a] construction of the statute that avoids this kind of open-ended grant should certainly be favored." *Id.* at 646.[9]

Here, as in *Industrial Union*, Defendants have pressed an "extreme position," *id.* at 641: that there are no "standards by which to evaluate the President's exercise of [his NEA] authority" and that the emergency determination has been "le[ft] to the President," Defs.' MTD at 21.  That position would result in a "sweeping delegation of legislative power," *Indus. Union*, 448 U.S. at 646, empowering the President to declare an emergency on a whim—or more likely, whenever he loses a political battle—and thereby unlock breathtaking executive authority under a wide array of separate statutes.  *See, e.g.*, 47 U.S.C. § 606(c) (in event of emergency, President may direct "the clos[ure] of any station for radio communication"); 21 U.S.C. § 360bbb-3 (in event of emergency, Secretary of Health and Human Services may authorize use of unapproved "drug, device, or biological product").  "[I]t is unreasonable to assume that Congress intended to give the [President] th[is] unprecedented power." *Indus. Union*, 448 U.S. at 645.  Because another "construction of the statute [would] avoid[] this kind of open-ended grant"—and in fact would best cohere with the

---

[9] Although only a plurality of the Court reached this conclusion, that was because then-Justice Rehnquist would have gone even further and held the statute unconstitutional under the nondelegation doctrine. *Id.* at 686 ("We ought not to shy away from our judicial duty to invalidate unconstitutional delegations of legislative authority . . . .") (Rehnquist, J., concurring in the judgment).

plain meaning of "emergency"—that construction "should certainly be favored." *Id.* at 646.[10]

### B.      If Read to Authorize the Proclamation, the NEA Is Unconstitutional

Article I, § 1 of the Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." "This text permits no delegation of those powers." *Whitman*, 531 U.S. at 472. In a nondelegation challenge, then, "the constitutional question is whether the statute [at issue] has delegated legislative power" to the Executive Branch. *Id.*

The Supreme Court has developed the "intelligible principle" test to determine whether Congress has violated the nondelegation doctrine. Under that test, if "Congress shall lay down by legislative act an intelligible principle to which the person or body [to whom power is delegated] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *see United States v. Whaley*, 577 F.3d 254, 263 (5th Cir. 2009). An intelligible principle must not only be clear enough to guide the Executive, but it must also enable the Judiciary to evaluate whether the Executive has acted within the bounds of its authority. *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 423, 425 (1944) (requiring that courts be able to see "in an appropriate proceeding" that there is a "substantial basis" for the executive action and that the "will of Congress has been obeyed").

Under the intelligible principle test, "the degree of [executive] discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. Whereas Congress itself must regulate "important subjects," it has more leeway to delegate in

---

[10] By flagrantly disregarding the NEA through his declaration of a fabricated emergency, the President has also violated his "most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Lujan*, 504 U.S. at 577 (quoting U.S. Const. art. II, § 3); *see* Am. Compl. Count VII. The Take Care Clause would be rendered a dead letter if construed to authorize bad-faith presidential actions designed to subvert the will of another governmental branch. As the Supreme Court explained in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), "the President's power to see that the laws are faithfully executed refutes the idea that he is to be the lawmaker." *Id.* at 587.

areas of "less interest." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). So, for example, while Congress "must provide substantial guidance on setting air standards that affect the entire national economy," it need not flesh out relatively minor matters, like the definition of "country elevators." *Whitman*, 531 U.S. at 475.

In *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), the Supreme Court applied the nondelegation doctrine to invalidate a statute "authoriz[ing] [the President] to prohibit the transportation in interstate and foreign commerce of petroleum" products in excess of state production quotas. *Id.* at 406. Because regulation of oil transportation was a question "of legislative policy," the Court asked whether Congress had "set up a standard for the President's action," or "required any finding by the President in the exercise of the authority to enact the prohibition." *Id.* at 415. The Court held that the statute did not do so: it "establishe[d] no criterion to govern the President's" decision of "whether or in what circumstances or under what conditions" to prohibit oil transportation. *Id.* Nor did it "require any finding by the President as a condition of his action." *Id.* Instead, the statute gave the President "unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit," unguided by any "standard or rule." *Id.* at 415, 418; *see id.* at 418 ("The Congress left the matter to the President without standard or rule, to be dealt with as he pleased."). Accordingly, the Court concluded, Congress had unconstitutionally "transfer[red] . . . its lawmaking function . . . to the President." *Id.* at 430.

The NEA, as Defendants have construed it, suffers from the same constitutional infirmity. As earlier explained, the Act permits the President to claim "special or extraordinary power[s]" under numerous separate statutes whenever he declares an "emergency." 50 U.S.C. § 1621. By its terms, the Act does not define "emergency" or provide any intelligible principle to guide the

President's emergency determination.  As a result, the natural approach is to construe "emergency" in accordance with its ordinary meaning—an unforeseen circumstance requiring immediate action—which would thereby give the President the requisite intelligible principle from which to operate.  *See supra* at 20-25.

Defendants, however, have rejected this approach.  In their view, because the NEA "does not define the term national emergency or provide courts with any standards by which to evaluate the President's exercise of this authority," Congress has "le[ft] to the President the determination about when and under what circumstances to declare a national emergency."  Defs.' MTD at 21. Moreover, Defendants have asserted, "[t]he NEA sets forth no criteria from which the Court could judge the President's action or make a determination about whether a particular issue constitutes a national emergency."  *Id.* at 26.

Under this (flawed) reading, the NEA amounts to an unconstitutional delegation of legislative power.  The NEA, Defendants have argued, provides no "standards" to guide presidential action.  *Id.* at 21.  That is another way of saying that the statute lacks an intelligible principle.  *See Panama Refining*, 293 U.S. at 418 (invalidating statute because it established no "standard or rule" to govern the President's determination).  And the NEA, Defendants have contended, "sets forth no criteria from which" a court can evaluate the President's emergency determination.  Defs.' MTD at 26.  That is yet another way of saying that the statute flunks the intelligible principle test.  *See Yakus*, 321 U.S. at 423 (courts need "substantial basis" for evaluating executive action).

