# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

EL PASO COUNTY, TEXAS
500 E. San Antonio
El Paso, TX 79901,

BORDER NETWORK FOR HUMAN RIGHTS
2115 N. Piedras St
El Paso, TX 79930,

          Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500,

MARK T. ESPER,[1] in his official capacity as Acting
Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301,

KEVIN McALEENAN, in his official capacity as
Acting Secretary of Homeland Security
245 Murray Lane, SW, Mail Stop 0485
Washington, DC 20528-0485,

TODD T. SEMONITE, in his official capacity as
Commanding General
United States Army Corps of Engineers
441 G Street, NW
Washington, DC 20314-1000,

DAVID BERNHARDT, in his official capacity as
Acting Secretary of the Interior
1849 C Street, NW
Washington, DC 20240,

          Defendants.

Civil Action No. 3:19-cv-66-DB

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION, AND OPPOSITION TO THE GOVERNMENT'S CROSS-MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

---

[1] Since the filing of Plaintiffs' amended complaint, Patrick M. Shanahan left his position as Acting Secretary of Defense. Pursuant to Federal Rule of Civil Procedure 25(d), this brief substitutes his successor as a defendant.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

    I.      PLAINTIFFS HAVE STANDING ................................................................ 2

          A.    El Paso County Has Standing ................................................... 2

                1.    Reputational Harm ........................................................ 2

                2.    Pecuniary Injuries ........................................................ 5

          B.    BNHR Has Standing ................................................................ 7

          C.    Plaintiffs Have Standing To Challenge Wall Construction Carried Out With § 2808 Funds ........................................................... 11

          D.    Plaintiffs Have Standing To Challenge DOD's Reprogramming Of Funds Under § 8005 ............................................................ 13

    II.    THE PRESIDENT'S PROCLAMATION IS UNLAWFUL ............................. 15

          A.    The Proclamation Exceeds the President's Authority Under the NEA ..................................................................................... 15

          B.    If Read To Authorize the Proclamation, the NEA Is Unconstitutional ................................................................... 20

          C.    This Court Has the Power To Review Plaintiffs' NEA Claim ............... 26

                1.    The NEA Does Not Preclude Judicial Review of Emergency Declarations ...................................................... 26

                2.    Challenges To NEA Emergency Declarations Do Not Present Nonjusticiable Political Questions ................................. 30

                3.    Even If the President's Emergency Declaration Were Nonjusticiable, Plaintiffs' Nondelegation Challenge Is Reviewable ........................................................................ 33

          D.    There Is No Basis For Dismissing the President as a Defendant ............. 34

    III.    DEFENDANTS' USE OF FUNDS TO BUILD A BORDER WALL VIOLATES THE APPROPRIATIONS CLAUSE .............................................. 36

          A.    The CAA Precludes Defendants' Wall-Funding Plan ............................. 36

          B.    Section 2808 Does Not Authorize Border-Wall Expenditures ............... 39

          C.    Section 284 Does Not Authorize Border-Wall Expenditures ................. 45

          D.    Section 8005 Does Not Authorize DOD's Reprogramming of Funds ..................................................................................... 47

          E.    Plaintiffs' Appropriations Clause Claims Are Valid .............................. 53

IV.    DEFENDANTS HAVE VIOLATED THE ADMINISTRATIVE
PROCEDURE ACT .................................................................................. 55

    A.    Defendants' Wall-Funding Plan Violates the APA ................................. 55

    B.    Plaintiffs' APA Claims Are Reviewable .................................................. 56

        1.    There Is "Final Agency Action" For Purposes of Plaintiffs'
§ 2808 Claim ............................................................................. 56

        2.    Defendants' Use of § 2808 Is Not Committed To Agency
Discretion .................................................................................. 57

        3.    Plaintiffs Fall Within the "Zone of Interests" of § 2808, §
284, and § 8005 ......................................................................... 58

V.    EVEN IF A PERMANENT INJUNCTION WERE NOT YET
WARRANTED, PLAINTIFFS ARE ENTITLED TO A PRELIMINARY
INJUNCTION ........................................................................................ 59

CONCLUSION ....................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935)....................................................................................... 21

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967)....................................................................................... 26

*AFL-CIO v. Kahn,*
618 F.2d 784 (D.C. Cir. 1979)....................................................................... 27

*Am. Airlines, Inc. v. Herman,*
176 F.3d 283 (5th Cir. 1999) .................................................................. 56, 57

*Arizona v. United States,*
567 U.S. 387 (2012)....................................................................................... 25

*Armstrong v. Exception Child Ctr.,*
135 S. Ct. 1378 (2015).............................................................................. 53, 54

*Ass'n of Cmty. Organizations for Reform Now v. Fowler,*
178 F.3d 350 (5th Cir. 1999) ..................................................................... 7, 8

*Beacon Prods. Corp. v. Reagan,*
814 F.2d 1 (1st Cir. 1987).............................................................................. 28

*Bennett v. Spear,*
520 U.S. 154 (1997)....................................................................... 4, 12, 14, 59

*Bloate v. United States,*
559 U.S. 196 (2010)....................................................................................... 36

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984)....................................................................................... 29

*Boumediene v. Bush,*
553 U.S. 723 (2008)......................................................................................... 1

*BP Am. Prod. Co. v. Burton,*
549 U.S. 84 (2006)......................................................................................... 27

*Carpenters Indus. Council v. Zinke,*
854 F.3d 1 (D.C. Cir. 2017)............................................................................. 5

*Centro Presente v. DHS,*
332 F. Supp. 3d 393 (D. Mass. 2018) ........................................................... 35

**Page(s)**

*Chamber of Commerce v. Dep't of Labor,*
885 F.3d 360 (5th Cir. 2018) ................................................... 42

*Chamber of Commerce v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ................................................ 54

*Chang v. United States,*
859 F.2d 893 (Fed. Cir. 1988) ................................................ 33

*City & County of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ........................................... 12, 13

*City of Indianapolis v. Edmond,*
531 U.S. 32 (2000) ................................................................ 39

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .............................................................. 11

*Clark v. Martinez,*
543 U.S. 371 (2005) .............................................................. 23

*Clarke v. Sec. Indus. Ass'n,*
479 U.S. 388 (1987) .............................................................. 58

*Clinton v. City of New York,*
524 U.S. 417 (1998) ........................................................ 21, 55

*Clinton v. Jones,*
520 U.S. 681 (1997) .............................................................. 34

*Ctr. for Bio. Diversity v. Mattis,*
868 F.3d 803 (9th Cir. 2017) ................................................. 44

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund,*
138 S. Ct. 1061 (2018) .......................................................... 45

*Dalton v. Specter,*
511 U.S. 462 (1994) ........................................................ 52, 53

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) .............................................................. 54

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019) .................................................... passim

*Dunlop v. Bachowksi,*
421 U.S. 560 (1975) ........................................................ 26, 29

**Page(s)**

*Ellison v. Connor*,
    153 F.3d 247 (5th Cir. 1998) ........................................................ 57

*El-Shifa Pharm. Indus. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) ...................................................... 30

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ....................................................................... 32

*Foretich v. United States*,
    351 F.3d 1198 (D.C. Cir. 2003) ................................................... 3, 5

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .................................................................. 34, 35

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) ........................................................................... 30

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ....................................................... 20, 21, 22

*Harvard Pilgrim Health Care v. Thompson*,
    318 F. Supp. 2d 1 (2004) .............................................................. 54

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................. 7, 8, 9

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ....................................................................... 57

*Industrial Union Dept., AFL-CIO v. American Petroleum Inst.*,
    448 U.S. 607 (1980) ....................................................................... 19

*INS v. Chadha*,
    462 U.S. 919 (1983) ....................................................................... 28

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ....................................................................... 18

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928) .................................................................. 20, 24

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) .................................................................. 30, 33

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
    58 F. Supp. 3d 1191 (D.N.M. 2014) ............................................. 54

**Page(s)**

*Jubelirer v. Rendell*,
  953 A.2d 514 (Pa. 2008) ............................................................... 49

*K.P. v. LeBlanc*,
  627 F.3d 115 (5th Cir. 2010) ........................................................... 6

*Karahalios v. Nat'l Fed'n of Fed. Emps.*,
  489 U.S. 527 (1989) ...................................................................... 28

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ...................................................................... 32

*Kuwait Pearls v. Kellogg Brown*,
  853 F.3d 173 (5th Cir. 2017) ............................................... 29, 30, 41

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ...................................................... 32, 44

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...................................................................... 55

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992) ............................................................ 2, 13, 14

*Mach Mining, LLC v. EEOC*,
  135 S. Ct. 1645 (2015) ................................................................. 26

*Marbury v. Madison*,
  1 Cranch 137 (1803) ....................................................................... 1

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ................................................................. 57, 58

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ........................................................................ 32

*Meese v. Keene*,
  481 U.S. 465 (1987) ................................................................. 3, 4, 5

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
  453 U.S. 1 (1981) ......................................................................... 28

*Milner v. Dep't of Navy*,
  562 U.S. 562 (2011) ...................................................................... 19

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ........................................................................ 34

Page(s)

*NAACP v. City of Kyle*,
626 F.3d 233 (5th Cir. 2010) ............................................................. 9, 10

*Nat'l Ass'n of Home Builders v. Def. of Wildlife*,
551 U.S. 644 (2007)............................................................................ 46

*NCAA v. New Jersey*,
730 F.3d 208 (3d Cir. 2013) .............................................................. 3

*Nevada v. Dep't of Energy*,
400 F.3d 9 (D.C. Cir. 2005).......................................................... 36, 50

*NLRB v. SW Gen. Inc.*,
137 S. Ct. 929 (2017) ....................................................................... 29

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017) ...................................................... 8, 9, 10, 11

*Old Dominion Branch No. 496 v. Austin*,
418 U.S. 264 (1975)........................................................................... 16

*OPM v. Richmond*,
496 U.S. 414 (1990)........................................................................... 36

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)...................................................................... 21, 24

*Planned P'Hood of Gulf Coast, Inc. v. Gee*,
862 F.3d 445 (5th Cir. 2017) ......................................................... 14, 59

*Rucho v. Common Cause*,
2019 WL 2619470 (S. Ct. 2019)....................................................... 30

*Saget v. Trump*,
345 F. Supp. 3d 287 (E.D.N.Y. 2018) ........................................... 34, 35

*Sale v. Haitian Ctrs. Council, Inc.*,
509 U.S. 155 (1993)........................................................................... 55

*Santiago v. Rumsfeld*,
2004 WL 3008724 (D. Ore. 2004).................................................... 32

*Sardino v. Fed. Res. Bank of N.Y.*,
361 F.2d 106 (2d Cir. 1966) ............................................................. 33

*Sebelius v. Cloer*,
569 U.S. 369 (2013)........................................................................... 19

**Page(s)**

*Sierra Club v. Leavitt*,
    368 F.3d 1300 (11th Cir. 2004) ........................................................ 55

*Sierra Club v. Trump*,
    2019 WL 2247689 (N.D. Cal. 2019) ............................................ passim

*Sierra Club v. Trump*,
    2019 WL 2865491 (9th Cir. 2019) .............................................. passim

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ...................................................................... 52

*Soudavar v. Bush*,
    46 F. App'x 731 (5th Cir. 2002) ................................................... 32

*Spawr Optical Research, Inc.*,
    685 F.2d 1076 (9th Cir. 1982) ..................................................... 33

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................... 6, 7, 11

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ..................................................... 35

*Tesfamichael v. Gonzales*,
    411 F.3d 169 (5th Cir. 2005) ....................................................... 59

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .................................................... 1, 32

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ..................................................... 59

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ................................................................. 32

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ................................................................. 56

*U.S. Dep't of Navy v. FLRA*,
    665 F.3d 1339 (D.C. Cir. 2012) ......................................... 21, 37, 47

*UARG v. EPA*,
    573 U.S. 302 (2014) ..................................................................... 45

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) .................................................. 27, 33

**Page(s)**

*United States v. Beacon Prods. Corp. v. Reagan*,
633 F. Supp. 1191 (D. Mass. 1986) ................................ 32

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936) .................................................. 17

*United States v. Dhafir*,
461 F.3d 211 (2d Cir. 2006) .......................................... 33

*United States v. Groos*,
616 F. Supp. 2d 777 (N.D. Ill. 2008) ................................ 33

*United States v. Lee*,
106 U.S. 196 (1882) .................................................. 34

*United States v. MacCollom*,
426 U.S. 317 (1976) .............................................. 37, 50

*United States v. Mirza*,
454 F. Appx. (5th Cir. 2011) ......................................... 25

*United States v. Nixon*,
418 U.S. 683 (1974) ............................................... 1, 34

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (U.S. Ct. CPA 1975) .................................... 33

*Van de Walle v. Am. Cyanamid Co.*,
477 F.2d 20 (5th Cir. 1973) .......................................... 15

*Veterans and Reservists for Peace v. Reg'l Comm'r of Customs*,
459 F.2d 676 (3d Cir. 1972) .......................................... 33

*Walter Nixon v. United States*,
506 U.S. 224 (1993) .................................................. 30

*Wash. St. Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*,
537 U.S. 371 (2003) .................................................. 43

*Wayman v. Southard*,
10 Wheat. 1 (1825) ................................................... 21

*West Va. Univ. Hosps., Inc. v. Casey*,
499 U.S. 83 (1991) ................................................... 37

*Weyerhaeuser Co. v. FWS*,
139 S. Ct. 361 (2018) ................................................ 57

**Page(s)**

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001)...................................................................... passim

*Yakus v. United States,*
321 U.S. 414 (1944)...................................................................... 20, 21

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952)...................................................................... passim

*Zavydas v. Davis,*
533 U.S. 678 (2001)...................................................................... 18

*Zivotofsky v. Clinton,*
566 U.S. 189 (2012)...................................................................... 29, 30, 31, 33

**Statutes**

1 U.S.C. § 105 ............................................................................... 38

10 U.S.C § 2801(c)(4) ................................................................... 41

10 U.S.C § 284(b)(7). ............................................................ 44, 45, 47

10 U.S.C. § 275 ............................................................................. 40

10 U.S.C. § 2801 ........................................................................... 43

10 U.S.C. § 2801(a) ...................................................... 41, 42, 51, 52

10 U.S.C. § 2801(c)(4) ................................................................. 41

10 U.S.C. § 2808 .................................................................... passim

10 U.S.C. § 284 ...................................................................... passim

10 U.S.C. § 284(a) ....................................................................... 44

10 U.S.C. § 284(b)(1) ................................................................... 44

10 U.S.C. § 284(b)(10) ................................................................. 44

10 U.S.C. § 284(h)(1)(B) .............................................................. 45

10 U.S.C. § 284(i)(3) .................................................................... 45

18 U.S.C. § 1385 .......................................................................... 40

2 U.S.C. § 622(5) ......................................................................... 38

**Page(s)**

31 U.S.C. § 1532 .................................................................................................. 47

40 U.S.C. § 3147 .................................................................................................. 23

47 U.S.C. § 606(c) ............................................................................................... 23

5 U.S.C. § 701(a)(2) ............................................................................................ 57

5 U.S.C. § 702 ...................................................................................................... 55

5 U.S.C. § 704 ...................................................................................................... 55

5 U.S.C. § 706(2) ................................................................................................. 55

50 U.S.C. § 1622(a) ............................................................................................. 27

50 U.S.C. § 1622(a)(1) ........................................................................................ 27

50 U.S.C. § 1701(b) ............................................................................................. 17

50 U.S.C. § 1621 ............................................................................................ 15, 22

6 U.S.C. § 202(2) ................................................................................................. 42

7 U.S.C. § 5712(c) ............................................................................................... 23

8 U.S.C. § 1103(a)(10) ........................................................................................ 40

Administrative Procedure Act ........................................................................ 55, 59