In fact, under Defendants' reading, the delegation here is even more flagrantly unconstitutional than the one in *Panama Refining*.  In both cases, the relevant statute left "the matter to the President without standard or rule, to be dealt with as he pleased."  *Panama Refining*,

293 U.S. at 418.  But there, at least the delegation took place within a relatively confined area of economic policy.  *See Whitman*, 531 U.S. at 475 ("[T]he degree of [executive] discretion that is acceptable varies according to the scope of the power congressionally conferred."); *Whaley*, 577 F.3d at 264 (upholding delegation because "the authority delegated is relatively small").  Here, by contrast, the delegation would authorize the President to "affect the entire nation[]," *Whitman*, 531 U.S. at 475—giving him access to scores of new funds and policymaking powers—simply by making the unreviewable determination that an emergency exists.  Were the Judiciary to bless such a delegation, the only future limit on presidential power would be the President's own imagination.  *See Youngstown*, 343 U.S. at 650 (Jackson, J., concurring) (emergencies "afford a ready pretext for usurpation"); *id.* at 652 ("[E]mergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them.").

If all this were not enough, two other aspects of the delegation in this case exacerbate its unconstitutionality.  First, the NEA delegates power directly to the President, as opposed to an administrative agency.   Unlike an administrative agency, which is subject to procedural requirements and robust judicial review, *see* 5 U.S.C. §§ 552, 553, 706, the President can act with speed and insulation—often enacting and implementing policies long before courts can review them. The President's deployment of legislative authority therefore threatens the separation of powers and, in turn, individual liberty, to a greater extent than an administrative agency's.  *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("The structural principles secured by the separation of powers protect the individual").  For this reason, it is no surprise that the two cases in which the Supreme Court has found nondelegation-doctrine violations involved direct delegations to the President.  *See Panama Refining*, 293 U.S. 388; *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

Second, the delegation opens the door to the President spending appropriated funds in violation of their assigned purpose.  Appropriating funds is a uniquely legislative function:  The Appropriations Clause vests Congress with the "exclusive power over the federal purse" and forms the "bulwark of the Constitution's separation of powers."  *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) (Kavanaugh, J.); *see* Part III *infra*.  When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened."  *Clinton*, 524 U.S. at 451 (Kennedy, J., concurring).  Under Defendants' reading of the NEA, Congress has given the President unconstrained authority to declare an emergency and thereby use funds appropriated for other purposes to address that emergency. *See, e.g.*, 10 U.S.C. § 2808 (in event of emergency declaration, allowing expenditures on "military construction projects").  On this view, in other words, Congress has licensed the President to usurp one of its quintessential functions.  Not only does this consequence render Defendants' statutory interpretation unreasonable, but it also renders the constitutional violation that would result from that interpretation all the more egregious.

III.   **DEFENDANTS' USE OF FUNDS TO BUILD A BORDER WALL VIOLATES THE APPROPRIATIONS CLAUSE**

Even if the Proclamation were lawful, Defendants' plan to build a border wall could not proceed.  That is because the plan entails spending funds for purposes that Congress never authorized, in direct contravention of the Appropriations Clause.  Because of Defendants' Appropriations Clause violations, their plan to build a border wall—and all actions carried out in accordance with that plan—must be declared unlawful and enjoined.

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cty. of S.F.*, 897 F.3d at 1231; *Dep't of Navy*, 665 F.3d at 1348 ("Congress's control over federal expenditures is absolute." (quotation omitted)).  In *The Federalist Papers*,

James Madison described that power as "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people."  The Federalist No. 58.  And in his own constitutional commentary, Joseph Story deemed it "highly proper" that "[C]ongress should possess the power to decide how and when any money should be applied," because "[i]f it were otherwise, the executive would possess an unbounded power over the public purse of the nation . . . and might apply all its moneyed resources at his pleasure."   2 Joseph Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1851).

The key source of Congress's power of the purse is the Appropriations Clause, which declares that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  By its terms, the Clause "provides an explicit rule of decision":  "the payment of money from the Treasury must be authorized by a statute."  *OPM v. Richmond*, 496 U.S. 414, 424 (1990); *see Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress.").  That means "that the expenditure of public funds is proper only when *authorized* by Congress, not that public funds may be expended *unless prohibited* by Congress."  *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (emphasis added); *see Dep't of Navy*, 665 F.3d at 1348 ("[A]ll uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient.").  Thus, "[w]here Congress has addressed [a] subject" and "authorized expenditures where a condition is met, the clear implication is that where the condition is not met, the expenditure is not authorized."  *MacCollom*, 426 U.S. at 321.

Congress has "reinforce[d] [its] control over appropriated funds" pursuant to "numerous" federal statutory provisions.  *Dep't of Navy*, 665 F.3d at 1347 (citing 31 U.S.C. § 1301 *et seq.*); *see also Harrington v. Bush*, 553 F.2d 190, 194-95 (D.C. Cir. 1977) ("Congress has plenary power

to give meaning to" the Appropriations Clause).  These provisions include 31 U.S.C. § 1301, known as the "Purpose Statute," which states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made."  Similarly, 31 U.S.C. § 1532, known as the "Transfer Statute," provides that funds may not "be withdrawn from one appropriation account and credited to another" unless "authorized by law."  And 31 U.S.C. § 1341, known as the "Antideficiency Act," makes it unlawful for any federal officer to "make or authorize an expenditure or obligation exceeding an amount available in an appropriation," or to involve the "government in a contract or obligation for the payment of money before an appropriation is made."