Consolidated Appropriations Act (CAA), Pub. L. No. 116-6 (2019) .................. 16

Consolidated Appropriations Act, 2018,
    Pub. L. No. 115-141, div. F, tit. II, § 230(a) (2018) .............................. passim

Drug Interdiction and Counter-Drug Activities  Pub. L. No. 115-245, div. A, tit. VI, 132
    Stat. 2981, 2997 (2018) ................................................................................ 46

International Emergency Economic Powers Act (IEEPA),
    Pub. L. No. 95-223Stat. 1626 (1977) ..................................................... 17, 25

Military Construction Codification Act, Pub. L. 97-124, 96 Stat. 153 (1982) ........ 38

National Defense Authorization Act, Pub. L. 114-328, 130 Stat. 2000, 2381, 2497 (2016) ....... 38

National Emergencies Act (NEA),
    Pub. L. No. 94-412, 90 Stat. 1255 (1976) .......................................... passim

**Page(s)**

Pub. L. No. 93-238, § 735, 87 Stat. 1026 (1974) ......................................................... 50

**Other Authorities**

Antonin Scalia, Testimony to the House of Representatives, Subcommittee on
    Administrative Law and Government Relations of the Committee on the Judiciary,
    at 95 (Apr. 9, 1975) ................................................................................................ 15

Brief of the Brennan Center for Justice as *Amicus Curiae* in Support of Pls., ECF 60-1, at
    15 ("Brennan Ctr. Br.") ..................................................................................... 15, 17

Deferred Action for Parents of Americans and Lawful Permanent Residents program ............... 32

*Department of Defense Budget Posture: Hearing Before the S. Comm. on Armed Servs.*,
    116th Cong. (2019), https://tinyurl.com/DefenseBudgetHearing ............................................ 40

DOD Serial No. FY 04-37 PA,
    Reprogramming Action (Sept. 3, 2004),
    http://tinyurl.com/DOD2004ReprogrammingAction ............................................. 48

Exec. Order No. 13767 ............................................................................................. 48

Executive Order 12722 ............................................................................................. 17

GAO, Principles of Federal Appropriations Law (4th Ed. 2017) (GAO Red Book), at 1-
    64 ......................................................................................................................... 37

H. Rep. No. 93-662 (1973) ....................................................................................... 50

H. Rep. No. 99-106 (1985) ....................................................................................... 50

Heather Timmons, *The US Border Situation Isn't a National Emergency, Pentagon
    Officials Tell Congress*,
    Quartz (Jan. 29, 2019), https://tinyurl.com/QuartzBorder ..................................... 40

Merriam-Webster's Dictionary 932 (10th ed. 1998) ................................................. 38

Presidential Memorandum,
    2018 WL 1633761 (Apr. 4, 2018) ......................................................................... 49

Proc. 7924 ................................................................................................................ 17

Proc. No. 6481 ......................................................................................................... 17

Proc. No. 6867 ......................................................................................................... 17

Proc. No. 7463 ......................................................................................................... 17

**Page(s)**

Proc. No. 8443 ..................................................................................... 17

Senate Report Number 93-1170, at 2 (1974) .................................. 15

Senate Report Number 94-1168, at 3 (1976) ............................. 17, 19

Webster's New Collegiate Dictionary 372 (1976).......................... 15

**Regulations**

55 Fed. Reg. 31803 (Aug. 3, 1990)................................................ 17

57 Fed. Reg. 47553 (Oct. 14, 1992)............................................... 17

61 Fed. Reg. 8843 (Mar. 1, 1996).................................................. 17

66 Fed. Reg. 48199 (Sept. 14, 2001) ............................................. 17

70 Fed. Reg. 54225 (Sept. 8, 2005) ............................................... 17

74 Fed. Reg. 55439 (Oct. 23, 2009)............................................... 17

82 Fed. Reg. 8793 (Jan. 25, 2017) ................................................. 48

82 Fed. Reg. 8794 (Jan. 25, 2017) ................................................. 48

# INTRODUCTION

The Government relies on various doctrines, but its brief presses one main, quite startling, point: No court may review the President's emergency declaration or his subordinates' actions in pursuit thereof. This assertion of blind deference is incompatible with the rule of law. When a member of the Executive Branch (including the President) violates his constitutional or statutory duties, courts must enjoin that violation. Since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), that principle has been applied over and over. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *United States v. Nixon*, 418 U.S. 683 (1974); *Boumediene v. Bush*, 553 U.S. 723 (2008); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). The Government would have this Court ignore that principle and accept Defendants' word that they are complying with the law. The Court should reject the Government's invitation and fulfill its duty to say what the law is.

In contrast to the Government's numerous justiciability arguments, it says precious little about the merits of this case. And the proper resolution of those merits is clear. The President has violated the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), by declaring a longstanding problem an "emergency" in response to a congressional appropriations decision he disliked. If the NEA *did* permit this declaration, moreover, the NEA itself would run afoul of the nondelegation doctrine—rendering the President's declaration (and acts carrying it out) void. Beyond the President's declaration, Defendants' plan to spend funds appropriated for other purposes on a border wall violates the Appropriations Clause. The text of the provisions that Defendants have invoked does not authorize wall expenditures. And throughout their history, those provisions have never been construed in the manner the Government proposes here. This Court should accordingly grant Plaintiffs' summary-judgment motion and a permanent injunction or, alternatively, preliminarily enjoin Defendants' unlawful acts. Plaintiffs request that the Court move expeditiously in resolving their motion, because Defendants are progressing quickly toward

building a border wall, and the President's emergency declaration is causing Plaintiffs continuous and irreparable harm.

## ARGUMENT

## I. PLAINTIFFS HAVE STANDING

### A. El Paso County Has Standing

As a border community, El Paso County is the direct "object" of Defendants' actions in this case: the Proclamation declares that the border is in a state of emergency, and Defendants' wall-funding plan threatens imminent construction and militarization there. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 561-62 (1992). Accordingly, there is "little question" that the County has standing to challenge those actions, *id.*, based on two related concrete harms. First, as official governmental policies indicating that the County is in crisis and needs a wall to protect it, Defendants' actions have harmed the County's reputation. Second, the Proclamation and impending wall construction will wreak substantial economic harm on the County by inhibiting tourism and commercial development. The Government's contrary arguments lack merit.

### 1. Reputational Harm

To begin, the Government argues that the County's reputational injury has "nothing to do with actual border-barrier construction." Govt. Br. 35-36. That is wrong. On March 25, 2019, the Acting Defense Secretary formally approved El Paso Sector Project 1, which will take place in Dona Ana County, New Mexico—immediately adjoining El Paso County. *Id.* at 10; Govt. Ex. 6, at 1; *see* Pls. Ex. 26, Samaniego Decl. ¶ 17. Defendants have already awarded contracts for this project, and the start of construction is imminent. Govt. Ex. 6, at 2. As an El Paso County official explained, the "blight of [this] construction" will create an image that the County is "mired in a long-term state of chaos," rather than a "safe place to live, work, and visit." Pls. Ex. 26, Samaniego

Decl. ¶¶ 4, 11.  Thus, by transforming the El Paso County region into a militarized construction zone, Defendants have injured the County's reputation.

The Government next seeks to minimize the Proclamation's effect on the County, calling the Proclamation a mere "government message" that is "not self-effectuating."  Govt. Br. 36.  But the Proclamation is much more:  It is a highly publicized order that the President announced in the Rose Garden, declaring the entire southern border (including El Paso County) an emergency zone and invoking billions of dollars to address that emergency.  Because of the Proclamation's immediate substantive impact, *Meese v. Keene*, 481 U.S. 465 (1987), *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003), and *NCAA v. New Jersey*, 730 F.3d 208 (3d Cir. 2013), are all on point.  *See* Pls. MSJ 11-13.  *NCAA* is particularly instructive.  There, the court held that a law "permit[ing] State authorities to license sports gambling" inflicted "reputational harm" on plaintiff sports leagues by "increasingly associating the Leagues' games with gambling."  *NCAA*, 730 F.3d at 217, 221.  Here, the Proclamation inflicts "reputational harm" on the County by "increasingly associating" the County with danger, militarization, and construction.  *Id.*

Similarly, the Government observes that "the Proclamation does not specifically disparage the reputation of the County."  Govt. Br. 37.  But while the Proclamation does not denigrate the County by name, it asserts that "[t]he current situation at the southern border" is a "national emergency."  Pls. Ex. 14, at 1.  The County sits on the southern border, so the implication is clear: the County is in a state of crisis and needs a wall to protect it.  No case suggests that reputational injury is cognizable only if the challenged law "specifically disparage[s]" the plaintiff.  Govt. Br. 37.  In *NCAA*, for instance, the challenged law only legalized sports gambling; it did not denigrate professional sports leagues.  730 F.3d at 217.  Still, those leagues had standing.  *Id.* at 220.

The Government also asserts that the County's reputational injury is unfounded because it rests on "speculation" about "choices made by independent actors." Govt. Br. 37. That sweeping theory would wipe out reputational standing altogether, since findings of reputational injury always derive from predictions about how third parties will view the plaintiff in light of the challenged governmental action. *See, e.g.*, *Meese*, 481 U.S. at 473-74 (relying on "an opinion poll" as evidence that plaintiff's "personal, political and professional reputation would suffer" due to the challenged law). Moreover, there is no "speculation" here. County officials have reported, based on their firsthand experiences, that "the President's Proclamation" has already "generat[ed] fears of potential investors that the community will be mired in a long-term state of chaos." Pls. Ex. 26, Samaniego Decl. ¶ 11; *see* Pls. Ex. 25, Keller Decl. ¶ 8 ("I often have to counteract negative misimpressions associated with the President's Proclamation when I talk to people about coming here."). And it is hardly counterintuitive that third parties will avoid visiting or investing in a particular location after the President has designated that location an emergency military construction zone. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding standing where "third parties will likely react in predictable ways"); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (standing may rest on "injury produced by determinative or coercive effect upon the action of someone else").

Finally, the Government contends that the County cannot satisfy standing doctrine's causation and redressability prongs. Govt. Br. 38-39. But as just noted, County officials stated that Defendants' actions have led directly to negative perceptions of the County. *See supra*; *see also* Pls. Ex. 25, Keller Decl. ¶ 10 ("*Because of the President's Proclamation*, we are now in the process of strategizing how to combat a falsely negative image." (emphasis added)); *id.* ¶ 12 ("tourism and business development are impacted by *the Proclamation's threat* that El Paso

County and the southern border will soon be a massive construction zone" (emphasis added)); Pls. Ex. 26, Samaniego Decl. ¶ 11 ("interactions" with "local business leaders" have "indicated to me that *the President's Proclamation* is harming our economic development efforts on an ongoing basis" (emphasis added)). The Government labels these reports "conclusory statements," Govt. Br. 39, but they are the sworn, *unrebutted* testimony of County government officials linking the County's injury to Defendants' actions. *See Meese*, 481 U.S. at 474 (finding reputational standing based on plaintiff's "uncontradicted" affidavits); *Foretich*, 351 F.3d at 1213 (finding reputational standing based on plaintiff's "uncontroverted affidavit").

Because the County can show causation, redressability follows easily. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) ("[c]ausation and redressability typically overlap as two sides of a causation coin"). As courts finding reputational injury caused by governmental action have consistently held, "[a] judicial determination that" the relevant action is "unlawful[] . . . will provide a significant measure of redress for the harm to [plaintiff's] reputation." *Foretich*, 351 F.3d at 1214; *see Meese*, 481 U.S. at 476. Here, such a determination would strip Defendants' actions of legal force and legitimacy, restoring the County's prior image and allowing County officials to stop taking "affirmative steps to avoid the risk of harm to [the County's] reputation." *Id.* The Government's suggestion that any redress would be "speculative," Govt. Br. 39, runs counter to both reputational-standing precedent and common sense.

## 2. Pecuniary Injuries

County officials have also explained the economic harm that the County will suffer because of Defendants' actions. First, County officials have reported "fears of" "potential investors" and "local business leaders" that the County "will be mired in a long-term state of chaos" because of Defendants' actions, which "is harming [the County's] economic development efforts." Pls. Ex. 26, Samaniego Decl. ¶ 11. Second, Defendants' actions are "detrimental to a drive to bring in

tourists" because they cultivate "the perception that [the] community is chaotic and dangerous"—
"a strike against El Paso" in the County's "various negotiations" and initiatives to increase tourism.
Pls. Ex. 25, Keller Decl. ¶ 8. Third, the impending wall construction in an adjacent county "creates
uncertainty about traffic, the accessibility of nearby ports, and blighted and obstructed natural
sites," which "further affects [the County's] efforts to promote business development and
tourism." Pls. Ex. 26, Samaniego Decl. ¶ 17. Fourth, Defendants' likely diversion of $52.3 million
in funds away from Fort Bliss, "the army base that drives [El Paso's] economy," "creates the
imminent prospect of economic harm to El Paso County." *Id.* ¶¶ 14, 16; *see* Pls. Ex. 21.

The Government does not dispute the settled principle that "a direct pecuniary injury" is
generally "sufficient to establish injury-in-fact." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir.
2010). Nor does it dispute that a "future" pecuniary injury may suffice so long as there is a
"substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158
(2014). Instead, the Government again attacks Plaintiffs' evidence as speculative and dependent
on "the actions of third parties." Govt. Br. 39. But as explained, Plaintiffs' standing theory relies
"on the predictable effect of Government action on the decisions of third parties," not on "mere
speculation about the decisions of third parties." *Dep't of Commerce*, 139 S. Ct. at 2566. The
Government further claims that the County must submit specific "example[s] of actual or
threatened loss of tourism dollars." Govt. Br. 39. But it cites no authority for that requirement
and fails to explain why a County official's description of "fears of potential investors" based on
his personal "interactions" with "local business leaders" does not suffice. Pls. Ex. 26, Samaniego
Decl. ¶ 11.

The Government also takes issue with County officials' sworn declarations that massive
wall construction in the County's nearby vicinity will cause economic harm, given the County's

regional economy. Govt. Br. 40 (deeming these declarations "conclusory statements and speculation"). But the Government never explains *why* the County officials' commonsense projections based on their own firsthand experience are unsustainable. Similarly, the Government brushes aside the fact that DOD designated Fort Bliss—"the lifeblood of the El Paso economy," Pls. Ex. 26, Samaniego Decl. ¶ 15; Pls. Ex. 21—as a potential military construction site from which 10 U.S.C. § 2808 funds will be diverted. "[E]ven assuming that is a cognizable harm," the Government says, "a decision has yet to be made by [DOD] regarding § 2808." Govt. Br. 40. But the Government does not dispute that Defendants have deemed Fort Bliss a prime candidate from which to divert such funds. Accordingly, there is at least a "substantial risk" that Fort Bliss will lose millions of federal dollars, which is enough to establish standing. *Driehaus*, 573 U.S. at 158.

## B.    BNHR Has Standing

BNHR independently has organizational standing to challenge Defendants' actions. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that an organization has standing to challenge a governmental practice that causes a "concrete and demonstrable injury to the organization's activities" and therefore leads to a "drain on the organization's resources." *Id.* at 379. Thus, "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999).