Here, Defendants have announced, and begun to implement, a plan to use certain appropriated funds to build a border wall.  Specifically, Defendants will draw:  (1) $3.6 billion from DOD funds for military construction projects, *see* 10 U.S.C. § 2808; and (2) $2.5 billion from DOD funds designed to support DHS counterdrug activities, *see* 10 U.S.C. § 284.  All told, these funding sources would provide an additional $6.1 billion toward building a border wall.

But in the CAA, Congress itself considered whether to appropriate funds for a border wall. In fact, border-wall funding was the chief issue that Congress debated, and a standoff over such funding precipitated the longest government shutdown in American history.  *See supra* at 4-5.  And in the CAA, Congress provided only $1.375 billion—not $6.1 billion (or a combined $7.5 billion)—for border-wall funding.  *See* CAA, § 230(a).  It also made clear that the appropriated $1.375 billion is for "construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector" alone, not along other sections of the southern border.  *Id.*; *see also id.* § 231 ("None of the funds made available by this Act or prior Acts are available for the construction of pedestrian fencing" in five specified border areas).  Finally, Congress barred the use of appropriations to

increase funding for "a program, project, or activity" beyond the allotted amount, unless authorized by a "reprogramming or transfer provision" of an appropriations statute. *Id.* § 739. As explained in Part III.A *infra*, Defendants' funding plan violates the CAA and, in turn, the Appropriations Clause.

Separately, Defendants' funding plan violates the Appropriations Clause because it is not authorized by the statutory provisions it invokes. *See MacCollom*, 426 U.S. at 321 (Appropriations Clause violated if the expenditure is not "authorized by Congress"). First, § 2808 does not authorize the planned border-wall expenditures because the President's declared emergency does not "require[] use of the armed forces"; a border wall is not a "military construction project[]"; and a border wall is not "necessary to support [a] use of the armed forces." 10 U.S.C. § 2808; *see* Part III.B *infra*. Second, § 284 does not authorize the planned expenditures because $2.5 billion toward a wall is not "support" for counterdrug activities, and the entire southern border is not a "drug smuggling corridor[]." 10 U.S.C. § 284(a), (b)(7); *see* Part III.C *infra*.

## A.    Defendants' Wall-Funding Plan Violates the CAA

"[A]n appropriation for a specific purpose is exclusive of other appropriations in general terms which might be applicable in the absence of the specific appropriation." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quotations omitted). "[E]stablished from time immemorial," this rule applies "to appropriations bills the general principle of statutory construction" that "a more specific statute will be given precedence over a more general one." *Id.* (quoting *Busic v. United States*, 446 U.S. 398, 406 (1980)). Applying this rule, the D.C. Circuit has held, for instance, that Congress's specific appropriation of $1 million to Nevada for conducting "scientific oversight responsibilities" precluded a more general $190 million appropriation for "nuclear waste disposal activities" from being directed to Nevada. *Id.*

The CAA appropriates $1.375 billion for border-wall expenditures and requires those

expenditures to be made on "construction . . . in the Rio Grande Valley Sector" alone.  CAA, § 230; *id.* § 231.  Defendants' funding plan, by contrast, will transfer $6.1 billion of funds appropriated for other more *general* purposes—military construction, 10 U.S.C. § 2808, and counterdrug support, 10 U.S.C. § 284—to construction of a wall along the entire southern border.  Their plan therefore flouts the cardinal principle that a specific statute controls a general one and is precluded by the CAA.  *See Nevada*, 400 F.3d at 16; *MacCollom*, 426 U.S. at 321.  And by using appropriated funds for different purposes than Congress chose, the plan also violates the "Purpose Statute" discussed above.  31 U.S.C. § 1301.

On top of that, CAA § 739 expressly forbids Defendants' funding plan.  Section 739 states:

> None of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Section 739 creates a general rule and an exception.  The general rule is that "[n]one of the funds made available" in an "appropriations Act" (including the CAA) "may be used to increase funding for a program, project, or activity" that was "proposed in the President's budget request for a fiscal year."  The exception is that appropriations may be used to increase such funding if that use is authorized by "the reprogramming or transfer provisions" of an "appropriations Act."  Section 739 prohibits Defendants' plan to fund the border wall, because the plan is barred by that provision's general rule and does not fall within its exception.

1.  Defendants' plan is barred by Section 739's general rule, because it (1) seeks to use funds "made available" in an "appropriations Act"; (2) "to increase funding for a program, project, or activity"; (3) that was "proposed in the President's budget request for a fiscal year."

First, Defendants' plan seeks to use funds "made available" in an "appropriations Act."  In

particular, it taps appropriated military construction funds under 10 U.S.C. § 2808 and counterdrug support funds under 10 U.S.C. § 284.  As the White House has acknowledged, all of those funds have been "appropriated by Congress."  Fact Sheet, note 2 *supra*.  The military construction funds have been "made available" by Military Construction Appropriation Acts dating back to 1982.  *See, e.g.*, Pub. L. No. 97-106, 95 Stat. 1503; *see also* 10 U.S.C. § 2808(a) (military construction projects "may be undertaken only within the total amount of funds that have been appropriated for military construction").  And the counterdrug support funds have been "made available" by the Department of Defense Appropriations Act.  *See* Pub. L. No. 115-245 (2019).

Second, Defendants' plan also seeks to use these appropriations to "increase funding for a program, project, or activity."  Construction of a wall along the southern border is a singular "project" under that word's ordinary meaning.  *See* Merriam-Webster's Dictionary 932 (10th ed. 1998) (defining "project" as "a specific plan or design").  Indeed, the Executive Branch has consistently referred to the wall in this manner.  In the first days of his administration, the President signed an executive order stating that it is "the policy of the executive branch" to construct "a physical wall on the southern border," defined as "a contiguous, physical wall, or other similarly secure, contiguous, and impassable physical barrier."  82 Fed. Reg. at 8793-94 (Ex. 5).  Likewise, on the day of the President's Proclamation, a White House fact sheet announced that the Executive Branch would use over $6 billion in additional funds to "build the border wall."  Fact Sheet, *supra* note 2.