BNHR has standing under this rule. BNHR's "core mission" consists of human rights education and "promoting immigration reform." Pls. Ex. 27, Garcia Decl. ¶¶ 13. Because of Defendants' actions, BNHR has been forced to "devote[] resources to counteract [Defendants'] allegedly unlawful practices," rather than focus those resources on its core mission. *Fowler*, 178 F.3d at 360. In particular, "[b]ecause of the Proclamation's effects on BNHR's member families," BNHR "has had to reduce its educational efforts and increase its efforts to counsel community

members who are fearful," as well as "reduce [its] organizing efforts around immigration reform and spend more time organizing [the] community in opposition to the President's Proclamation." Pls. Ex. 27, Garcia Decl. ¶ 13. Relatedly, the impending wall construction in Dona Ana County, where many BNHR members live and work, "will cause yet more diversion of BNHR resources away from [its] core mission and toward opposing construction." *Id.* ¶ 33; *id.* ¶¶ 33-36 ("Large-scale construction threatens to affect our members' basic quality of life"). Since the Proclamation, BNHR has also dramatically increased the frequency of its "Know Your Rights" presentations, *id.* ¶ 15, hired a policy consultant "to assist with an aggressive advocacy campaign to combat the division and fear [caused by] the Proclamation's misinformation," *id.* ¶ 16, and canceled its signature "Hugs Not Walls" campaign due to "the impending construction of more border barriers," *id.* ¶ 32. BNHR's additional efforts have strained its staff, which is "working longer hours" on different tasks related to "organizing defense actions in the community." *Id.* ¶¶ 22, 28. It is unsurprising that an organization dedicated to "organiz[ing] border communities" and bettering "the lives of the immigrant community," *id.* ¶ 3, would suffer a "concrete and demonstrable injury" when the President declares a national emergency *at the border* because of *unlawful immigration* and begins constructing a wall there, *Havens Realty*, 455 U.S. at 379.

According to the Government, however, *Havens Realty* does not apply because it is "a narrow decision" that "recognize[s] standing only when a defendant actually inhibits a plaintiff from carrying out its organizational mission." Govt. Br. 40-41. Not so—the Fifth Circuit has read *Havens Realty* broadly to confer standing whenever an organization is forced to divert resources to counteract government practices. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (standing because organization "went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction"); *Fowler*, 178 F.3d at 360-61 (standing because

organization "expended definite resources counteracting the effects of Louisiana's alleged failure to implement" a voter-registration law); *see also Dep't of Commerce*, 139 S. Ct. at 2565-66 (organizational standing based on "diversion of resources").

The Government contends that "[t]his case lacks the nexus between organizational activities and defendant conduct present in *Havens Realty*," because "BNHR's mission is community organizing, education, and advocacy." Govt. Br. 41. But while BNHR does engage in those *activities*, its *mission* is intimately tied to immigration reform and border issues: As BNHR's Executive Director describes it, the organization's "mission" is to "organize border communities" and "advocate for positive change in policies and practices that affect the lives of the immigrant community." Ex. 27, Garcia Decl. ¶ 3. Because Defendants' actions have plainly targeted "border communities" and affected immigration "policies and practices," they have "perceptibly impaired" BNHR's "ability to" pursue its mission. *Havens Realty*, 455 U.S. at 379.

The Government's analogy to *NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010), Govt. Br. 42, is off-base. There, a home builders association challenged new zoning ordinances, arguing that it had standing based on its "prelitigation responses to the revised ordinances," including commissioning a study and lobbying the city. *Id.* at 238. The court ruled otherwise, holding that the association had "not explained how the[se] activities" diverged from the association's "routine lobbying activities." *Id.* As the Fifth Circuit recently explained, however, "[t]he key fact in *City of Kyle* was that every claimed 'injury' either was undertaken to prepare for litigation" or "no different from the plaintiff's daily operations." *OCA-Greater Houston*, 867 F.3d at 611-12. Here, by contrast, none of BNHR's injuries relate to litigation preparation. And whereas BNHR's routine activities involve "promoting immigration reform," it has recently been forced to "increase its efforts to counsel community members who are fearful" and "organiz[e] [its] community in

opposition to the President's Proclamation." Pls. Ex. 27, Garcia Decl. ¶ 13; *id.* ¶ 15 (describing five-fold increase in "Know Your Rights" presentations since Proclamation). In other words, while BNHR's daily operations consist of promoting forward-looking immigration reform, it has shifted those operations toward combatting the effects of Defendants' actions. BNHR has thus shown that its "expenses occurred prelitigation and are unrelated to litigation"—the "critical distinction" between this case and *City of Kyle*. *OCA-Greater Houston*, 867 F.3d at 612.

To be sure, *City of Kyle* also mentioned that the plaintiff association did not "identif[y] any specific projects that [it] had to put on hold or otherwise curtail in order to respond to the revised ordinances." 626 F.3d at 238. But the Fifth Circuit has held that this "remark" was "not a heightening of the *Lujan* standard [for standing], but an example of how to satisfy it by pointing to a non-litigation-related expense." *OCA-Greater Houston*, 867 F.3d at 612. Thus, BNHR need not "identify any specific project it has been required to put on hold because of the Proclamation" to establish standing. Govt. Br. 42. In any event, BNHR *has* identified such a project: the "Hugs Not Walls" campaign, which BNHR cancelled "because of the impending construction of more border barriers." Pls. Ex. 27, Garcia Decl. ¶ 32.

BNHR has also shown causation and redressability. The Proclamation and Defendants' subsequent steps to build a border wall have caused BNHR's diversion of resources away from its core mission. *See, e.g.*, Pls. Ex. 27, Garcia Decl. ¶ 13 ("*Because of the Proclamation's effects* on BNHR's member families, BNHR has had to divert resources away from its core mission" (emphasis added)); *id.* ¶ 37 ("We have spent, and will continue to spend, approximately 70 to 80% of the organization's time and resources *opposing the illegal construction*" (emphasis added)). The Government downplays the Proclamation as a "general statement[] about the southern border" no different from "decades of intense debate about the state of the southern border generally."

Govt. Br. 44.  But the President's Proclamation has in fact upended the traditional immigration-reform debate by declaring an emergency, militarizing the border, and directing construction of a border wall.  Given the salience of these actions, they have required a different response from BNHR than previous policies directed at the border.

Correspondingly, a judgment invalidating Defendants' actions would redress BNHR's organizational injury by reinstating the status quo, and allowing BNHR to concentrate its resources on *improving* the immigration system, rather than *combating* a particular border policy.  Whether or not that judgment would "disprove the factual accuracy of the statements in the Proclamation" is immaterial, Govt. Br. 44:  it would nullify the Proclamation itself, depriving it of legal force and legitimacy.  As a result, BNHR would no longer need to expend resources fighting the Proclamation and impending wall.  That is plenty of relief to satisfy Article III.  *See, e.g.*, *OCA-Greater Houston*, 867 F.3d at 613-14 (finding redressability under similar circumstances).

### C.    Plaintiffs Have Standing To Challenge Wall Construction Carried Out With § 2808 Funds

In addition to disputing both Plaintiffs' standing generally, the Government argues that Plaintiffs lack standing to challenge Defendants' use of § 2808 in particular.  Govt. Br. 33-34.  According to the Government, because DOD has yet to formally decide which specific wall construction projects to authorize under § 2808, DOD's use of § 2808 funds amounts to only a "possible future injury."  *Id.* at 34 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  A federal district court recently rejected that very argument in *Sierra Club v. Trump*, 2019 WL 2247689, at *15 (N.D. Cal. 2019).  This Court should reject it as well.

To have standing to challenge Defendants' use of § 2808 funds, Plaintiffs must demonstrate only a "substantial risk" that Defendants will rely on § 2808 to fund a border wall.  *Driehaus*, 573 U.S. at 158.  Such a risk is palpable.  The Proclamation expressly "invoke[s]" and "ma[kes]

available" "the construction authority provided in section 2808 of title 10." Pls. Ex. 14, at 1. And the same day the President issued his Proclamation, the White House identified the amount of § 2808 funds "that will be available to build the border wall": $3.6 billion. Govt. Ex. 5, at 4. There is obviously a substantial risk that the Acting Defense Secretary will follow the President's directive to use § 2808 funds to build a border wall, rather than disregarding it. *See Bennett*, 520 U.S. at 169 (finding standing to challenge agency biological opinion that "ha[d] a powerful coercive effect on the agency action"). In fact, the former Acting Secretary recently stated the following: "We have a crisis at the border, a national emergency declared by the President. The Commander-in-Chief has given me a direct legal order to secure the border. I'm securing the border." Brian Everstine, USAF Takes Big Hit As DOD Reprograms Funds to Pay For Border Wall, Air Force Magazine (May 13, 2019). The fact that the Acting Secretary is "technically free to disregard the" Proclamation is irrelevant in light of its "virtually determinative effect" on his actions. *Bennett*, 520 U.S. at 170.

In essence, the Government's litigation position is that the Proclamation—and its express invocation of § 2808—lacks real force and effect. Even though the President announced the Proclamation in a Rose Garden speech claiming that the border was in a state of emergency and needed a wall to protect it, the Government posits that DOD might still simply act as if the Proclamation had never occurred. This is not the first time the Government has pulled such a litigation ploy. In *City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), the Government similarly claimed that an "Executive Order is all bluster and no bite, representing a perfectly legitimate use of the presidential 'bully pulpit,' without any real meaning." *Id.* at 1238. But the Ninth Circuit repudiated the Government's claim, holding that "statements made by and on behalf of the Administration outside the context of this litigation . . . suggest[] that the

Administration's current litigation position is grounded not in the text of the Executive Order but in a desire to avoid legal consequences." *Id.* So too here.

The Government's position is made all the more implausible by the fact that DOD has taken significant steps toward building the border wall using § 2808 funds. On May 6, 2019, DOD "identified existing unawarded military construction projects of sufficient value to provide up to $3.6 billion of funding for potential border barrier construction pursuant to section 2808." Govt. Ex. 7, at 1. One of those projects was set to occur at Fort Bliss, in El Paso County. *See* Pls. Ex. 21. That same day, the Chairman of the Joints Chiefs of Staff submitted an assessment to the Acting Secretary providing "information and recommendations about specific border barrier construction projects" to undertake using § 2808 funds. Govt. Ex. 7, at 1. There is a more than substantial risk that DOD will use § 2808 funds on a border wall, at Fort Bliss's expense.

### D. Plaintiffs Have Standing To Challenge DOD's Reprogramming Of Funds Under § 8005

The Government's final standing argument focuses on Plaintiffs' challenge to DOD's reprogramming of funds from its military pension account to its counterdrug support account pursuant to DOD Appropriations Act § 8005, Pub. L. No. 115-245. Govt. Br. 34-35. In *Sierra Club*, both the district court and Ninth Circuit have correctly held that this argument lacks merit. 2019 WL 2247689, at *14 (district court); *Sierra Club v. Trump*, 2019 WL 2865491, at *9 (9th Cir. 2019).

The Government initially contends that because Plaintiffs have no "entitlement to the money transferred" and are not "the 'object' of that transfer," "their standing to challenge the transfer of funding from one DoD appropriation to another is no greater than that of any taxpayer to challenge any expenditure of taxpayer money." Govt. Br. 34. As support for this contention, the Government cites only *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), which recognized

that when a plaintiff "is himself an object of the [challenged] action," there is "ordinarily little question that the action . . . has caused him injury." *Id.* at 561-62. True enough, but that does not mean that a plaintiff *must* be the "object" of the challenged action to show standing. Here, Plaintiffs are injured by DOD's unlawful reprogramming of funds, because that reprogramming will lead directly to DOD's expenditure of § 284 money on a border wall in the County's close vicinity. *See supra* at 2-3, 5-6, 8. No more is required for Plaintiffs to show standing.

Further, the Government argues that "[t]he intervening step of invoking § 284 is necessary to connect DoD's use of § 8005 to the border barrier construction that is the source of Plaintiffs' alleged injuries, and Plaintiffs cannot invoke their alleged harm from the separate act of constructing barriers . . . to establish standing for a claimed violation of § 8005." Govt. Br. 35. Again, that is wrong. Plaintiffs' standing depends on whether their injuries are "fairly traceable" to Defendants' challenged actions, not on whether "the defendant's actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 168-69; *accord Planned P'Hood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 455-56 (5th Cir. 2017). As already explained, Plaintiffs have suffered injury in fact because of Defendants' impending wall construction under § 284. *See supra* at 2-3, 5-6, 8. That injury is fairly traceable to DOD's unlawful reprogramming of funds under § 8005, because without that transfer, DOD could not provide $2.5 billion in § 284 "support" for wall construction. After all, Congress appropriated only $881,525,000 to DOD's drug interdiction account in 2019. *See* DOD Appropriation Act, 2019 and Continuing Appropriation Act, 2019, Pub. L. No. 115-245, Title VI, 132 Stat. 2981, 2997 (2018). Defendants admit that DOD has already reprogrammed $1 billion under § 8005 in order to "fund the approved [border wall] projects," and upon reprogramming, that money was immediately transferred to "the U.S. Army Corps of Engineers to undertake fence and road construction and lighting installation for the

approved projects." Govt. Ex. 6, at 1-2. Plaintiffs' injuries are "fairly traceable" to the § 8005 reprogramming, which is all that Article III requires.

## II. THE PRESIDENT'S PROCLAMATION IS UNLAWFUL

The President's Proclamation is fatally flawed. If the NEA is construed (properly) in accord with its ordinary meaning, then the Proclamation violates the statute. If the NEA is construed as the Government proposes, then the NEA violates the nondelegation doctrine. Either way, the Proclamation—and all of Defendants' actions in reliance thereon—must be enjoined.

### A. The Proclamation Exceeds the President's Authority Under the NEA

Before the NEA's passage, presidents had declared all manner of national emergencies, allowing them to wield "extraordinary powers" and "manage every aspect of the lives of all American citizens." S. Rep. 93-1170, at 2 (1974). In 1976, Congress enacted the NEA to "insure that the extraordinary powers which now reside in the hands of the Chief Executive . . . could be utilized only when emergencies actually exist." S. Rep. No. 94-1168, at 2 (1976). As then-Assistant Attorney General Antonin Scalia stated, "[t]hose powers which society really no longer views as emergency powers should not be called that." Antonin Scalia, Testimony to the House of Representatives, Subcommittee on Administrative Law and Government Relations of the Committee on the Judiciary, at 95 (Apr. 9, 1975).

The NEA's core provision allows the President to declare an "emergency" and thereby exercise "special or extraordinary power[s]" conferred by over 100 other statutes. 50 U.S.C. § 1621; *see* Brief of the Brennan Center for Justice as *Amicus Curiae* in Support of Pls., ECF 63, at 15 ("Brennan Ctr. Br."). Per its ordinary meaning, an "emergency" is an "unforeseen combination of circumstances or the resulting state that calls for immediate action." Webster's New Collegiate Dictionary 372 (1976). Numerous courts have interpreted the term "emergency" along these lines. *See, e.g.*, *Van de Walle v. Am. Cyanamid Co.*, 477 F.2d 20, 23 (5th Cir. 1973).

The question here is whether the Proclamation exceeds the President's power under the NEA, given the ordinary meaning of "emergency." The answer is yes, for several reasons.

First, the Proclamation's text acknowledges that "[t]he problem of large-scale unlawful migration through the southern border"—which the Proclamation purports to address—"is *long-standing*." Pls. Ex. 14, at 1 (emphasis added). Congress's repeated actions to address the problem of unlawful immigration confirm that fact. *See* Pls. MSJ 22 n.5. A "longstanding" problem is the opposite of an unforeseen combination of circumstances calling for immediate action.