Third, funding for the border wall was "proposed in the President's budget request for a fiscal year."  On January 6, 2019, President Trump formally requested $5.7 billion for fiscal year 2019 "for construction of a steel barrier for the Southwest border."  Ex. 28, at 1.

2. Defendants' funding plan is not saved by Section 739's exception:  the funding increases

it proposes are not "change[s] . . . made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." Under federal law, an "appropriations Act" is an Act whose title begins: "An Act making appropriations." 2 U.S.C. § 622(5); 1 U.S.C. § 105. Neither 10 U.S.C. § 2808 nor 10 U.S.C. § 284 is found in an "appropriations Act." Section 2808 is a provision of the Military Construction Codification Act, Pub. L. No. 97-124, 96 Stat. 153 (1982), which says nothing about appropriations in its title, nor makes any appropriations in its body. And § 284 is a provision of the National Defense Authorization Act, Pub. L. No. 114-328, 130 Stat. 2000, 2381, 2497 (2016), which by title and substance is not an "appropriations Act." *Cf.* Pub. L. No. 115-31, 131 Stat. 135, 229 (2017) (separate statute appropriating Department of Defense funds).

Because Defendants' funding plan runs afoul of the CAA, it must be enjoined in its entirety. But even apart from the CAA, the funding plan cannot be sustained by either of the individual statutes on which Defendants rely, as explained directly below.

### B.      Section 2808 Does Not Authorize Defendants' Border-Wall Expenditures

Defendants have invoked 10 U.S.C. § 2808 as authority for the Secretary of Defense to spend $3.6 billion on constructing a border wall. Section 2808 does not authorize that expenditure.

In relevant part, § 2808 states:

> In the event . . . of the declaration by the President of a national emergency in accordance with the National Emergencies Act . . . that requires use of the armed forces, the Secretary of Defense . . . may undertake military construction projects . . . that are necessary to support such use of the armed forces.

Broken down, the provision sets forth three requirements, each of which must be satisfied for border-wall construction to be permitted: (1) the relevant "national emergency" must "require[]" use of the armed forces"; (2) the relevant project must be a "military construction project"; and (3) the relevant project must be "necessary to support such use of the armed forces." *Id.* None of these requirements is satisfied here.

1.   The Proclamation declares that the relevant "national emergency" is the "current situation at the southern border." Ex. 14, at 1.  According to the Proclamation, the essence of that "situation" is "the problem of large-scale unlawful migration" and an "inability to provide detention space for many . . . aliens while their removal proceedings are pending."  *Id.*  This "situation" is therefore inextricably linked to the enforcement of immigration laws.

But the enforcement of immigration laws does not "require[] use of the armed forces."  10 U.S.C. § 2808.  Such enforcement requires no military experience or training; instead, it requires only traditional law enforcement experience and training possessed by civilian officers around the country.  *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) ("Securing the border . . . [is], of course, law enforcement activit[y].").  For that reason, Congress has long tasked civilian agencies such as DHS and CBP with immigration enforcement responsibilities.[11]  In fact, even when addressing "an actual or imminent mass influx of aliens . . . near a land border[] present[ing] urgent circumstances"—*i.e.*, the same circumstances alleged in the Proclamation—Congress only empowered the Attorney General to authorize civilian "law enforcement officer[s]" to perform immigration functions.  8 U.S.C. § 1103(a)(10).

Not only has Congress assigned immigration enforcement solely to civilian agencies, but it has also expressly disapproved of military officers performing law enforcement duties.  The Posse Comitatus Act generally bars military members from "execut[ing] the laws."  18 U.S.C. § 1385.  And other federal statutory provisions contain similar prohibitions—*e.g.*, barring military participation in "search[es], seizure[s], arrest[s], or other similar activit[ies]."  10 U.S.C. § 275.

---

[11] *See* 6 U.S.C. § 202 (assigning DHS responsibility for "[s]ecuring the borders" and "immigration enforcement functions"); *id.* § 251 (assigning DHS responsibility for "Border Patrol," "detention and removal," and "inspections"); 8 U.S.C. § 1103(a)(5) (Secretary of DHS has "duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens").

These laws embody the longstanding norm that the President must avoid using the military to execute domestic laws.  That norm is grounded in the recognition that nothing could be "more sinister and alarming" than allowing a President to "vastly enlarge his mastery over the internal affairs of the country" through "commitment of the Nation's armed forces."  *Youngstown*, 343 U.S. at 642 (Jackson, J., concurring).

Lastly, setting aside immigration enforcement, the act of constructing a border wall itself does not "require[] use of the armed forces."  10 U.S.C. § 2808.  Since 1996, Congress has provided for construction of hundreds of miles of southern-border barriers.[12]   The military has not participated in any of that construction.  That is unsurprising, since no military training or experience is necessary to build walls.

2.  Even when there is a national emergency requiring use of the armed forces, § 2808 authorizes only "military construction projects."   Section 2801(a) in turn defines "military construction" as "any construction, development, conversion, or extension of any kind carried out with respect to a military installation."  10 U.S.C. § 2801(a).  And "military installation" means "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."  *Id.* § 2801(c)(4).

Given these statutory definitions, § 2808 does not authorize a border wall.  The southern border, where the wall construction will be "carried out," is not a "military installation."  *Id.* § 2801(a).  It is not a "base, camp, post, station, yard, center, or other activity."  *Id.* § 2801(c)(4).