Second, the President's statements and the Government's actions contradict the existence of an emergency. *See, e.g.*, *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 274-75 (1975) (considering presidential announcement accompanying executive order). When announcing the Proclamation, the President admitted that he "could do the wall over a longer period of time" and "didn't need to do this," but would "rather do it much faster." Pls. Ex. 15, at 17. And although Congress appropriated $1.571 billion for border barriers in 2018, *see* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a) (2018), the Government has "represent[ed] [that] it has only constructed 1.7 miles of fencing with that funding," *Sierra Club*, 2019 WL 2247689, at *29 n.22. All this is inconsistent with the notion that a border wall is immediately required to address an unforeseen problem.

Third, the President issued the Proclamation after his failure to convince Congress to fund his desired border wall. Indeed, he issued it only one day after signing the 2019 Consolidated Appropriations Act (CAA), Pub. L. No. 116-6 (2019), which appropriated only $1.375 billion for targeted fencing in the Rio Grande Valley, *id.* § 231, rather than the approximately $6 billion he wanted for a wall stretching the full border. As the President openly admitted, his emergency declaration was "another way" of building a wall that he could use "if I can't make a deal with

people [in Congress] that are unreasonable." Pls. Ex. 11, at 1; Pls. Ex. 12, at 4. Again, the NEA was designed to allow the President to act "when [an] emergenc[y] actually exist[s]," S. Rep. No. 94-1168, at 3 (1976), not to circumvent a congressional appropriations decision he disfavored.

The Government responds to this statutory analysis in two basic ways. First, it emphasizes "[p]ast practice" of emergency declarations, insisting that "Presidents have often chosen to declare national emergencies to address circumstances that were neither new nor unforeseen at the time the declaration issued." Govt. Br. 24 n.10. But the history in fact favors Plaintiffs' position. Of the 60 national emergencies declared since the NEA's passage, 54 were declared pursuant to the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1626 (1977) (codified at 50 U.S.C. § 1701(b)), and related legislation, in order to impose foreign economic sanctions. *See* Brennan Ctr. Br. 9. Unlike the appropriations power at issue here, which is quintessentially legislative, the President has independent foreign-policy and trade-related authority, *see United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), and Congress has long acquiesced in the President's use of the IEEPA as a substitute for traditional sanctions legislation, Brennan Ctr. Br. 9-10. Given their distinct context, these emergency declarations should play no role in the historical analysis.

Only six emergency declarations since 1976 have *not* been issued pursuant to the IEEPA. *Id.* at 9. And those six all responded to unforeseen circumstances requiring immediate action: Iraq's invasion of Kuwait, *see* Exec. Order 12722, 55 Fed. Reg. 31803 (Aug. 3, 1990); Hurricanes Andrew and Iniki, *see* Proc. No. 6491, 57 Fed. Reg. 47553 (Oct. 14, 1992); Cuban attacks on U.S. civilian aircraft, *see* Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996); the 9/11 terrorist attacks, *see* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); Hurricane Katrina, *see* Proc. 7924, 70 Fed. Reg. 54227 (Sept. 13, 2005); and the swine flu epidemic, *see* Proc. No. 8443, 74 Fed. Reg.

55439 (Oct. 23, 2009).  *See* Brennan Ctr. Br. 11-12.  In short, the Proclamation is the only post-NEA emergency declaration that (1) is not a tool to impose sanctions on a foreign nation and (2) responds to a longstanding issue that Congress has considered.

Indeed, the Proclamation departs from past practice in a more fundamental respect:  no other president has ever declared an emergency to override a legislative judgment.  This is the elephant in the room that the Government's brief never addresses.  And it is the feature of the Proclamation that most gravely threatens the separation of powers and individual liberty.  If this Proclamation is upheld, nothing will stop future presidents from invoking emergency powers as a tool to impose their political will on a resistant Congress.  *See Youngstown*, 343 U.S. at 650 (Jackson, J., concurring) (emergencies "afford a ready pretext for usurpation").  The Government says nothing about this fundamental point.

The Government's second response to Plaintiffs' statutory analysis is that Congress intended to give the President unfettered discretion to determine whether an emergency exists.  Govt. Br. 11 ("Congress intentionally left this determination to the President.");  *id.* at 20 (emphasizing "Congress's intentional decision to leave to the President the determination about when and under what circumstances to declare a national emergency").  As an initial matter, construing the NEA as a blank policymaking check to the President would—at minimum—raise "a serious doubt" about its constitutionality, given that the nondelegation doctrine bars Congress from transferring its legislative power to the Executive Branch.  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  Because of that serious constitutional doubt, this Court would be obliged to accept Plaintiffs' "fairly possible" "alternative interpretation of the statute": that an "emergency" under the NEA, as in ordinary parlance, is an unforeseen circumstance requiring immediate action.  *INS v. St. Cyr*, 533 U.S. 289,

300 (2001); *see Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality opinion) (applying constitutional avoidance canon to avoid nondelegation doctrine violation).

The Government contends, however, that even if the NEA amounts to "an 'extreme' delegation of authority to the President, it is quite clear that Congress intended it." Govt. Br. 31-32. But the Government bases that argument only on the NEA's lack of a definition for "emergency" and its "legislative history." *Id.* at 32. Plaintiffs address these arguments below, in explaining why the NEA does not preclude judicial review and why this case does not present a nonjusticiable political question. *See infra* at 27-29, 31. But for present purposes, it suffices to note the extraordinary nature of the Government's argument. When a statute does not define a term, courts normally apply that term's ordinary meaning. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). The Government's suggestion that Congress's failure to define a term requires construing that term as contrary to its ordinary meaning lacks any justification. *See* Govt. Br. 32 (claiming, without support, that applying the ordinary meaning of "emergency" would be "substantially rewriting the NEA"). And while the Government cites some legislative history that it believes supports its position that "national emergency" means whatever the President says, *but see infra* at 28-29, other legislative history favors Plaintiffs, *see* S. Rep. No. 94-1168, at 3 (1976) (rejecting definition of "emergency" requiring a "grave national crisis" as "overly broad"); *id.* at 2 (NEA "could be utilized only when emergencies actually exist"). "[A]mbiguous legislative history" cannot possibly evince clear congressional intent. *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).

The Government thus cannot escape the dilemma that its reading of the NEA creates: it is wrong as a matter of ordinary meaning and statutory context; but even if it were right, it would raise grave constitutional doubts. The Government's construction should be rejected.

## B.  If Read To Authorize the Proclamation, the NEA Is Unconstitutional

As just noted, the Government argues that the NEA must be read as an "intentional decision" by Congress "to leave to the President the determination about when and under what circumstances to declare a national emergency." Govt. Br. 20. On the Government's view, moreover, the "NEA sets forth no criteria from which [courts] could judge the President's action." *Id.* at 25. If that were so, the NEA would be unconstitutional.

The Constitution's text "permits no delegation" of Congress's legislative powers. *Whitman*, 531 U.S. at 472. Under Supreme Court precedent, unless a statute contains "an intelligible principle" to which the Executive Branch "is directed to conform," it amounts to an unconstitutional delegation. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). That intelligible principle must also be sufficiently clear to allow the Judiciary to determine whether the "will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 425 (1944).

The Supreme Court recently reaffirmed these principles in *Gundy v. United States*, 139 S. Ct. 2116 (2019). Although a plurality upheld the relevant delegation, it did so only after "determin[ing] [the] challenged statute's meaning" and finding that it "supplied an intelligible principle to guide the delegee's use of discretion." *Id.* at 2123. The plurality recognized that if the relevant statute had given the Executive "unguided and unchecked authority," "we would face a nondelegation question." *Id.*

The Government's proposed reading of the NEA violates the nondelegation doctrine. A statute that "leave[s] to the President the determination about when and under what circumstances to declare a national emergency," Govt. Br. 20, by definition lacks "an intelligible principle" to

which the President "is directed to conform," *J.W. Hampton*, 276 U.S. at 409. And a statute without "criteria from which [courts] could judge the President's action," Govt. Br. 25, is not sufficiently clear to allow judges to determine if the "will of Congress has been obeyed," *Yakus*, 321 U.S. at 425. Just as the Supreme Court held in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), that a statute leaving the relevant policy decision "to the President without standard or rule, to be dealt with as he pleased" violated the nondelegation doctrine, *id.* at 418, this Court must do the same if it agrees with the Government's construction of the NEA.

Indeed, under the Government's interpretation, the nondelegation violation here would be particularly flagrant for three reasons. First, "the scope of [presidential] power" under the NEA would be breathtaking: it would grant the President unfettered authority to "affect the entire nation[]" by declaring a national emergency and thus unlocking awesome emergency powers under scores of separate statutes. *Whitman*, 531 U.S. at 475. Second, because the NEA delegates power directly to the President, rather than an administrative agency, far fewer procedural requirements would constrain his unilateral policymaking. Both Supreme Court decisions finding nondelegation violations also involved this sort of direct presidential delegation. *See Panama Refining*, 293 U.S. 388; *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). Third, the NEA's delegation would open the door to the President spending appropriated funds contrary to their assigned purpose, even though the Constitution endows Congress with the "exclusive power over the federal purse" and "liberty is threatened" when "the decision to spend [is] determined by the Executive alone." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) (Kavanaugh, J.); *Clinton v. City of N.Y.*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring). The delegation thus unconstitutionally "transfer[s] to another branch 'powers which

are strictly and exclusively legislative.'" *Gundy*, 139 S. Ct. at 2123 (plurality opinion) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)).

Importantly, finding a nondelegation doctrine violation here would not inhibit the Government's ability to function or call into question any precedent upholding a congressional delegation. It is of course true that Congress must be able to give executive officials "the flexibility to deal with real-world constraints in carrying out [their] charge." *Id.* at 2130. For that reason, the Court has upheld many statutes setting only broad guidelines for executive action. *Id.* at 2129 (citing cases). But flexibility to implement policy based on broad guidelines is different from boundless power to make policy in the first place. If the Government's reading of the NEA were accepted, this case would involve the latter, not the former. Under that reading, there is *no standard at all* to guide the President's use of emergency powers, which every Justice in *Gundy* agreed would run afoul of the nondelegation doctrine. *Id.* at 2123, 2129; *see also id.* at 2131-2148 (Gorsuch, J., dissenting).

The Government does not even attempt to argue that the NEA contains the intelligible principle that Supreme Court precedent requires. Govt. Br. 32-33. According to the Government, Plaintiffs' "focus on Congress's choice not to limit the circumstances under which the President may declare a national emergency"—*i.e.*, the established doctrinal test—is "misplaced." *Id.* at 32. Instead, the Government would prefer to focus on the NEA's supposed status as a "procedural statute" that "does not, on its own, give the President any new powers." *Id.*

The Government mischaracterizes the NEA. The NEA states that "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, *the President is authorized to declare such national emergency*." 50 U.S.C. § 1621 (emphasis added). By its terms, the italicized phrase delegates emergency-declaration

power to the President. The Government simply ignores this textual delegation when denominating the NEA a "procedural statute." Govt. Br. 32. And as much as the Government would like to downplay it, *id.* at 33, that power has real effect: The President's emergency declaration pursuant to a federal statute carries immense symbolic force and inevitably spurs action from subordinates, States, and citizens.

What's more, an emergency declaration triggers the President's ability to invoke powers under numerous other federal statutes—an ability that would not exist but for the declaration. Many of those statutes contain no additional constraints beyond the declaration of an emergency under the NEA. *See* 47 U.S.C. § 606(c) (upon declaration of "national emergency" President "may suspend or amend, for such time as he may see fit, the rules and regulations applicable to any or all" radio stations); 7 U.S.C. § 5712(c) ("during a period for which the President has declared a national emergency" the President "may prohibit or curtail the export of any agricultural commodity"); 40 U.S.C. § 3147 (President may "suspend" statutory wage requirements for public contracts "during a national emergency"). While the Government would have this Court ignore these other statutes, Govt. Br. 33, they bear directly on the NEA's constitutionality. Under the nondelegation doctrine, after all, "the degree of agency discretion that is acceptable varies according to *the scope of the power congressionally conferred*." *Whitman*, 531 U.S. at 475 (emphasis added). Here, the scope of the power conferred by the NEA can only be understood in the context of the unbridled authorities that an emergency declaration automatically unlocks.[2]

---

[2] These authorities must also be considered in applying the constitutional avoidance canon, *see supra* at 18-19, because when one statutory interpretation "would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).

Even accepting the Government's argument that "[t]he only power at issue here is military construction authority under § 2808," Govt. Br. 33, the delegation would still be unconstitutional. To be sure, to unlock § 2808 funds, the emergency must "require[] use of the armed forces" and the military construction must be "necessary to support [the relevant] use of the armed forces." But according to the Government, those constraints, too, are illusory. "The statutory scheme," says the Government, "leaves to the President the determination of whether a national emergency 'requires the use of the armed forces,'" and "determinations about whether specific construction projects would be 'necessary to support such use of the armed forces' are vested in the expertise of the Secretary of Defense." Govt. Br. 50. On the Government's view, then, the *only* constraint on the expenditure of § 2808 funds is that the project qualify as "military construction." *Id.* at 33. But as this case illustrates, that is no constraint at all, given that a border wall to stop unlawful immigration counts as "military construction" under the Government's theory. In any event, merely confining the Executive's powers to "military construction" is not an "intelligible principle." *J.W. Hampton*, 276 U.S. at 409. If that were enough, then *Panama Refining* would not have found a nondelegation violation, since the President there could only make policy relating to transportation of "petroleum." 293 U.S. at 406. Every statute has some defined subject-matter scope, so naming the general area in which the President can exercise legislative power cannot be enough to avoid an unconstitutional delegation.

The Government also observes that the NEA did not invent a brand "new power[]" or "enlarge or add to Executive power," Govt. Br. 32, insofar as presidents declared emergencies before the NEA's passage. But the nondelegation doctrine's application turns solely on whether Congress has "delegated legislative power" by failing to furnish an "intelligible principle," *Whitman*, 531 U.S. at 472; Congress is not absolved of violating that doctrine if the legislative

24

powers it transfers had previously been exercised by the Executive. Put otherwise, if for fifty years, presidents unilaterally exercise legislative power and Congress then chooses to expressly permit that exercise of legislative power by codifying it in a statute, the statute would violate the nondelegation doctrine.