---

[12] *See* Pub. L. No. 104-208, 110 Stat. 3009, 3009-546, 554-55 (1996) (authorizing Attorney General to install barriers "in areas of high illegal entry" and directing construction of 14 miles of barriers in San Diego); Pub. L. No. 109-367, 120 Stat. 2368, 2638-39 (2006) (directing construction of barriers in specific areas and designating five "priority areas"); Pub. L. No. 110-161, 121 Stat. 1844, 2090 (2008) (allowing DHS to determine where fencing would be "most practical and effective").

Rather, the southern border is an international boundary line.  Nor is the border "under the jurisdiction of the Secretary of a military department."  *Id.*  But to the extent the border is under any agency's "jurisdiction," it would be DHS, which is responsible for "[s]ecuring the borders," 6 U.S.C. § 202(2)—not DOD.

Past practice highlights Defendants' misapplication of the phrase "military construction projects" under § 2808.  Presidents have twice invoked § 2808 and the NEA to authorize "military construction projects."  First, President George H.W. Bush did so during Operation Desert Shield.[13]  Based on that invocation, Army officials opted to use $20.5 million to construct new facilities at an Army base in Kuwait.[14]  Second, President George W. Bush invoked § 2808 in the aftermath of September 11th,[15] leading to eighteen different military construction projects.[16]  Seventeen of those projects occurred at overseas military sites, such as the construction of barracks at camps in Afghanistan.  *Id.*  The one project on American soil involved construction necessary to secure weapons of mass destruction.  *Id.* at 2.

Every past use of § 2808 has thus involved mine run military construction—*i.e.*, construction taking place on military sites under the control of military departments.  Never has the Executive Branch sought to stretch § 2808's words like Defendants have here, to authorize construction of a law-enforcement project away from a military site.  The novelty of Defendants'

---

[13] *See* Exec. Order No. 12,734, 55 Fed. Reg. 48,099 (Nov. 14, 1990); Exec. Order No. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990).

[14] *See* Janet A. McDonnell, *After Desert Storm* 221-22 (Dep't of the Army 1999), https://tinyurl.com/McDonnellAfterDesertStorm.  Ultimately, however, the Kuwaiti government paid the construction costs, so the Army never had to use the emergency construction authority. *Id.* at 225.

[15] *See* Exec. Order No. 13,235, 66 Fed. Reg. 58,343 (Nov. 16, 2001).

[16] Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., *Military Construction Funding in the Event of a National Emergency* 2-3 (2019), https://tinyurl.com/CRS-MilConFunding.

application of § 2808 is itself a reason to reject it.  *See Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 380 (5th Cir. 2018) ("[T]hat it took [an agency] forty years to discover its novel interpretation further highlights [that interpretation's] unreasonableness." (quotation marks omitted)).

3.   Even if a border wall were a "military construction project[]," it would need to be "necessary to support such use of the armed forces" for § 2808 to allow it.  For instance, the Secretary of Defense has previously invoked § 2808 to build military hangars, runways, logistics hubs, and ammunition-storage facilities.  *See* Vassalotti & McGarry, note 16 *supra*, at 2-3.  Those projects "support" uses of the armed forces by enabling them to more effectively carry out military functions.

The relevant "use of the armed forces" here would be immigration enforcement at the border, because that is what the alleged "national emergency" purportedly requires.  *See supra* at 37.  But immigration enforcement is not a valid "use of the armed forces" at all, as discussed above.  And even assuming it were, a border wall is not "necessary to support" the armed forces in its enforcement of immigration laws at the border.  Instead, a wall would obviate the need for the military to enforce immigration laws, rather than "support[ing]" its effort to do so.  As President Trump explained:  "If we had a wall, we don't need the military because we'd have a wall."  Ex. 15, at 6.  That explanation shows that a border wall cannot be "necessary to support" the relevant use of the armed forces.

### C.    Section 284 Does Not Authorize Defendants' Border-Wall Expenditures

Defendants have also invoked 10 U.S.C. § 284 as authority to spend $2.5 billion on a border wall.   Section 284(a) states that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency . . . for any of the purposes set forth in subsection (b)."  10 U.S.C. § 284(a).  Section 284(b)(7) lists as one such purpose: "Construction

of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7). Relying on these provisions, Defendants have announced, and begun to carry out, a plan in which the Acting Secretary of Defense will "support" DHS by providing it $2.5 billion for construction of a wall along the entire southern border. To validate that plan, this Court would have to conclude that: (1) $2.5 billion toward a border wall qualifies as "support" for DHS's "counterdrug activities"; and (2) the entire southern border qualifies as a "drug smuggling corridor[]." Neither of these conditions is met.

1. To determine the meaning of "support" in § 284, one must view that term in the context of the provision as a whole. *See, e.g., Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("[s]tatutory language" is not "construed in a vacuum" and "must be read in . . . context and with a view to [its] place in the overall statutory scheme"). Section 284(b) lists ten forms of support that DOD may provide to other agencies. 10 U.S.C. § 284(b). These forms of support include maintaining and repairing equipment, transporting personnel, establishing training facilities, detecting air and sea traffic, constructing roads and fences, establishing computer networks, providing intelligence analysis, and performing aerial and ground reconnaissance. *See* 10 U.S.C. § 284(b)(1)-(10). After listing the types of support that DOD may give, § 284 specifies instances in which the Secretary must notify Congress about "support" DOD has provided. 10 U.S.C. § 284(h). And there, it states that "[i]n the case of support for a purpose described in subsection (b)"—including subsection (b)(7)—the Secretary must offer "a description of any small scale construction project for which support is provided." *Id.* § 284(h)(1)(B). "[S]mall scale construction," in turn, is defined as "construction at a cost not to exceed $750,000 for any project." *Id.* § 284(i)(3).