Nor do the NEA's "congressional notification and reporting requirements" save its constitutionality. Govt. Br. 33. The only constraint that can satisfy the nondelegation doctrine is an "intelligible principle" that guides Executive action and judicial review. *See supra* at 20. It would be passing strange to allow Congress to transfer away its legislative authority so long as it directed the Executive to periodically describe how it was exercising that authority. The Fifth Circuit's unpublished decision in *United States v. Mirza*, 454 F. Appx. 249 (5th Cir. 2011), does not hold otherwise. *Contra* Govt. Br. 33. There, the court merely noted the IEEPA's congressional reporting requirement *after* concluding "that the IEEPA contains an 'intelligible principle' that constrains the exercise of power delegated to the Executive branch." *Mirza*, 454 F. Appx. at 256. It did not suggest that such a reporting requirement could salvage a statute that lacked such a principle.[3]

Finally, the Government contends that the NEA's delegation should be forgiven because "Congress may delegate in even broader terms in the realm of immigration, foreign affairs, and national security." Govt. Br. 31. But the NEA is not tied to any particular substantive "realm": it is an across-the-board grant of emergency powers that can be invoked, in the Government's view, *whenever the President chooses*. Nor does the emergency declaration in this case have anything

---

[3] The IEEPA imposes a more specific standard for an emergency declaration than does the NEA under the Government's reading, requiring an "unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States." *Mirza*, 454 F. Appx. at 256. That courts have upheld the IEEPA against nondelegation challenges therefore says nothing about whether the NEA passes muster.

to do with "foreign affairs" or "national security," areas in which the President has certain inherent constitutional authority. While the declaration does relate to immigration, immigration is hardly the sole province of the Executive, *see Arizona v. United States*, 567 U.S. 387, 395 (2012) (cataloguing Congress's immigration powers), so it is unclear why the nondelegation doctrine would be more permissive in that sphere. And what the Government neglects to mention is that this case also touches on the power to appropriate money—an exclusively *legislative* power. *See supra* at 21. So if anything, this case's subject matter calls for a more—not less—demanding stance toward delegation.

### C. This Court Has the Power To Review Plaintiffs' NEA Claim

The Government pays mere lip service to the merits of Plaintiffs' statutory and constitutional arguments outlined above. It instead principally argues that this Court should decline to review Plaintiffs' NEA claim at all. To that end, the Government contends that (1) the NEA precludes judicial review of emergency declarations; and (2) NEA emergency declarations are nonjusticiable political questions. Neither contention has merit.

#### 1. The NEA Does Not Preclude Judicial Review of Emergency Declarations

"Congress rarely intends to prevent courts from enforcing its directives" to the Executive Branch. *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015). There is accordingly a "strong presumption that Congress d[oes] not mean to prohibit all judicial review" of statutory claims. *Dunlop v. Bachowksi*, 421 U.S. 560, 567 (1975), *overruled on other grounds*, *Local No. 82 v. Crowley*, 467 U.S. 526 (1984). To overcome that presumption, the Government bears the "heavy burden" of showing "clear and convincing evidence" that Congress precluded judicial review. *Id.*; *see Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967). The Government points to several features of the NEA that it believes evince Congress' intent to preclude judicial review of national emergency declarations. Notably, none of these features is an express provision barring

judicial review—a provision Congress easily could have written had it wanted to do so. *See Dunlop*, 421 U.S. at 567 (finding no intent to preclude judicial review "[i]n the absence of an express prohibition"). The Government's cited "evidence" is instead more amorphous, like the absence of a statutory definition, congressional reporting requirements, and snippets of legislative history. Even in conjunction, this evidence cannot surmount the "strong presumption" favoring judicial review. *Id.*

First, the Government emphasizes that the NEA "does not define the term national emergency." Govt. Br. 20. But if the lack of a statutory definition for a relevant term counseled against judicial review, then the Judiciary's caseload would be constricted beyond recognition. Interpreting undefined statutory terms is a federal court's bread and butter. In those circumstances, courts look to the term's ordinary meaning and context, and perhaps to legislative history. *See, e.g.*, *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). They do not declare judicial review unavailable. That is no less true when the case involves review of whether the President has exceeded his statutory authority. *See, e.g.*, *AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979).

Second, the Government notes "the fact that the NEA establishes only procedural and reporting guidelines that the President must follow when he invokes other statutory authorities conditioned on a . . . national emergency declaration." Govt. Br. 20. But the Government does not even try to explain why establishing procedural requirements suggests an intent to preclude judicial review of emergency declarations. If anything, the presence of procedural requirements suggests that Congress wanted to *constrain* presidential authority—not leave it totally unchecked. The Government cites only one case for its counterintuitive proposition, *id.* at 21, but that case contradicts the Government's argument, *see United States v. Amirnazmi*, 645 F.3d 564, 581 (3d

Cir. 2011) (under NEA, courts are "not preclude[d] [from] enforcing compliance with statutory dictates").

Third, the Government argues that Congress's inability to terminate the President's emergency declaration by passing a veto-proof "joint resolution," 50 U.S.C. § 1622(a)(1), means that "the Court should not step in to adjudicate this dispute." Govt. Br. 21-22. As an initial matter, the Government mischaracterizes the congressional remedy at issue, which allows Congress to "terminate" an already existing "national emergency," 50 U.S.C. § 1622(a), not to find such a declaration unlawful in the first instance. In any event, just because Congress provided *itself* with a way to terminate emergency declarations does not mean that it precluded *litigants* from challenging the legality of such declarations. The Government's cited cases have drawn this sort of negative inference only where: (1) Congress provided private parties with a particular remedial scheme and a private party then sought to circumvent that scheme by pursuing a separate remedy, *see Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14 (1981); or (2) Congress created an administrative dispute-resolution scheme and a party sought to sue in court before invoking that scheme, *see Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 532 (1989). The Government cites no case where a *congressional* remedy—*i.e.*, passing veto-proof legislation—has precluded a litigant from pursuing a *judicial* remedy.

For this reason, too, Congress's response to *INS v. Chadha*, 462 U.S. 919 (1983), is irrelevant. *See* Govt. Br. 21-22. After *Chadha*, Congress had no choice but to change the congressional termination procedure from a "concurrent resolution" (which does not require presidential approval) to a "joint resolution" (which requires either the President's signature or a veto override), because "concurrent resolutions" had been deemed unconstitutional. *See Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 3 (1st Cir. 1987). Congress's decision to bring the

congressional termination process in line with constitutional procedures says nothing about whether Congress intended to preclude judicial review of private challenges to emergency declarations.

The Government next posits that the NEA's legislative history evidences Congress's intent to preclude judicial review. Govt. Br. 22-23. Even assuming that unenacted legislative history could ever provide the clear statement necessary to preclude judicial review, the NEA's legislative history comes nowhere close to doing so. The Government points to nothing in the legislative history suggesting that "Congress gave thought to the matter of the preclusion of judicial review"—let alone that it in fact precluded such review in "clear and convincing" fashion. *Dunlop*, 421 U.S. at 567. The best the Government can muster is a few bland statements—some from individual legislators, *see NLRB v. SW Gen. Inc.*, 137 S. Ct. 929, 943 (2017) ("statements by individual legislators rank among the least illuminating forms of legislative history")—suggesting that presidents would have some discretion in determining whether to declare emergencies, and that Congress could terminate emergencies. Govt. Br. 22-23. Such statements are far afield from the kind of "specific legislative history that is a reliable indicator of congressional intent" that could theoretically preclude judicial review. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984).

Finally, the Government argues that because "any remedial scheme where litigants could sue the President to challenge a national emergency declaration would raise separation of powers concerns," the Court should not presume that Congress intended to allow such suits. Govt. Br. 22-23. This argument flips the applicable presumption on its head: Congress must clearly state its intent to *preclude* judicial review of governmental action, not to *authorize* it. *See supra* at 26-27.

In any event, as explained below, suing the President under the NEA poses no separation of powers problem. *See infra* at 34-35. There is no basis for the Government's judicial-review prohibition.

### 2. Challenges To NEA Emergency Declarations Do Not Present Nonjusticiable Political Questions

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). The political question doctrine represents "a narrow exception to that rule," *id.* at 195, for "actions which would improperly require judicial review of decisions exclusively within the purview of the political branches of government," *Kuwait Pearls Catering Co. v. Kellogg Brown Root Servs. Inc.*, 853 F.3d 173, 178 (5th Cir. 2017). Evidencing the doctrine's limited scope, the Supreme Court has relied on it only thrice since 1960. *See Rucho v. Common Cause*, 139 S. Ct. 2484 (2019); *Nixon v. United States*, 506 U.S. 224 (1993); *Gilligan v. Morgan*, 413 U.S. 1 (1973).

The political question doctrine has no application here, because "purely legal question[s] of statutory interpretation" are not political questions even if they "may have significant political overtones." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *accord Kuwait Pearls*, 853 F.3d at 179. Indeed, "[t]he Supreme Court has never applied the political question doctrine in cases" alleging "that the Executive Branch violated congressionally enacted statutes that purportedly constrain the Executive." *El-Shifa Pharm. Indus. v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment). For good reason: "If a court refused to give effect to a statute that regulated Executive conduct, it necessarily would be holding that Congress is unable to constrain Executive conduct in the challenged sphere of action," and thereby "would systematically favor the Executive Branch over the Legislative Branch." *Id.* at 857; *see Japan Whaling,* 478 U.S. at 230 (no political question because "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts");

*Zivotofsky*, 566 U.S. at 196 (no political question because "[t]o resolve [plaintiff's] claim, the Judiciary must decide if [plaintiff's] interpretation of the statute is correct, and whether the statute is constitutional"—"a familiar judicial exercise").

Here, Plaintiffs claim that the President's Proclamation violates the NEA, based on the ordinary meaning of "emergency." And they further claim that if the Government's contrary interpretation of the NEA were adopted, then the NEA would be unconstitutional. As in *Japan Whaling* and *Zivotofsky*, to resolve these claims, this Court "must decide if [Plaintiffs'] interpretation of the statute is correct, and whether the statute is constitutional." *Id.* "This is a familiar judicial exercise," falling within the judicial competency "[a]t least since *Marbury v. Madison*." *Id.*

The Government's contrary arguments are unpersuasive. To begin, the Government contends that "there are no judicially manageable standards to ascertain whether or when to declare a 'national emergency'" because "Congress intentionally chose not to define the term 'national emergency' and left that determination to the President." Govt. Br. 25. As explained already, however, courts regularly construe undefined statutory terms by analyzing their ordinary meaning and context. *See supra* at 27. That is all the Court must do here.

The Government fundamentally misunderstands Plaintiffs' proposed statutory inquiry when it claims that "the Court would have to conduct a standardless inquiry into how the current humanitarian and security crisis at the border impacts immigration policy, foreign relations, public safety, and national security." Govt. Br. 25. Plaintiffs do not argue that the Proclamation violates the NEA because there is no problem at the border, or because a border wall is unwise immigration policy. Rather, they argue that, based on the ordinary meaning of "emergency," the Proclamation is invalid given its text and context. *See supra* at 15-17. So while "[f]raming the issue as the

[Government] d[oes]"—*i.e.*, whether the Judiciary may decide if "the current humanitarian and security crisis at the border" justifies an emergency declaration, Govt. Br. 25—may raise justiciability "concerns," those concerns "dissipate . . .when the issue is recognized to be the more focused one of" the NEA's meaning. *Zivotofsky*, 566 U.S. at 197.

The Government's suggestion that addressing "illegal immigration" is an unreviewable "policy determination[]" "fall[ing] squarely within a substantive area clearly committed by the Constitution to the political branches," Govt. Br. 26-27, suffers from the same problem. This case presents an ordinary statutory interpretation question, and courts—including the Supreme Court and Fifth Circuit—have often adjudicated cases touching on complex issues of immigration policy. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2403 (2018) (reviewing President Trump's "entry restrictions on nationals of countries that do not share adequate information for an informed entry determination, or that otherwise present national security risks"); *Texas*, 809 F.3d at 169-70 (reviewing President Obama's Deferred Action for Parents of Americans and Lawful Permanent Residents program). The Government cannot simply incant the words "immigration," "foreign policy," or "national security" and evade judicial review. *See Lane v. Halliburton*, 529 F.3d 548, 558 (5th Cir. 2008). While the Government's cited cases contain generic language about the delicate judgments underlying immigration and foreign policy, none actually finds an issue unreviewable on political question grounds, and certainly not when the only issue is what a statute means. *See* Govt. Br. 27 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972); *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).

Finally, the Government relies on cases holding that challenges to particular presidential emergency declarations under the NEA and other similar statutes constituted nonjusticiable political questions. Govt. Br. 23-24 & n.9. As an initial matter, the Government cites no Supreme

Court or published Fifth Circuit decision that binds this Court. At any rate, most of the Government's cases raised open-ended questions about the wisdom of a president's emergency declaration as a matter of foreign policy.[4] This case, in contrast, raises the question whether the President's declaration complies with the text of a statute. The Government's other cases predate the NEA, *Japan Whaling*, and *Zivotofsky*, so do nothing to undermine Plaintiffs' arguments here.[5]

### 3. Even If the President's Emergency Declaration Were Nonjusticiable, Plaintiffs' Nondelegation Challenge Is Reviewable

The Government's reliance on the political question doctrine is limited to Plaintiffs' argument that the President's Proclamation violates the NEA. *See* Govt. Br. 23. The Government

---

[4] *See Soudavar v. Bush*, 46 F. App'x 731 (5th Cir. 2002) (per curiam) (unpublished and unreasoned decision in which plaintiff argued that "President Bush unjustly issued executive orders imposing trade sanctions against Iran"); *Chickakli v. Szubin*, 2007 WL 9711515, at \*4 (N.D. Tex. 2007) (unpublished decision in which plaintiff "ask[ed] the Court to make a policy determination regarding the nature of the threat posed by the conflict in Liberia"); *United States v. Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1194 (D. Mass. 1986) (plaintiff argued simply that "Nicaragua [does] not pose an unusual and extraordinary threat"); *Santiago v. Rumsfeld*, 2004 WL 3008724, at \*3 (D. Ore. 2004) (unpublished decision in which plaintiff "dispute[d] the justification for sending troops to Afghanistan" because "Afghanistan now has a democratically elected government"); *United States v. Groos*, 616 F. Supp. 2d 777, 788-79 (N.D. Ill. 2008) (plaintiff simply argued that "the unrestricted access of foreign parties to U.S. goods and technology" was not an "unusual and extraordinary threat"); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988) (plaintiff argued that "the 'true facts' of the Libyan crisis" did not constitute an emergency). The Government also cites *Amirnazmi*, but that case helps Plaintiffs on this score, because the court there adjudicated the merits of a nondelegation challenge to the IIEPA and noted that even in foreign-policy cases courts must "enforc[e] compliance with statutory dictates." 645 F.3d at 576-81.

[5] *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982) (plaintiff argued simply that "there was no genuine national emergency" and court still left open possibility of review if there was a "compelling reason"); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 579 & n.29 (C.C.P.A. 1975) (U.S. Court of Customs and Patent Appeals decision stating only that "courts will not *normally* review . . . the declaration or continuance of a national emergency" and then noting that review *would* be proper in "clear instances" where the President exceeded delegated powers (emphasis added)); *Veterans and Reservists for Peace in Viet. v. Reg'l Comm'r of Customs*, 459 F.2d 676, 679 (3d Cir. 1972) (court noted in dicta that "a President's declaration of national emergency is unreviewable"); *Sardino v. Fed. Res. Bank of N.Y.*, 361 F.2d 106, 109 (2d Cir. 1966) (declining to review an emergency declaration "when thousands of United States troops are in action and many more are in readiness around the globe").

does not contend that Plaintiffs' alternative argument that the NEA violates the nondelegation doctrine is unreviewable. *See id.* at 30-33 (addressing Plaintiffs' nondelegation doctrine argument on the merits). Nor could it: courts have uniformly addressed the merits of similar nondelegation challenges to laws granting the President emergency policymaking powers. *See, e.g.*, *Amirnazmi*, 645 F.3d at 575-77; *United States v. Dhafir*, 461 F.3d 211, 215-17 (2d Cir. 2006). That makes sense, given that "there is, of course, no exclusive commitment to the [political branches] of the power to determine the constitutionality of a statute." *Zivotofsky*, 566 U.S. at 197.