Taken together, § 284's interlocking provisions show that "support" cannot include $2.5 billion toward a border wall.  For starters, an expenditure in that amount for a project of that magnitude is totally disproportionate to the other forms of "support" that § 284(b) authorizes.  In accordance with the ordinary meaning of "support"—"assistance or backing," Oxford English Dictionary Online (last visited Apr. 23, 2019)—those other forms amount to subsidiary acts of aid. A $2.5 billion outlay for a border wall, by contrast, would be the primary driver of a mammoth construction project.

Indeed, § 284's congressional notification provisions make clear that "support" in the context of § 284(b)(7) can include only assistance with "small scale construction project[s]" costing no more than $750,000.  10 U.S.C. §§ 284(h)(1)(B), 284(i)(3).  Congress, after all, only required notification for construction projects of that scale.  *Id.*  Defendants' contrary reading makes no sense:  the Secretary would be required to notify Congress of construction projects costing under $750,000, but would not need to notify Congress of a massive construction project costing over 3,000 times that amount.  Congress, as the keeper of the public fisc, would obviously want a description of the *more* expensive project over the *less* expensive one, just as any parent would want their teenager to alert them before making a $5,000 purchase more so than a $5 one. No plausible reading could lead to such an "incongruous" result.  *Salinas v. United States*, 522 U.S. 52, 58 (1997).

And there is still another reason to reject the government's interpretation of "support."  By reading that word to authorize a $2.5 billion payment for a border wall, the Acting Secretary of Defense is "claim[ing] to discover in a long-extant statute an unheralded power."  *UARG v. EPA*, 573 U.S. 302, 324 (2014).  But as the Supreme Court has held, Congress does not grant agencies such powers through "vague terms or ancillary provisions—it does not, one might say, hide

elephants in mouseholes." *Whitman*, 531 U.S. at 468. It is unsurprising, then, that DOD has never, before now, contended that § 284 authorizes anywhere near this level of spending. Where, as here, an agency announces such a novel contention, courts "typically greet it[] . . . with a measure of skepticism." *UARG*, 573 U.S. at 324; *accord Chamber of Commerce*, 885 F.3d at 380.

2. Regardless of whether $2.5 billion for a border wall can qualify as "support," Defendants' reliance on § 284 fails on a separate ground. Recall that Defendants have invoked § 284(b)(7), which authorizes support for construction of "fences . . . to block drug smuggling corridors across international boundaries of the United States," 10 U.S.C. § 284(b)(7), to build a wall that will ultimately span the entire "international boundar[y]" with Mexico. But that application of § 284(b)(7) cannot be reconciled with its text. Section 284(b)(7) differentiates between "corridors" and "international boundaries," by stating that "corridors" exist "*across*" such boundaries. So while an international boundary may feature numerous "corridors," an international boundary cannot itself *be* a "corridor." Read Defendants' way, the word "corridors" is superfluous, as § 284(b)(7) would allow "fences to block . . . international boundaries." *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (rejecting interpretation that rendered word "insignificant, if not wholly superfluous").

Nor can the ordinary meaning of "corridor" be stretched to encompass an entire international boundary. "Corridor" means "passageway." American Heritage Dictionary 412 (4th ed. 2006). Recognizing as much, courts (including the Fifth Circuit) have used the phrase "drug corridor" to refer to discrete passageways through which drugs are transported. *See, e.g.*, *United States v. Vasquez*, 298 F.3d 354, 357 (5th Cir. 2002) (referring to "Highway 59" as a "known corridor for . . . drug trafficking"); *United States v. Powell*, 137 F. App'x 701, 702, 706 (5th Cir. 2005) (referring to "Interstate 45" as "known major drug corridor"); *United States v. Foreman*,

369 F.3d 776, 784-85 (4th Cir. 2004) (referring to "Route 13" as a "frequented corridor for illegal narcotics"); *United States v. Pino*, 855 F.2d 357, 358 (6th Cir. 1988) (referring to "Interstate 24" as a "drug corridor").  Such discrete passageways might cross the border at certain points.  *See Vasquez*, 298 F.3d at 355 (noting that "South Texas highways often serve as corridors for illegal immigration and drug-trafficking activity originating in Mexico").  But the entirety of the southern border is not itself a discrete passageway.

## IV.   DEFENDANTS' ACTIONS VIOLATE THE ADMINISTRATIVE PROCEDURE ACT

The Administrative Procedure Act (APA) directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*:  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; and "in excess of statutory jurisdiction [or] authority."  5 U.S.C. § 706(2).  Here, Defendants Shanahan and McAleenan, as Acting Secretaries of Defense and Homeland Security, respectively, have violated the APA in two separate ways.  First, they have made a determination to spend funds on a border wall under 10 U.S.C. §§ 284 and 2808, even though neither of those provisions authorizes such expenditures.  Second, Defendant Shanahan has made a determination to transfer funds from one DOD appropriations account to another and then to DHS, even though the Department of Defense Appropriations Act bars such transfers.

Although an agency's "allocation of funds from a lump-sum appropriation" is unreviewable under the APA, *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), Plaintiffs here do not challenge such an action.  Rather, Plaintiffs contend that Defendants' use of funds violates express "restrictions in [their] operative statutes"—a claim to which APA review fully applies.  *Id.* at 193; *see Louisiana State v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 585-88 (5th Cir. 2016) (conducting APA review of agency's funding decisions where statutes constricted agency's

discretion).   Courts have reviewed and invalidated agency fund-allocation decisions in precisely

these circumstances.   *See Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1347, 1350 (D.C. Cir.

1996) (agency's allocation of funds was reviewable under APA and violated governing statute).

This Court should do the same here.