### D.     There Is No Basis For Dismissing the President as a Defendant

Certain of Plaintiffs' claims seek declaratory and injunctive relief against the President, on the ground that his Proclamation is unlawful. *See* Am. Compl., ECF 52, at 38-41. The Government argues that the President should be dismissed as a defendant to those claims because "there is no cause of action against the President, and Plaintiffs may not obtain—and the Court may not order—equitable relief directly against the President." Govt. Br. 28. That is incorrect.

"All the officers of the government, from the highest to the lowest, are creatures of law, and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882). Accordingly, the Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). And it has likewise held "that the President is subject to judicial process in appropriate circumstances." *Id.*; *see United States v. Nixon*, 418 U.S. 683, 706 (1974) (requiring President Nixon to comply with subpoena obligating him to produce White House tape recordings).

Contrary to the Government's suggestion, Govt. Br. 28, no categorical rule bars injunctive relief against the President in all circumstances. *See Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018) ("[T]he Supreme Court has never held that a court may *never* enjoin the President with regard to his official behavior."). In *Mississippi v. Johnson*, 71 U.S. 475 (1866), the Court

held that it could not enjoin the President from carrying out an act of Congress. *Id.* at 501. But there, injunctive relief against subordinate executive officials would have been available and had substantially the same effect as injunctive relief against the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."). The Supreme Court has never held that an injunction may not lie against the President in a case where presidential action would otherwise be "*unreviewable*." *Id.* Such a rule would flout the "bedrock principle that our system of government is founded on the rule of law," and that "a necessary function of the judiciary is to determine if the executive branch is abiding by the terms of legislative enactments." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).

Here, to challenge the legality of the Proclamation itself, Plaintiffs have no option but to sue the President. Only the President issued the Proclamation, and no subordinate executive official is directly effectuating the Proclamation. While the Acting Defense Secretary is relying on the Proclamation to spend § 2808 funds, enjoining the expenditure of those funds is not the same as invalidating the Proclamation. As explained earlier, the Proclamation independently injures Plaintiffs, and only invalidation of the Proclamation can cure those injuries. *See supra* at 3, 7-8. This is accordingly the "extraordinary" case in which injunctive relief against the President is warranted. *Franklin*, 505 U.S. at 802 (plurality opinion); *see Centro Presente v. DHS*, 332 F. Supp. 3d 393, 419 (D. Mass. 2018) (refusing to dismiss claim against president where it was premature to determine "whether an injunction against lower officials or declaratory relief would be sufficient"); *Saget*, 345 F. Supp. 3d at 297 (same).

Yet even if *injunctive* relief against the President were unavailable, *declaratory* relief would be. Declaratory relief is a less intrusive remedy than injunctive relief and thus does not raise the same separation of powers concerns. *See Franklin*, 505 U.S. at 803 (plurality opinion). A declaratory judgment of the Proclamation's illegality, moreover, would go a long way toward redressing Plaintiffs' harms, as we must "assume it is substantially likely that the President . . . would abide by a[] [court's] authoritative interpretation" of the NEA. *Id.* Because, at the very least, declaratory relief against the President is available, the President should not be dismissed as a defendant to this suit.

## III. DEFENDANTS' USE OF FUNDS TO BUILD A BORDER WALL VIOLATES THE APPROPRIATIONS CLAUSE

Even setting aside the Proclamation, Defendants' border-wall construction cannot move forward because Congress has not appropriated funds for it. Under the Appropriations Clause, "the payment of money from the Treasury must be authorized by a statute." *OPM v. Richmond*, 496 U.S. 414, 424 (1990). Congress has passed no statute authorizing Defendants' expenditure of $6.1 billion on a border wall. To the contrary, it considered and rejected doing just that. Defendants' wall-funding plan thus violates the Appropriations Clause and must be enjoined.

### A. The CAA Precludes Defendants' Wall-Funding Plan

"[A]n appropriation for a specific purpose is exclusive of other appropriations in general terms which might be applicable in the absence of the specific appropriation." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005). In the CAA, Congress *specifically* appropriated $1.375 billion for border-wall expenditures and restricted those expenditures to "construction . . . in the Rio Grande Valley Sector" alone. CAA, § 230; *id.* § 231. Yet Defendants intend to spend $6.1 billion in funds appropriated for other more *general* purposes—military construction, 10 U.S.C. § 2808, and counterdrug support, 10 U.S.C. § 284—on building a wall along other portions of the

southern border. This plan runs headlong into the specific vs. general canon and is thus inconsistent with the CAA.

The Government never even mentions the specific vs. general canon—a cardinal rule of statutory construction, *see, e.g.*, *Bloate v. United States*, 559 U.S. 196, 207 (2010), with direct application to this case. It instead presses the inverse rule: "In the absence of contrary language, the grant of a specific appropriation cannot be read to restrict the use of other appropriated funds for similar purposes pursuant to other statutory authority." Govt. Br. 54-55. "Had Congress wished to restrict all other border-barrier construction," the Government continues, "it could have plainly so stated." *Id.* at 55.

The Government offers no support for its novel rule, because there is none. Courts interpret statutes by viewing them in the context of the entire U.S. Code. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991). That general principle applies fully in the appropriations context. *See* GAO, Principles of Federal Appropriations Law (4th Ed. 2016) (GAO Red Book), at 1-64 ("[W]e assume that the legislature intended to enact a consistent body of law, and so we try to harmonize conflicting statutes to give full force to each of them."). So Congress's consideration and rejection of a $6.1 billion border wall in the CAA of course sheds light on whether Congress authorized a $6.1 billion border wall elsewhere in the statute books.

Moreover, the notion that Congress must "plainly" state restrictions on executive expenditures gets the law backwards. Govt. Br. 55. The actual rule is that "the expenditure of public funds is proper only when *authorized* by Congress, not that public funds may be expended *unless prohibited* by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (emphasis added). The Government's proposed principle would dangerously expand executive authority to

spend money, threatening Congress's "absolute" power of the purse and, in turn, individual liberty.

*See Dep't of Navy*, 665 F.3d at 1348.

Defendants' wall-funding plan also violates CAA § 739. That provision states:

> None of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Here, Defendants impermissibly seek to use funds "made available" in an "appropriations Act" to "increase . . . funding for a . . . project . . . as proposed in the President's budget." The military construction and counterdrug support funds they seek to use to build a border wall were "made available" by appropriations acts. *See* Pls. MSJ 35. The border wall is a "project" under that word's ordinary meaning. *See* Merriam-Webster's Dictionary 932 (10th ed. 1998) (defining "project" as "a specific plan or design"). And the President proposed that "project" in his January 6, 2019 budget request. Pls. Ex. 28, at 1.

Section 739's exception for changes "made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act" does not apply. An "appropriation[s] Act" is a law whose title begins: "An Act making appropriations." 2 U.S.C. § 622(5); 1 U.S.C. § 105. And neither § 2808 nor § 284 is found in such a law. *See* Military Construction Codification Act, Pub. L. 97-214, 96 Stat. 153 (1982) (§ 2808); National Defense Authorization Act, Pub. L. 114-328, 130 Stat. 2000, 2381, 2497 (2016) (§ 284).

The Government responds that Defendants' wall-funding plan does not violate § 739 because "[a]ny funds utilized for border barrier construction pursuant to § 2808 or § 284 will be used for . . . military construction and counter-drug activities," not "to increase funding for a CBP program, project, or activity as proposed in the President's budget request." Govt. Br. 55. But the

Government does not dispute that a border wall is a "project," or that § 2808 and § 284 money is being "used" to fund that project. While it is true that one could describe the § 2808 and § 284 funds at a higher level of generality as being "used" for "military construction and counter-drug activities," Govt. Br. 55, that does not negate the fact that they are being "used" to fund a "project as proposed in the President's budget request." And that is what § 739 forbids.

The Government also emphasizes that *DOD* will spend the relevant § 2808 and § 284 funds, whereas the President's budget request was for a *DHS* project. *See* Govt. Br. 55. But § 739's prohibition turns not on which *agency* uses appropriations to increase funding for a particular "project," but on whether the "project" is one that the President proposed. Indeed, § 739's whole point is to prevent end runs around the CAA's appropriations allocations; that safeguard would be nullified if the executive could simply choose a different agency to spend forbidden funds.

### B.    Section 2808 Does Not Authorize Border-Wall Expenditures

The Proclamation makes available to the Acting Defense Secretary $3.6 billion in § 2808 military construction funds to build a border wall. *See* Pls. Ex. 14. Section 2808, however, does not authorize border-wall expenditures.

In relevant part, § 2808 states:

> In the event of the declaration by the President of a national emergency in accordance with the National Emergencies Act that requires the use of the armed forces, the Secretary of Defense may undertake military construction projects that are necessary to support such use of the armed forces.

Section 2808 thus establishes three preconditions to the use of military construction funds: (1) the relevant "national emergency" must "require[] the use of the armed forces"; (2) the relevant project must constitute a "military construction project"; and (3) the relevant project must be "necessary to support such use of the armed forces." None is satisfied here.

1.    The Proclamation declares that the relevant "national emergency" is the "current situation at the southern border." Pls. Ex. 14, at 1.  The "current situation," in turn, boils down to a "problem of large-scale unlawful migration" and an "inability to provide detention space for many . . . aliens while their removal proceedings are pending." *Id.*  This "situation" is thus bound up with the enforcement of immigration laws.

But the enforcement of immigration laws does not "require[] the use of the armed forces." "Securing the border . . . [is], of course, law enforcement"—not military—"activit[y]." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000).  As the Acting Defense Secretary recently admitted, the situation at the southern border is "not a military threat."[6]  And as another top-level Defense official has testified, "[n]one of the capabilities that we are providing [at the southern border] are combat capabilities."[7]  Given this reality, Congress has always tasked civilian agencies with immigration enforcement responsibilities.  *See* Pls. MSJ 37 n.11.  And even when addressing "an actual or imminent mass influx of aliens . . . near a land border[] present[ing] urgent circumstances"—*i.e.*, the same circumstances alleged in the Proclamation—Congress only authorized civilian "law enforcement officer[s]" to perform immigration functions.  8 U.S.C. § 1103(a)(10).

The exclusive use of civilians for domestic law enforcement has deep roots.  Enacted in 1878, the Posse Comitatus Act generally bars military members from "execut[ing] the laws."  18 U.S.C. § 1385.  And other statutory provisions contain similar prohibitions—*e.g.*, barring military participation in "search[es], seizure[s], arrest[s], or other similar activit[ies]."  10 U.S.C. § 275.

---

[6] *Department of Defense Budget Posture: Hearing Before the S. Comm. on Armed Servs.*, 116th Cong. (2019) (statement of Patrick Shanahan), https://tinyurl.com/DefenseBudgetHearing.

[7] Heather Timmons, *The US Border Situation Isn't a National Emergency, Pentagon Officials Tell Congress*, Quartz (Jan. 29, 2019), https://tinyurl.com/QuartzBorder.

These laws recognize that nothing could be "more sinister and alarming" than allowing a President to "vastly enlarge his mastery over the internal affairs of the country" through "commitment of the Nation's armed forces." *Youngstown*, 343 U.S. at 642 (Jackson, J., concurring).

In response, the Government adopts a familiar refrain: "The statutory scheme leaves to the President the determination of whether a national emergency 'requires the use of the armed forces.'" Govt. Br. 50. This argument fails for all the reasons the Government's earlier political-question argument fails. Under Supreme Court precedent, statutory-interpretation inquiries are justiciable, even if they have political ramifications. *See supra* at 30-31. The issue here is one of pure statutory interpretation: Does the declared "national emergency" "require[] use of the armed forces"? Suppose, for instance, that a future president declares a national emergency after a financial crisis and invokes § 2808 to build a new consumer-protection agency in the middle of Wall Street. On the Government's view, a court would be powerless to invalidate that plan on the ground that addressing a financial crisis does not "require[] use of the armed forces." Nonsense.

Unsurprisingly, the Government cites nothing to support its argument. Its only justification is that because "courts have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question," the issue of whether an emergency "requires use of the armed forces" must be as well. Govt. Br. 50. That conclusion does not follow from the premise. Determining whether an issue presents a political question necessitates a "discriminating inquiry into the precise facts and posture of the particular case." *Kuwait Pearls*, 853 F.3d at 178. So even if a challenge to an emergency declaration itself were somehow a political question, a challenge to whether an emergency "requires the use of the armed forces" is not.

2. Even when there is a national emergency requiring use of the armed forces, § 2808 authorizes only "military construction projects." Section 2801(a) defines "military construction"

to include "any construction, development, conversion, or extension of any kind carried out with respect to a military installation." 10 U.S.C. § 2801(a). And "military installation" means "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." *Id.* § 2801(c)(4).

This language precludes Defendants' border-wall expenditures. The southern border, where the wall construction will be "carried out," is not a "military installation," because it is not a "base, camp, post, station, yard, center, or other activity." *Id.* § 2801(a), (c)(4). Nor is the border "under the jurisdiction of the Secretary of a military department." *Id.* § 2801(c)(4). If anything, the border is under DHS's "jurisdiction," and DHS is not a "military department." *See* 6 U.S.C. § 202(2) (tasking DHS with "[s]ecuring borders").

Not only text, but also past practice, cuts against Defendants' reliance on § 2808. The two instances in which presidents have invoked § 2808 to authorize "military construction projects" both involved standard construction on military sites under the control of military departments (*e.g.*, barracks on a base in Afghanistan). *See* Pls. MSJ 39; *accord* Govt. Br. 17-18. Thus, until now, the Executive Branch has never deployed § 2808 to build a law-enforcement project outside of a military site. "[T]hat it took [DOD] [decades] to discover its novel interpretation further highlights [that interpretation's] unreasonableness." *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 380 (5th Cir. 2018).

The Government first counters that because the definition of "military construction project" is (on its view) "broad and illustrative, not specific or exclusive," it can be read to encompass border-wall construction. Govt. Br. 51. In particular, it emphasizes the phrase "*include*[] any construction . . . of any kind carried out with respect to a military installation." *Id.* (quoting 10 U.S.C. § 2801(a)). But that phrase does not help the Government, because regardless of whether

"include" is broad, military construction must still be construction "*carried out with respect to a military installation*." The Government would simply read that critical phrase out of the statute.

Realizing the implausibility of that move, the Government alternatively addresses the definition of "military installation" head on. Govt. Br. 51. That definition, the Government stresses, contains the catchall phrase "*or other activity*," which the Government believes to include the southern border. *Id.* But "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. St. Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003). In § 2801, "or other activity" is a general phrase following a specific list—"base, camp, post, station, yard, center"—of military-related sites. That general phrase therefore must be "construed to embrace only objects similar in nature" to military-related sites. *Wash. St.*, 537 U.S. at 384. The southern border bears no such similarity. *See Sierra Club*, 2019 WL 2247689, at *25 ("Applying traditional tools of statutory construction, Section 2801 likely precludes treating the southern border as an 'other activity.'").

Having failed to justify Defendants' actions based on § 2808's text, the Government (of course) urges the Court not to address Plaintiffs' § 2808 argument, because it "has no concrete record upon which to assess whether these statutory requirements have been satisfied with respect to particular construction projects." Govt. Br. 51. But addressing Plaintiffs' argument does not require a "concrete record" of "particular construction projects." All that matters is that Defendants will use § 2808 funds to build a wall along the southern border, and the record plainly shows that they will. *See supra* at 11-13. The Court may therefore decide whether a wall along the southern border constitutes "military construction."