### A.     Defendants' Determination to Spend Funds on a Border Wall Violates the APA

As explained above, Defendants Shanahan and McAleenan, acting pursuant to the

President's direction, have decided to spend appropriated funds on a border wall.  They have taken

several actions in pursuit of that plan:  DHS has requested funds from DOD, citing 10 U.S.C. §

284, *see* Ex. 19; DOD has provided Congress with a "Fact Sheet" identifying § 2808 "military

construction" funding that could be used for building a border wall, including funding that

Congress originally appropriated for use on projects at Fort Bliss in El Paso County, *see* Ex. 21;

DOD has confirmed in a letter to DHS that the agencies have decided to undertake "El Paso Sector

Project 1," which entails the construction of 46 miles of border walls in the direct vicinity of El

Paso County, *see* Ex. 19, at 9; and DOD has awarded a private contract for wall construction in

the direct vicinity of El Paso County, *see* Ex. 24, at 1.

For the same reasons that Defendants' wall-funding plan violates the Appropriations

Clause, it also violates the APA.  Defendants claim that 10 U.S.C. §§ 284 and 2808 justify the

actions they have taken toward building a border wall.  But in fact, neither of those provisions

authorizes such actions.  *See supra* at 36-44.  Accordingly, Defendants' actions are "not in

accordance with law," "contrary to constitutional . . . power," and "in excess of statutory . . .

authority."  5 U.S.C. § 706(2).  This Court must therefore hold them "unlawful" and "set [them]

aside."  *Id.*; *see Ramah Navajo Sch. Bd.*, 87 F.3d at 1350.

### B.      DOD's Fund Transfers Violate the APA

As explained above, DOD plans to "support" DHS under § 284 by providing it $2.5 billion to construct a border wall.  But even aside from the fact that § 284 does not allow such an expenditure, that plan is unlawful for multiple other reasons.

DOD has stated that it will provide "support" to DHS under § 284 by transferring it funds from DOD's Drug Interdiction appropriations account.  *See* Ex. 23.  In the 2019 Department of Defense Appropriations Act, Pub. L. No. 115-245, however, Congress expressly barred such a transfer.  Section 8045(a) of that Act states:  "None of the funds available to the Department of Defense for any fiscal year for drug interdiction or counter-drug activities may be transferred to any other department or agency of the United States except as specifically provided in an appropriations law."  Even if § 284 allowed DOD's intended transfer on its own terms (it does not), § 284 is not "an appropriations law."  *See supra* at 36.  Thus, Section 8045 forbids DOD's $2.5 billion transfer to DHS.

DOD's plan to provide § 284 "support" to DHS falters for another, independent reason.  Congress appropriated $881,525,000 to DOD's Drug Interdiction account for fiscal year 2019— far less than the $2.5 billion that DOD plans to give DHS.  *See* Pub. L. No. 115-245, Title VI.  To make up the shortfall, DOD has reprogrammed $1 billion from its Military Personnel appropriation account to its Drug Interdiction Account.  *See* Exs. 22-23.

DOD may engage in such reprogramming only if Congress has authorized it to do so.  As discussed in Part III *supra*, Congress, exercising its Appropriations Clause powers, has provided that funds "may be withdrawn from one appropriation account and credited to another . . . *only when authorized by law*."  31 U.S.C. § 1532 (emphasis added); *see supra* at 32.  Here, DOD points to Section 8005 of the DOD Appropriations Act as the requisite authorization.  That section reads as follows:

> [The Secretary may transfer] funds made available in this Act to the Department of Defense for military functions (except military construction) . . . [p]rovided [t]hat such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress.

Section 8005 accordingly authorizes DOD's reprogramming only if: (1) it is "based on unforeseen military requirements"; (2) "the item for which funds are requested" has not "been denied by the Congress"; and (3) the transfer is "for military functions (except military construction)." None of these prerequisites is satisfied here.

1. DOD has reprogrammed funds in order to provide money to DHS for a border wall. That reprogramming is not "based on unforeseen military requirements." For all the reasons given in Part II *supra*, the alleged need for a border wall to impede unlawful immigration is not "unforeseen." *See supra* at 22. To the contrary, as the President's Proclamation admits, dealing with unlawful immigration is a "long-standing" political issue that Congress and the President have debated over decades. *See* Ex. 14, at 1. Nor would DOD's reprogramming be for a "military requirement." Enforcing immigration laws is, and has always been, a *civilian* responsibility. *See supra* at 37. And certainly, military members—who are trained to fight wars—are not "require[d]" to build a wall. *See supra* at 38.

2. DOD has requested funds to be transferred so that a wall can be built along the southern border. But such a wall is an "item" that has "been denied by the Congress." Congress considered providing funding for a border wall. Ultimately, however, it elected to appropriate only $1.375 billion for construction of barriers in specified areas. *See* CAA, §§ 230-31. In so doing, Congress "denied" the precise "item"—a $7.5 billion wall stretching the entire border—for which DOD now seeks to transfer funds. Section 8005 therefore fails to authorize that transfer.

3. DOD's transfer is also not "for military functions." It is for a wall designed to better

prevent unlawful immigration.  Preventing unlawful immigration and building walls are civilian, not military, functions.  But to the extent building a border wall is a "military function," it would of course be "military construction."  Indeed, in invoking 10 U.S.C. § 2808, Defendants expressly assert that building a border wall qualifies as "military construction."  *See supra* at 36.  That poses a problem for Defendants, because Section 8005 states that no transfer of funds may be used for "military construction."  So under any scenario, Defendants' transfer is barred.

What's more, DOD's assertion of contradictory positions on the meaning of "military construction" is a classic example of "arbitrary [and] capricious" agency action, in violation of the APA.  5 U.S.C. § 706(2)(A).  An agency may not give a term opposite definitions in two related actions, based purely on convenience.  *See, e.g.*, *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (rejecting agency interpretation that "chang[ed] . . . course" without "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).  To uphold such a gambit would be to abdicate this Court's role of ensuring "rational" agency decisionmaking.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 42 (1983).