3.  Even if a border wall were a "military construction project," § 2808 also requires that the project be "necessary to support such use of the armed forces."  Common sense and past practice show that projects "necessary to support" the armed forces are those that facilitate or promote military activity, such as hangars, runways, logistics hubs, and ammunition-storage facilities.  *See* Pls. MSJ 40.  Here, the relevant "use of the armed forces" is immigration enforcement, since that is what the alleged "national emergency" allegedly requires.  *See supra* at 39.  But as already explained, immigration enforcement is not a lawful "use of the armed forces" at all.  And even assuming it were, a border wall is not "necessary to support" the armed forces in its enforcement of immigration laws.  As President Trump explained: "If we had a wall, we don't need the military because we'd have a wall."  Pls. Ex. 15, at 7.

On this point, the Government again requests blind deference, arguing that "determinations about whether specific construction projects would be 'necessary to support such use of the armed forces' are vested in the expertise of the Secretary of Defense."  Govt. Br. 50.  But no case holds that *all* issues touching on the military are automatically political questions.  To the contrary, only where the case would ask courts to referee "matters of war," such as a "decision to deploy troops in a foreign land," "mine the harbors of another county in the course of a war," use particular "training procedures," or halt "nuclear testing" does the political question doctrine come into play. *Lane*, 529 F.3d at 560 (citing cases).  Determining whether a border wall is "necessary to support" the armed forces' enforcement of immigration law would not draw courts into "matters of war." *Id.*  And while the Government would solely focus on respecting *military* judgments, it fails to acknowledge that "to abstain from giving effect to a federal statute is [dis]respectful to *Congress*." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 825 (9th Cir. 2017) (emphasis added).

### C. Section 284 Does Not Authorize Border-Wall Expenditures

In addition to § 2808, Defendants have invoked § 284 as authority to spend $2.5 billion on a border wall. Section 284(a) states that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency . . . for any of the purposes set forth in subsection (b)." 10 U.S.C. § 284(a). Section 284(b)(7) then lists as one such purpose: "Construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7).

Section 284's text shows that "support" cannot include a $2.5 billion outlay toward a border wall. Consider first § 284(b)'s list of forms of support that DOD may provide. Each of those forms is a subsidiary act of assistance. *See* 10 U.S.C. § 284(b)(1)-(10) (listing, *inter alia*, equipment repair, personnel transport, and reconnaissance). A $2.5 billion border-wall expenditure, conversely, would bankroll a massive construction project. It therefore "fits poorly with the remainder of [§ 284's] scheme." *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1071 (2018).

Consider next § 284(h)'s congressional notification provision, which requires that DOD notify Congress about "small scale construction project[s]" costing no more than $750,000. 10 U.S.C. §§ 284(h)(1)(B), 284(i)(3). Congress would not have mandated notification of small-scale construction projects costing under $750,000 if it thought that DOD could also support large-scale construction projects costing over 3,000 times that amount, because Congress would care more about costly projects than inexpensive ones. The only inference, then, is that Congress did not intend the word "support" to encompass an expenditure like the one here.

That inference gains traction from established rules of statutory construction. Section 284(b)(7) a sub, sub provision allowing "support" for construction of "fences" to block "drug smuggling corridors," can only be regarded as an ancillary provision within a section about

counterdrug support activities. Yet DOD has suddenly "claim[ed] to discover in [this] long-extant statute [the] unheralded power" to spend $2.5 billion on a wall. *UARG v. EPA*, 573 U.S. 302, 324 (2014). That sort of gambit is "typically" met with a "measure of skepticism," *id.*, because Congress does not grant agencies sweeping powers through "vague terms or ancillary provisions— it does not, one might say, hide elephants in mouseholes." *Whitman*, 531 U.S. at 468.

The Government claims that Defendants' use of § 284(b)(7) here is not novel, pointing to: (1) the construction of a 14-mile fence "along the San Diego-Tijuana border" and (2) the "construction and rehabilitation" of 66.6 miles of fencing and 169.5 miles of road elsewhere along the border. Govt. Br. 51-52. The Government also notes that Congress once recommended that DOD spend between $2 and $3 million on "fence construction projects in Texas and Arizona." *Id.* These examples self-evidently pale in comparison to a $2.5 *billion* wall stretching the entire southwest border and thus only confirm the implausibility of the Government's interpretation.

The Government's textual arguments fare no better. It observes that no express "monetary restriction appears in the types of support permitted under § 284," relying on the truism that "if Congress wanted to limit all § 284 construction to 'small scale construction,'" it could have said so. Govt. Br. 51, 53. But as already explained, § 284's *structure and context* show that $2.5 billion exceeds what Congress could have possibly intended "support" to entail. And "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 666 (2007). The Government also states that "there is nothing inherently implausible about Congress choosing to require notifce for some, but not all, projects that DoD could construct under § 284." Govt. Br. 52. That misses the point. What is implausible

is that Congress would require notification for *inexpensive* projects (those costing under $750,000), but not *exorbitantly expensive* ones.

### D. Section 8005 Does Not Authorize DOD's Reprogramming of Funds

DOD has also violated the Appropriations Clause by unlawfully reprogramming funds from one account to another, so that it can spend $2.5 billion on a wall. Congress appropriated $881,525,000 to DOD's "Drug Interdiction and Counter-Drug Activities" account for fiscal year 2019, $517 million of which was for "counter-narcotics support." *See* Pub. L. No. 115-245, div. A, tit. VI, 132 Stat. at 2997. That appropriation is far less than the $2.5 billion that DOD has been asked to use to "support" DHS under § 284 by constructing a border wall. To make up the difference, DOD has reprogrammed $2.5 billion from its military personnel appropriation account to its drug interdiction account. Govt. Ex. 6, at 1; *see Sierra Club*, 2019 WL 2247689, at *10.

For this reprogramming to comply with the Appropriations Clause and federal appropriations law, it may be done only with congressional permission. *See Sierra Club*, 2019 WL 2865491, at *12; *Dep't of Navy*, 665 F.3d at 1348; 31 U.S.C. § 1532. DOD points to § 8005 of the DOD Appropriations Act as the requisite authorization. That section reads as follows:

> [The Secretary may transfer] funds made available in this Act to the Department of Defense for military functions (except military construction) . . . [p]rovided [t]hat such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress.

Section 8005 thus authorizes DOD's reprogramming only if: (1) it is "based on unforeseen military requirements"; (2) "the item for which funds are requested" has not "been denied by Congress"; and (3) the transfer is "for military functions (except military construction)." None of these conditions is met. *See Sierra Club*, 2019 WL 2865491, at *12-*15 (Ninth Circuit holding that Defendants likely violated § 8005); *Sierra Club*, 2019 WL 2247689, at *19-*23 (district court holding same).

1.   DOD has reprogrammed funds for purposes of building a border wall, not "based on unforeseen military requirements."  As already explained, the alleged need for a border wall is not "unforeseen"; rather, the President and his Administration have requested funding for a wall numerous times.  *See supra* at 38; Pls. MSJ 4.  Nor is DOD's reprogramming for a "military requirement."  A border wall would be used to prevent unlawful immigration, a civilian—not a military—responsibility.  *See supra* at 39-40.

According to the Government, "§ 8005 uses the term 'unforeseen' in the context of the budgeting process."  Govt. Br. 56.  Because "the need for DoD to exercise its § 284(b)(7) authority did not arise until February 2019, when DHS requested support from DoD," the Government continues, that need "was an unforeseen military requirement at the time of the President's fiscal year 2019 budget request" and through "Congress's passage of DoD's fiscal year 2019 budget."  Govt. Br. 56-57.  In essence, the Government argues that it was "unforeseen" that Congress would deny funding for a border wall and thus "unforeseen" that DHS would request support for a wall from DHS.

That is not a plausible construction of § 8005.  By § 8005's terms, what must be "unforeseen" is the "military requirement" itself, not a congressional appropriations judgment or a DHS "support" request.  Under the Government's view, the Executive could simply wait to see if Congress provided a requested DHS appropriation and, if not, direct DHS to seek "support" from DOD in the precise amount that Congress denied—a blatant evasion of Congress's appropriations authority.  The far more natural reading of § 8005 is that Congress wanted to give

DOD leeway to reprogram funds only in the face of an unexpected threat of war or other disaster. Indeed, that is how DOD has previously used this reprogramming authority.[8]

Even if the Government were right that "§ 8005 uses the term 'unforeseen' in the context of the budgeting process," Govt. Br. 56, DOD's need to use funds to support DHS in border-wall construction was not "unforeseen." Only five days after President Trump took office, he issued an executive order requiring DHS to "[i]dentify . . . *all sources of Federal funds* for the planning, designing, and constructing of a physical wall along the southern border." Exec. Order No. 13767, 82 Fed. Reg. 8793, 8794 (Jan. 25, 2017) (emphasis added). And in April 2018, the President directed the Defense Secretary to support DHS in "securing the southern border." *See* Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018).

2. DOD's reprogramming is also unlawful because a border wall—the "item" for which the funds are "requested"—is an "item" that has "been denied by Congress." The President sought funds to build a wall along the southern border. *See, e.g.*, Pls. Ex. 28, at 1 (January 6, 2019 request for "$5.7 billion for construction of a steel barrier for the Southwest border"). But Congress declined to give the President what he sought, instead appropriating only $1.375 billion for fencing in specified areas. *See* CAA, §§ 230-31. Congress thus "denied" the precise "item"—a $5.7 billion wall stretching the border—for which DOD now seeks to transfer funds.

The Government responds that the relevant "item" is "counter-drug activities funding," not a wall. Govt. Br. 57. And the appropriation of $1.375 billion to DHS for targeted fencing, says

---

[8] *See, e.g.*, Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 04-37 PA, Reprogramming Action (Sept. 3, 2004), http://tinyurl.com/DOD2004ReprogrammingAction (reprogramming to pay for unexpected hurricane damage to bases).

the Government, "does not constitute a 'denial' of appropriations to DoD for its counter-drug activities." *Id.*

Again, the Government's reading fails. An "item" in an appropriations bill is "a sum of money directed by the [legislature] to be spent for a particular purpose." *Jubelirer v. Rendell*, 953 A.2d 514, 534 (Pa. 2008); Black's Law Dictionary 832 (6th ed. 1990) ("An 'item' in an appropriation is an indivisible sum of money dedicated to a stated purpose."). In the CAA, Congress directed $1.375 billion to be spent for the purpose of targeted fencing in Rio Grande Valley and, in so doing, *denied* the direction of $5.7 billion for the purpose of a wall stretching the border. There is no basis for the Government's counterintuitive reading of "item" to mean "counter-drug activities funding" rather than a wall: as the Ninth Circuit held, had Congress intended that reading, it would have written "*funding* requests denied by the Congress." *Sierra Club*, 2019 WL 2865491, at *14. Nor does the Government explain how Congress did not "deny" $5.7 billion in wall funding under that word's ordinary meaning when it considered, but refused, to provide it. *See id.* at *14 (under "ordinary and common-sense meaning of 'denied,'" "Congress considered and denied appropriations for the border barrier construction projects that DoD now seeks to finance"). When Congress appropriates a specific amount for a project, "that is all Congress intended" for that project "to get in [a fiscal year] *from whatever source*." *Nevada*, 400 F.3d at 16 (emphasis added); *see MacCollom*, 426 U.S. at 321 ("Where Congress has addressed the subject as it has here, and authorized expenditures where a condition is met, the clear implication is that where the condition is not met, the expenditure is not authorized.").

Even if § 8005's text were ambiguous, its legislative history dooms the Government's reading. In 1974, Congress added the "denied by Congress" restriction on DOD's reprogramming authority to "tighten congressional control of the reprogramming process" and prevent DOD from

"undoing the work of the Congress." H. Rep. No. 93-662, at 16 (1973); *see* DOD Appropriations Act of 1974, Pub. L. No. 93-238, § 735, 87 Stat. 1026, 1044 (1974). The House Committee Report for that bill explains that "on some occasions, the Department ha[d] requested that funds which have been specifically deleted in the legislative process be restored through the reprogramming process," which the Committee found "untenable." H. Rep. No. 93-662, at 16. Accordingly, restrictions like § 8005 must be "construed strictly" to "prevent the funding for programs which have been considered by Congress and for which funding has been denied." H. Rep. No. 99-106, at 9 (1985). The Government's position cannot be reconciled with Congress's stated purpose in passing § 8005.

3. Finally, DOD's reprogramming of funds is unlawful for yet a third reason: it is not "for military functions." It is for building a wall designed to impede unlawful immigration. And the support DOD provides in building border walls is not "military" in nature. *See* Govt. Br. 7 (military personnel have "harden[ed] U.S. ports of entry, erect[ed] temporary barriers, and emplac[ed] concertina wire"). If building a border wall were a "military function," however, it would obviously be "military construction." Defendants have taken exactly that position when invoking § 2808 as a source of wall funding. Section 2808 also uses the term "military construction," and the same statutory definition applies to that term in both § 2808 and § 8005. *See* 10 U.S.C. § 2801(a) (defining "military construction" "*as used in this chapter or any other provision of law*" (emphasis added)). That creates an insuperable obstacle for Defendants, because § 8005 expressly bars reprogramming for "military construction." Defendants cannot have it both ways: If the funds being reprogrammed under § 8005 are "for military construction," then § 8005 bars that reprogramming; but if those funds are *not* being reprogrammed "for military construction," then § 2808 bars expenditures of funds on a border wall.

The Government argues that "[t]here is no violation of § 8005 here because neither the surplus Army personnel funds from which the original $1 billion was transferred, nor the counternarcotics support line of the [drug interdiction account], to which the funds were transferred, constitute military construction funds." Govt. Br. 58. But § 8005 says that funds can be reprogrammed only "*for* military functions," except when those functions are "military construction." The text thus trains attention on the *purpose* of the reprogramming itself, not the nature of the *accounts* from and to which the reprogramming is made. Defendants are reprogramming funds for the *purpose* of constructing a border wall. And to the extent constructing a border wall is a "military function," it must be "military construction," so § 8005 prohibits Defendants' attempted reprogramming.

The Government also resists the notion that there is "a contradiction between § 8005 and the definition of 'military construction' for purposes of § 2808." Govt. Br. 58. "In the context of § 8005," the Government claims, "'military construction' is a term of art that generally refers to the Military Construction and Veterans Affairs budget." *Id.* But the Government does not specify the source of this "context" or how it can overcome the fact that "military construction" is a *statutorily defined term* carrying the same meaning across all "provision[s] of law." *See* 10 U.S.C. § 2801(a). Moreover, the Government observes, "Congress has previously allowed DoD to use § 8005 to transfer funds for use under its § 284 authority and to provide support for activities on the southern border." Govt. Br. 58 & n.21. But "[a]bsent . . . overwhelming evidence of [congressional] acquiescence, [courts] are loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 n.5 (2001). The Government's isolated examples of congressional acquiescence fall well short of this threshold.

### E.  Plaintiffs' Appropriations Clause Claims Are Valid

As just explained, Defendants have violated the Appropriations Clause by spending and reprogramming money without congressional authorization.  The Government nonetheless argues that Plaintiffs' Appropriations Clause claims "must be dismissed."  Govt. Br. 58.  Relying principally on *Dalton v. Specter*, 511 U.S. 462 (1994), the Government maintains that "these counts merely recast statutory claims in constitutional terms, and 'claims simply alleging that the President has exceeded his statutory authority are not 'constitutional claims.'"  *Id.* (quoting *Dalton*, 511 U.S. at 473).