For all these reasons, this Court must "hold unlawful and set aside" DOD's plan to provide § 284 "support" to DHS.  5 U.S.C. § 706(2).  Not only is DOD's transfer to DHS prohibited by Section 8045, but its reprogramming of funds between appropriations accounts is barred by Section 8005 and is arbitrary and capricious.

## V.     EVEN IF A PERMANENT INJUNCTION WERE NOT YET WARRANTED, PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

Plaintiffs principally request that this Court grant summary judgment in their favor and declare unlawful and permanently enjoin Defendants' actions.   In the alternative, however, Plaintiffs ask this Court to grant a preliminary injunction, thereby placing Defendants' unlawful

actions on hold while this litigation runs its course.

To be entitled to a preliminary injunction, Plaintiffs must show: "(1) a substantial likelihood that [they] will prevail on the merits, (2) a substantial threat that [they] will suffer irreparable injury if the injunction is not granted, (3) [their] threatened injury outweighs the threatened harm to the party whom [they] seek[] to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017). Each of these factors weighs in Plaintiffs' favor.

First, for all the reasons given above, Plaintiffs have established a "likelihood of success on the merits," which is "arguably the most important" preliminary injunction factor. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

Second, Plaintiffs have demonstrated a "substantial threat" of "irreparable injury." *Gee*, 862 F.3d at 457. As an official government policy treating the border as a place of crime and chaos, the Proclamation injures the County's reputation every day that it remains on the books. That reputational injury, combined with the impending border-wall construction, is costing the County tourism and commercial dollars that it can never recoup. Likewise, BNHR will be forced to divert more and more resources to combat Defendants' actions as long as they remain in effect, depleting the organization's coffers.

Third, Plaintiffs' injuries outweigh any potential harm that an injunction would inflict on Defendants. *See id.* As the President's Proclamation notes, the issue of unlawful immigration is "long-standing," Ex. 14, at 1, and delaying border-wall construction until its legality is determined will simply leave intact the solution that Congress has chosen for dealing with that issue. Moreover, building a wall along the southern border would undoubtedly take years. A preliminary injunction would cause only a short delay of that lengthy process.

Finally, granting a preliminary injunction would not "disserve the public interest." *Gee*, 862 F.3d at 457. To the contrary, because Defendants' actions are unlawful, the public interest would be *served* by halting them. And even if those actions were lawful, the public interest would not be disserved by the minor delay of a years-long construction process.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted and Defendants' actions should be declared unlawful and permanently enjoined. In the alternative, Plaintiffs' motion for a preliminary injunction should be granted.

Dated:  April 25, 2019                    Respectfully submitted,

By: /s/ *Richard Mancino*
Richard Mancino (*Pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
rmancino@willkie.com

Kristy Parker (*Pro hac vice*)
Justin Florence (*Pro hac vice*)
Erica Newland (*Pro hac vice*)
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Avenue., NW, #163
Washington, DC  20006
Telephone:  (202) 579-4582
Facsimile:  (929) 777-8428
kristy.parker@protectdemocracy.org
justin.florence@protectdemocracy.org
erica.newland@protectdemocracy.org

Deana K. El-Mallawany (*Pro hac vice*)
THE PROTECT DEMOCRACY PROJECT, INC.
125 Walnut Street, Ste. 202
Watertown, MA  02472
Telephone: (202) 579-4582
Facsimile: (929) 777-8428

50

deana.elmallawany@protectdemocracy.org

Stephanie Llanes (*Pro hac vice*)
THE PROTECT DEMOCRACY PROJECT, INC.
222 Broadway, 19th Floor
New York, NY  10038
Telephone:  (202) 579-4582
Facsimile:  (929) 777-8428
stephanie.llanes@protectdemocracy.org

Anton Metlitsky (*Pro hac vice* forthcoming)
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY  10036
Telephone:  (212) 326-2000
ametlitsky@omm.com

Ephraim McDowell (*Pro hac vice* forthcoming)
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC  20006
Telephone:  (202) 383-5300
emcdowell@omm.com

David Bookbinder (*Pro hac vice*)
NISKANEN CENTER
820 First Street, NE
Washington, DC  20002
Telephone:  (301) 751-0611
dbookbinder@niskanencenter.org

Shaimaa M. Hussein (*Pro hac vice*)
Matthew Dollan (*Pro hac vice*)
Samantha G. Prince (*Pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
shussein@willkie.com
mdollan willkie.com
sprince@willkie.com

Stuart Gerson (*Pro hac vice*)
EPSTEIN BECKER GREEN
1227 25th Street, NW
Washington, DC  20037

51

Telephone:  (202) 861-4180
sgerson@ebglaw.com

Laurence H. Tribe (*Pro hac vice*)
Carl M. Loeb University Professor and
Professor of Constitutional Law
HARVARD LAW SCHOOL*
1575 Massachusetts Avenue
Cambridge, MA  02138
Telephone:  (617) 495-1767
tribe@law.harvard.edu

*Affiliation noted for identification purposes
only

John C. Padalino (Texas SB# 24041638)
401 Congress Avenue, Suite 1540
Austin, TX  78701
Telephone:  (512) 596-2944
Facsimile:  (512) 596-2944
john@padalinolaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically filed the foregoing document with

the U.S. District Court for the Western District of Texas by using the CM/ECF system, which will

send notifications of such filing to all CM/ECF counsel of record.

Dated:  April 25, 2019                          /s/ *Richard Mancino*
                                                Richard Mancino (*Pro hac vice*)
                                                WILLKIE FARR & GALLAGHER LLP
                                                787 Seventh Avenue
                                                New York, NY  10019
                                                Telephone:  (212) 728-8000
                                                Facsimile:  (212) 728-8111
                                                rmancino@willkie.com