But *Dalton* did not involve Appropriations Clause claims and is thus not controlling here. *See Sierra Club*, 2019 WL 2865491, at *18 (distinguishing *Dalton*).  In *Dalton*, the Court rejected the lower court's view "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."  511 U.S. at 471.  "Our cases do not support the proposition," the Court explained, "that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472.  The Court noted, however, that constitutional violations that inherently turn on issues of statutory interpretation—such as nondelegation violations—*are* reviewable.  *See id.* at 473 n. 5 (citing *Panama Refining*).

Unlike the *Dalton* plaintiffs, Plaintiffs here do not assert generic "separation of powers" violations.  Rather, they assert that by spending money without congressional authorization, Defendants have violated a specific constitutional command:  the Appropriations Clause.  Their constitutional claims, therefore, do not rest on the proposition "that every action by the [Executive Branch], in excess of . . . statutory authority is *ipso facto* in violation of the Constitution."  *Id.* at 472.  Their claims instead resemble the nondelegation claim in *Panama Refining*, which *Dalton* reaffirmed was reviewable.  *Id.* at 473 n.5.  Indeed, *every* Appropriations Clause claim will turn

"on whether the statutes authorize or proscribe the Government's action," Govt. Br. 59, because the constitutional violation stems from executive spending absent statutory permission. The Government's position, then, would categorically bar judicial review of Appropriations Clause claims, in contravention of the longstanding principle that plaintiffs may "sue to enjoin unconstitutional actions by . . . federal officers." *Armstrong v. Exceptional Child Ctr.*, 135 S. Ct. 1378, 1384 (2015).

For this reason, too, it is immaterial that the President does not purport to have "exercised his inherent authority under Article II of the Constitution," as the President did in *Youngstown*. Govt. Br. 59. That will be true in all Appropriations Clause disputes, which inevitably arise when the Executive invokes a statute—not inherent constitutional authority—that it believes authorizes certain spending. Thus, the Government's position again leads to the untenable result that Appropriations Clause claims are *never* reviewable.

Finally, in a footnote, the Government argues that "[e]ven if this Court were to determine that the Complaint stated a constitutional cause of action, challenges to the constitutionality of agency action must be brought pursuant to the APA." Govt. Br. 60 n. 22.[9] Its sole support for this argument is two citations to federal district court decisions, but those decisions hold only that extra-record discovery is unavailable when plaintiffs challenge the constitutionality of agency action outside the APA. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237 (D.N.M. 2014) (holding that judicial review of First Amendment claim against agency was limited "to the administrative record"); *Harvard Pilgrim Health Care v. Thompson*,

---

[9] Although Plaintiffs do not bring their constitutional claims under the APA, sovereign immunity does not apply. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not" (citing 5 U.S.C. § 702)).

318 F. Supp. 2d 1, 10 (D.R.I. 2004) (holding "that the presence of a constitutional claim" does not "allow[] for discovery of matters not included in the administrative record"). They do not hold that all constitutional challenges to executive action must be asserted under the APA, rather than the Constitution or an equitable right of action. Such a rule would upset centuries of Supreme Court precedent upholding "[t]he ability to sue to enjoin unconstitutional actions by . . . federal officers"—precedent that "reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 135 S. Ct. at 1384; *see Youngstown*, 343 U.S. at 583 (conducting non-APA review of whether executive order was authorized "by an act of Congress or by any constitutional provisions"); *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981) (conducting non-APA review of whether executive officials' actions "were beyond their statutory and constitutional powers"). The Government's proposal to relegate all constitutional claims to the APA would truly be revolutionary. *Sierra Club*, 2019 WL 2865491, at *19-*20 (rejecting same argument).[10]

## IV. DEFENDANTS HAVE VIOLATED THE ADMINISTRATIVE PROCEDURE ACT

### A. Defendants' Wall-Funding Plan Violates the APA

While Defendants' wall-funding plan violates the Appropriations Clause, it also independently violates the APA for essentially the same reasons. Defendants' use of § 2808 and § 284 to spend money on a border wall is both "contrary to constitutional . . . power" because it violates the Appropriations Clause, and "in excess of statutory . . . authority" because neither

---

[10] Even if this Court were to conceive of Plaintiffs' claims as statutory claims instead of constitutional claims, the result would be the same. *See Reich*, 74 F.3d at 1328 ("enactment of APA" did "not repeal the review of *ultra vires* actions recognized long before," so "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority"); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165, 170 (1993) (conducting non-APA review of executive action alleged to exceed statutory powers).

provision authorizes such spending.  5 U.S.C. § 706(2); *see supra* at 39-47.  So too Defendants' invocation of § 8005 to reprogram funds.  *See supra* at 47-52.[11]  Those actions accordingly must be "h[e]ld unlawful and set aside."  5 U.S.C. § 706(2).

## B.      Plaintiffs' APA Claims Are Reviewable

Even though "[t]he [APA] embodies a basic presumption of judicial review," *Dep't of Commerce*, 139 S. Ct. at 2567, the Government argues that Plaintiffs' APA claims are unreviewable for three reasons, Govt. Br. 44-49.  None has merit.[12]

### 1.      There Is "Final Agency Action" For Purposes of Plaintiffs' § 2808 Claim

The Government first asserts that Plaintiffs' challenge to Defendants' expenditure of funds under § 2808 (but not § 284 or § 8005) is unreviewable due to a lack of "final agency action." Govt. Br. 44.  "[T]he APA's finality requirement is 'flexible' and 'pragmatic.'"  *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999).  "[T]wo conditions . . . generally must be satisfied for agency action to be 'final' under the APA."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).   "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second,

---

[11]   Defendants' invocation of § 8005 is also "arbitrary and capricious" because DOD has defined the same term ("military construction") in opposite ways for purposes of different actions, without explanation.  *See, e.g.*, *Sierra Club v. Leavitt*, 368 F.3d 1300, 1304 (11th Cir. 2004) (finding action arbitrary and capricious where, "without explanation or acknowledgment, the agency gave a term two different meanings").

[12]  All three prerequisites to review that the Government invokes—"final agency action," "committed to agency discretion," and "zone of interests"—apply *only* to Plaintiffs' APA claims, not their Appropriations Clause claims.  *See* 5 U.S.C. § 704 (APA provides for judicial review of only "final agency action"); *id.* § 702(a)(2) (APA prohibits judicial review of "agency action [that] is committed to agency discretion by law"); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (zone of interests test applies to "statutorily created causes of action"); *see also Clinton*, 524 U.S. at 436-48 (deciding structural constitutional claim without applying zone of interests test).

the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.*

DOD's determination to spend § 2808 funds on a border wall satisfies these requirements. As already explained, the Proclamation expressly makes available to DOD § 2808 funds for purposes of building a wall, and DOD has taken numerous actions indicating that it will use those funds for that purpose. *See supra* at 11-13. Because there can be no genuine doubt that DOD will spend § 2808 funds on a border wall, its determination to do so is not "tentative or interlocutory." *Hawkes*, 136 S. Ct. at 1813. That determination has also led to "legal consequences." *Id.* For example, DOD's determination will require it to divert funds from *other* previously designated military construction projects—including potentially a $52.3 million project at Fort Bliss in El Paso County. *See supra* at 13. The County must therefore immediately gird itself for the economic toll that this loss of expected funds will exact. *See Hawkes*, 136 S. Ct. at 1814 (loss of "safe harbor" has "legal consequences"). And certainly DOD's determination to spend § 2808 funds on a wall has "impose[d] obligations on the agency" itself, which suffices under this finality factor. *Sierra Club*, 2019 WL 2865491, at *19 n.23. So while DOD has not finally determined to "undertake any *specific* construction projects," Govt. Br. 45 (emphasis added), it has finally determined to use § 2808 funds on a border wall, which is enough to fulfill the APA's "flexible and pragmatic" finality requirement, *Herman*, 176 F.3d at 287.

### 2. Defendants' Use of § 2808 Is Not Committed To Agency Discretion

The Government next contends that any DOD decision to invoke § 2808 (again, not § 284 or § 8005) is "not subject to judicial review because it is 'committed to agency discretion by law.'" Govt. Br. 45 (quoting 5 U.S.C. § 701(a)(2)). Because the "committed to agency discretion" exception conflicts with the APA's "basic presumption of judicial review [for] one suffering legal wrong because of agency action," courts have read it "quite narrowly, restricting it to 'those rare

circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. FWS*, 139 S. Ct. 361, 370 (2018); *accord Dep't of Commerce*, 139 S. Ct. at 2568.

This is not such a circumstance. As elaborated above, § 2808's text imposes three express, judicially manageable constraints on DOD's decision to spend funds. *See supra* at 39-44. The Government's contrary arguments mirror its meritless political question arguments addressed above. *See supra* at 40-41. They fail for the same reasons.[13]

### 3. Plaintiffs Fall Within the "Zone of Interests" of § 2808, § 284, and § 8005

"[A] person suing under the APA" must show that "[t]he interest he asserts" is "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). This test "is not meant to be especially demanding," and is applied in accord with the APA's "evident intent" to "make agency action presumptively reviewable." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Courts thus "do not require any indication of congressional purpose to benefit the would-be plaintiff." *Patchak*, 567 U.S. at 225. "The text forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

Plaintiffs will be injured by Defendants' use of funds to build a border wall. *See supra* at 2-3, 5-6, 8. The statutory provisions they claim have been violated all allow governmental

---

[13] The Government takes only two new tacks. First is to emphasize the word "may" in § 2808. Govt. Br. 46. But the Supreme Court recently held that while the "use of the word 'may' certainly confers discretion," it does not "segregate [a] discretionary decision" from other statutory requirements, like those in § 2808. *Weyerhaeuser*, 139 S. Ct. at 371. Second is to cite cases involving agency *inaction*, which are inapposite where, as here, an agency takes affirmative action, such as spending funds on a wall. *See* Govt. Br. 45 (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Ellison v. Connor*, 153 F.3d 247, 257 (5th Cir. 1998)).

expenditures or transfers of funds under specified circumstances. *See supra* at 39-52. Because Plaintiffs claim injury based on the use of *funds* by pointing to violations of *funding statutes*, they fall within those statutes' zones of interest.

The Government's contrary arguments fall flat. The Government claims that "Plaintiffs seek to vindicate reputational and pecuniary interests that have absolutely no connection to the interests protected by § 8005, § 284, and § 2808." Govt. Br. 47. But the question is not whether the nature of Plaintiffs' harms is connected to the statutes at issue, but whether the nature of their *legal challenge* is. In *Patchak*, for instance, the plaintiff asserted "economic, environmental, and aesthetic harm," but the Court did not ask whether the relevant statutes protected against those particular injuries. 567 U.S. at 224-25; *see id.* at 225 n.7. Rather, the Court asked whether the plaintiff's *legal challenge*—which focused on certain "land's use as a casino"—fell within the statute's zone of interests. *Id.* at 225. Since Plaintiffs' legal challenge turns on the use of funds, they come within the zones of interests of funding provisions.

The Government also argues that § 2808, § 284, and § 8005 contain no private right of action authorizing Plaintiffs' suit. Govt. Br. 48-49. That is irrelevant, however, because Plaintiffs sue under the APA, not § 2808, § 284, or § 8005. And the APA provides a "cause of action for parties," like Plaintiffs here, "adversely affected by agency action." *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006); *accord Bennett*, 520 U.S. at 175.

## V.   EVEN IF A PERMANENT INJUNCTION WERE NOT YET WARRANTED, PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

Although Plaintiffs principally seek summary judgment and a permanent injunction, they alternatively request that this Court preliminarily enjoin Defendants' unlawful actions. For all the reasons given in this brief and Plaintiffs' opening brief, Plaintiffs have shown "a substantial likelihood that [they] will prevail on the merits," *Gee*, 862 F.3d at 457, thereby satisfying "arguably

the most important" preliminary injunction factor, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005). Plaintiffs have also demonstrated a "substantial threat" of "irreparable injury," *Gee*, 862 F.3d at 457: the Proclamation and impending wall construction are causing the County untold reputational harm and costing it tourism and commercial dollars it cannot recover, and those same acts are forcing BNHR to spend time and money, depleting the organization's limited resources. These harms outweigh any potential harm to Defendants, as a short delay of a years-long border-wall construction process will cause little prejudice. Finally, a preliminary injunction would not "disserve the public interest," *id.*, because the public has no interest in an unlawful Proclamation remaining on the books, or in a border wall that Congress—*the public's representatives*—declined to pay for.

In all events, Plaintiffs request that this Court move expeditiously in resolving their claims given this case's extraordinary nature, and Plaintiffs' aforementioned continuous and irreparable harm. The President's unlawful emergency declaration remains intact, and Defendants are moving quickly toward building a wall that Congress expressly rejected—a plan that will divert funds from Fort Bliss and create a massive construction zone in the County's vicinity. Only prompt relief can prevent these grievous injuries.

## CONCLUSION

For the foregoing reasons, Plaintiffs' summary-judgment motion and a permanent injunction should be granted. In the alternative, Plaintiffs' preliminary-injunction motion should be granted.

Dated: July 10, 2019

Respectfully submitted,

/s/ *Anton Metlitsky*
Anton Metlitsky (*Pro hac vice*)
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com

Ephraim McDowell (*Pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
emcdowell@omm.com

Kristy Parker (*Pro hac vice*)
Justin Florence (*Pro hac vice*)
Erica Newland (*Pro hac vice*)
THE PROTECT DEMOCRACY PROJECT,
INC.
2020 Pennsylvania Avenue., NW, #163
Washington, DC 20006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
justin.florence@protectdemocracy.org
kristy.parker@protectdemocracy.org
erica.newland@protectdemocracy.org

Deana K. El-Mallawany (*Pro hac vice*)
THE PROTECT DEMOCRACY PROJECT,
INC.
10 Ware Street
Cambridge, MA 02138
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
deana.elmallawany@protectdemocracy.org

Stephanie Llanes (*Pro hac vice*)
THE PROTECT DEMOCRACY PROJECT,
INC.
222 Broadway, 19th Floor
New York, NY 10038
Telephone: (202) 579-4582
Facsimile: (929) 777-8428

stephanie.llanes@protectdemocracy.org

David Bookbinder (*Pro hac vice*)
NISKANEN CENTER
820 First Street, NE
Washington, DC 20002
Telephone: (301) 751-0611
dbookbinder@niskanencenter.org

Richard Mancino (*Pro hac vice*)
Shaimaa M. Hussein (*Pro hac vice*)
Matthew Dollan (*Pro hac vice*)
Samantha G. Prince (*Pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
RMancino@willkie.com
SHussein@willkie.com
MDollan willkie.com
SPrince@willkie.com

Stuart Gerson (*Pro hac vice*)
EPSTEIN BECKER GREEN
1227 25th Street, NW
Washington, DC 20037
Telephone: (202) 861-4180
Email: SGerson@ebglaw.com

Laurence H. Tribe (*Pro hac vice*)
Carl M. Loeb University Professor and
Professor of Constitutional Law
HARVARD LAW SCHOOL*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767
Email: tribe@law.harvard.edu

*Affiliation noted for identification purposes only

John C. Padalino (Texas State Bar No. 24041638)
401 Congress Avenue, Suite 1540
Austin, Texas 78701

Telephone: (512) 596-2944
Facsimile: (512) 596-2944
john@padalinolaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically filed the foregoing document with the U.S. District Court for the Western District of Texas by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel of record.

Dated: July 10, 2019

/s/ *Anton Metlitsky*
Anton Metlitsky (*Pro hac vice*)
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 326-2000
ametlitsky@omm.com