**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

EL PASO COUNTY, TEXAS; BORDER
NETWORK FOR HUMAN RIGHTS,

                  Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America, *et al.*,

                  Defendants.

Case No. EP-19-CV-66-DB

**DEFENDANTS' SUPPLEMENTAL BRIEF ADDRESSING BORDER BARRIER
CONSTRUCTION PURSUANT TO 10 U.S.C. § 2808**

## INTRODUCTION

The Plaintiffs in this proceeding do not have standing to challenge the Secretary of Defense's recent decision to authorize the funding and construction of eleven border barrier projects pursuant to 10 U.S.C. § 2808, but that decision was lawful regardless.  The Court should grant Defendants' cross-motion for summary judgment on all § 2808 claims.

Most fundamentally, the Secretary's recent decision does not change the fact that neither El Paso County nor the Border Network for Human Rights (BNHR) has Article III standing.  None of the projects will be built in El Paso County or its immediate vicinity, so there is no plausible construction-based harm to Plaintiffs.  Nor does the County acquire standing because $20 million of the total $3.6 billion the Department of Defense (DoD) has made available for these projects might come from funds associated with a construction project at Fort Bliss.  Well-established authority precludes the County from establishing standing on the theory that a diminution in federal spending will negatively impact its general economy or tax base.  And even if this purported harm could establish a legally cognizable injury-in-fact, the County cannot establish traceability and redressability.  DoD has unreviewable discretion over how to spend lump-sum appropriations like the one that funded the project at Fort Bliss, and the decision whether to move forward with that project is traceable to that discretion, not to the decision to potentially use those funds for § 2808 projects.  As for BNHR, it has no interest in the deferred military construction projects and lacks standing for the reasons explained previously.  *See* Defs.' Cross-Mot. for Summ. J. at 40–44 (Defs.' Mot.) (ECF No. 95); Defs.' Reply ISO Cross-Mot. for Summ. J. at 14–16 (Defs.' Reply) (ECF No. 106).

Even if Plaintiffs have standing to raise these claims, they lack a cause of action.  Plaintiffs cannot bring an implied equitable action to enforce the Appropriations Clause because this case raises statutory claims related to § 2808, not constitutional claims.  Moreover, the Court should not imply an equitable remedy because there is no history or tradition of courts using their equitable jurisdiction

1

to enforce the type of claim that Plaintiffs assert here.  Plaintiffs also cannot bring a cause of action under the Administrative Procedure Act (APA) because the decision to use § 2808 is committed to agency discretion by law.  And regardless of whether Plaintiffs' claims are considered under the APA or as an implied equitable action, Plaintiffs do not fall within the zone of interests protected by § 2808.

Further, to the extent Plaintiffs challenge the President's national emergency declaration through § 2808, those arguments fail for the same reasons their claims under the National Emergencies Act (NEA) fail.  The President's decision to declare a national emergency is a nonjusticiable political question and Plaintiffs cannot challenge a discretionary judgment of the President.

There is also no merit to Plaintiffs' argument that the Secretary of Defense failed to comply with § 2808's statutory requirements.  The eleven border barrier projects are military construction projects because they will be carried out with respect to a military installation.  Two projects will be built on an existing military installation along the U.S.-Mexico border.  As for the other project areas, DoD has the authority to acquire jurisdiction over both federal and non-federal land and thereby convert that property into a military installation.  The Secretary also determined that the border barrier projects are necessary to support the use of the armed forces.  Relying on the analysis of the Chairman of the Joint Chiefs of Staff, the Secretary concluded the projects will reduce demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers.  This quintessential military judgment is well supported by the administrative record and entitled to substantial deference from this Court.

Finally, Plaintiffs are not entitled to the extraordinary remedy of a permanent injunction stopping all § 2808 border barrier projects nationwide.  Plaintiffs cannot meet the high bar necessary for a permanent injunction and, even if they could, Article III forbids entering relief that is greater than necessary to redress Plaintiffs' harm.  Even if the Court fully agrees with the County on standing,

2

the merits, and the balance of equities, the most it should do is thus enjoin DoD from spending money in the amount expected for construction at Fort Bliss. Such an injunction would fully abate whatever harm the diversion of funds might cause and would accordingly provide the County complete relief. There is no basis, however, for a sweeping injunction prohibiting the use of *all other* funds, or § 2808 construction in general.

## BACKGROUND

On September 3, 2019, the Secretary of Defense authorized 11 border barrier projects pursuant to § 2808 that the Secretary determined are military construction projects necessary to support the use of the armed forces in connection with the President's declaration of a national emergency. *See* Administrative Record for Border Barrier Projects Undertaken Pursuant to § 2808 at 1–33 (ECF No. 123) ("AR"). Based on analysis from the Chairman of the Joint Chiefs of Staff, among others, the Secretary concluded the projects will deter illegal entry, increase the vanishing time of those illegally crossing the border (*i.e.*, the time that passes before a subject who illegally crosses the border can no longer be identified), and channel migrants to ports of entry. *Id.* Further, the projects will reduce demand for DoD personnel and assets at the locations where the barriers are constructed and allow redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers. *See id.* Consequently, the barriers serve as force multipliers and allow DoD to provide support to the Department of Homeland Security (DHS) more efficiently and effectively. *See id.*

To fund these projects, the Secretary authorized the Department of the Army to expend up to $3.6 billion in unobligated military construction funds. *See id.* at 82. The Secretary directed that, initially, only funds associated with projects located outside the United States will be provided to the Department of the Army. *See id.* Deferred military construction projects outside the United States account for $1.8 billion of the required funds. *See id.* The remaining $1.8 billion associated with deferred projects located in the United States (including U.S. territories) will be made available to the

Secretary of the Army when needed for obligation.  *See id.*  One of the deferred domestic projects is a defense access roads project at Fort Bliss estimated to cost $20 million.  *See id.* at 89.

The § 2808 projects fall into three categories based on the current status of the land where the barriers will be built.  *See* Declaration of Brigadier General Glenn Goddard ¶ 10 (ECF. No. 112-3).  First, two projects (Yuma 2 and Yuma 10/27) are located on the western portion of the Barry M. Goldwater Range, an existing military installation in Arizona.  *See id.* ¶ 10.a.  The Goldwater Range is used for live fire and weapons exercises by United States military pilots.  *See* National Defense Authorization Act for Fiscal Year 2000, Pub. L. 106-65, Title XXX, § 3031, 113 Stat. 512.

Second, seven projects are located, at least in part, on Federal land not subject to the Federal Property and Administrative Services Act (Property Act), 40 U.S.C. § 471 *et. seq.*, and can be transferred under the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.  See* Goddard Decl. ¶ 10.b; *see also* 43 U.S.C. § 1702(j).  These projects are:  Yuma 3; Yuma 6; San Diego 4; San Diego 11; El Paso 2; El Paso 8; and El Centro 9.  Goddard Decl. ¶ 10.b.

In these seven project areas, the Department of the Army intends to obtain administrative jurisdiction of the requisite land and add the land to the Army's real property inventory, either as a new installation or as part of an existing military installation.  *See* AR at 3, 9–10, 30–31, 40.  To that end, the Secretary of Defense directed the Acting Secretary of the Army, as authorized by § 2808, to undertake the acquisition of lands and transfer of administrative jurisdiction.  *See id.* at 9–10, 30–31.  DoD also requested, to the extent necessary, assistance from other federal agencies.  The Secretary of Defense directed the Acting Secretary of the Army to request that the Department of the Interior withdraw Federal lands subject to the FLPMA required for the projects and transfer administrative jurisdiction to the Secretary of the Army.  *See id.*  On September 18, 2019, the Secretary of the Interior announced transfers of the lands to the Department of the Army for five of the seven projects in this category.  *See* Exhibit 1.  For Federal land governed by the Property Act, the Secretary of Defense

4

directed the Acting Secretary of the Army to request that the relevant Federal land holding agency, through the General Services Administration (GSA), expeditiously and without charge transfer administrative jurisdiction over lands in the project areas to the Army. *See* AR at 9–10, 30–31. Two of the seven projects, Yuma 3 and San Diego 4, are exclusively on Federal land subject to transfer under FLPMA. Goddard Decl. ¶ 10.b. The other five projects involve combinations of Federal land subject to transfer under FLPMA; Federal land that can be transferred between Federal agencies under the Property Act; and non-Federal land. *Id.* With respect to any non-Federal land, the United States intends to acquire that land through negotiated purchases or condemnation. *See id.* ¶¶ 9, 10.c.

Third, the remaining two projects (El Centro 5 and Laredo 7) are located entirely on Federal land subject to the Property Act and non-Federal land. *See id.* ¶ 10.c. Thus, the United States would acquire the land through transfers between agencies or negotiated purchases or condemnation.

## ARGUMENT

## I.  Plaintiffs Do Not Have Article III Standing to Challenge § 2808 Construction.

No § 2808 project has been authorized within El Paso County. Indeed, the closest project to the County begins about 100 miles away from downtown El Paso, "approximately 20 miles west of the Columbus[, New Mexico point of entry]." *See* AR at 11. As Defendants explained with respect to § 284 construction, *see* Defs.' Mot. at 35–40; Defs.' Reply at 12–17, Plaintiffs cannot establish an "injury in fact" arising from § 2808 construction "based on their fears of hypothetical future harm that is not certainly impending," or from voluntary expenditures of resources by County officials in response to such fears. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415–18 (2013).

The only significant change in the County's standing argument is its contention that it will suffer "direct pecuniary injury" as a result of DoD deferring a military construction project at Fort Bliss. Pls.' Supp. Br. 2–5 (ECF No. 116-1). That is incorrect. Standing for a "direct pecuniary injury" arises only when the *plaintiff itself* suffers a loss. The County does not claim that *it* would receive the

$20 million associated with the project at Fort Bliss, and is therefore entirely different from the plaintiffs in the cases it invokes.[1]  Construction at Fort Bliss may "benefit[] the County's economy," but only in a highly general, indirect way.  Pls.' Supp. Br. 3; *see also* Samaniego Decl. ¶¶ 15–16.  "[T]his type of economic loss 'is the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing.'"  *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).  As the Supreme Court explained in *Wyoming v. Oklahoma*, state and local governments may have standing to challenge "a direct injury in the form of a loss of specific tax revenues," but not where, as here, "actions taken by United States Government agencies [have injured their] econom[ies] and thereby caused a decline in general tax revenues."  502 U.S. 437, 448 (1992) (discussing *Kleppe* and *Miller*).  Much like the standing theories the County pressed in earlier briefs, their argument is really a *parens patriae* claim on behalf of residents potentially impacted by the deferral of funding from Fort Bliss.  Such claims are not permitted against the federal government. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982).  The County's argument thus fails at the injury-in-fact threshold.

     Nor can the County establish traceability and redressability.  An appropriation merely provides legal authority for federal agencies to incur obligations and make payments from the Treasury for specified purposes.  *See* U.S. Gov't Accountability Off., A Glossary of Terms Used in the Federal

---

[1] *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 982–83 (2017) (bankruptcy court's dismissal of chapter 11 case ensured petitioners received nothing on their claims against estate);  *Ecosystem Investment Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 289, 292 (5th Cir. 2018) (agency's failure to consider whether mitigation "credits were a reasonable alternative" led to loss of plaintiff's opportunity to sell such credits); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (likely increases in legally required state expenditures due to increase in pool of individuals eligible for drivers' licenses); *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010) (state insurance program "refused [plaintiffs] benefits otherwise associated with their paid membership"); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (plaintiff "'would need to raise and expend additional funds and resources to prepare a new and different campaign . . . .'").

Budget Process 13–14 (Sept. 2005). The project at Fort Bliss was funded out of a general lump sum appropriation for defense access roads that DoD decided at that time to use for Fort Bliss. *See* Consolidated Appropriations Act, Pub. L. No. 115-141, div. J, § 131, 132 Stat. 805; Exhibit 2. Because lump-sum spending is typically committed to agency discretion by law, an order enjoining the § 2808 projects would not ensure construction at Fort Bliss takes place. *See Lincoln v. Vigil*, 508 U.S. 182, 192–95 (1993). At most, the Court could enjoin DoD from expending $20 million on border barrier projects, but that would not remedy the County's purported injury because the Court cannot require DoD to spend that discretionary lump-sum appropriation in the County. The County may achieve "psychic satisfaction" from halting § 2808 construction, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998), but since it would not necessarily result in the Fort Bliss project moving forward, the County lacks standing.

BNHR does not have standing to challenge the Secretary's § 2808 decision, either, for the reasons Defendants have already explained in connection with previously announced § 284 construction in New Mexico. Defs.' Mot. at 40–44; Defs.' Reply at 16–17. Those arguments apply with equal force to the recently announced § 2808 projects. Summary judgment is thus appropriate.

## II.     Plaintiffs Lack a Cause of Action to Challenge the § 2808 Projects.

Even if Plaintiffs had standing, though, they have no cause of action for their § 2808 claims. Plaintiffs contend they have "two separate and independent" causes of action to challenge the § 2808 projects: (1) an equitable cause of action for "actions that violate the Appropriations Clause"; and (2) a cause of action under the APA. *See* Pls. Supp. Br. at 7. Both of these arguments fail.

First, this is not "a proper case" for the "judge-made remedy" of an implied cause of action to enjoin alleged violations of the Appropriations Clause by agency officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). The Supreme Court has recognized that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts

7

of equity," and is available only in "some circumstances," *id.*, where such relief "was traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo SA v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Here, Plaintiffs identify no history or tradition where courts of equity have entertained lawsuits to enforce purported violations of the Appropriations Clause that allegedly cause indirect harm to a local economy. *See id.* at 319–20. Moreover, this case does not raise any constitutional issues because Plaintiffs cannot recast their statutory claim that Defendants violated the terms of § 2808 as a "constitutional" claim. *See Dalton v. Spector*, 511 U.S. 462, 473 (1994); Defs.' Mot. at 58–60; Defs.' Reply at 17–19. The absence of a cause of action was among the reasons the Supreme Court stayed an injunction in a related border wall case raising similar issues wherein the plaintiffs similarly attempted to recast their statutory claims as "constitutional" ones under the Appropriations Clause. *See Trump v. Sierra Club*, --- S. Ct. ----, 2019 WL 3369425 (U.S. July 26, 2019) ("Among the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005.").

Second, Plaintiffs cannot satisfy the APA's threshold requirements for review of agency action. In light of the decision to authorize border barrier projects pursuant to § 2808, Defendants withdraw their argument that Plaintiffs cannot satisfy the APA's final agency action requirement*, see* Defs. Mot. at 44–45; Defs.' Reply at 19, but Defendants' other APA cause of action arguments are unaffected by the Secretary's decision and remain dispositive. The Secretary of Defense's decision to authorize the projects under § 2808 is not reviewable because it is committed to agency discretion by law. *See* Defs. Mot. at 45–47; Defs.' Reply at 19–20. And, as noted above, the same is true for challenges to the use of lump-sum appropriations. *See Lincoln*, 508 U.S. 192–95. Further, Plaintiffs do not fall within the zone of interests protected by § 2808. *See* Defs. Mot. at 47–49; Defs.' Reply at 20–21.

Plaintiffs contend that the zone-of-interest requirement either does not apply or has been satisfied here, but those arguments lack merit. *See* Pls.' Supp. Br. at 8–10. Whether Plaintiffs' cause

of action is considered under the APA or as an implied equitable action, the zone-of-interests requirement unquestionably applies. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320–21 n.3 (1977).

Plaintiffs' claims fall outside of the zone of interests protected by § 2808. *See* Defs.' Mot. at 47–49; Defs.' Reply at 20–21. They present no arguments that BNHR falls within § 2808's zone of interests. *See* Pls. Supp. Br. 8–10. And the County cannot show it was "an intended beneficiary of military construction funds" or "entitled to the funds as originally appropriated." *See id.* at 9; *Sierra Club v. Trump*, 929 F.3d 670, 715 (9th Cir. 2019) (N.R. Smith, J., dissenting). In authorizing DoD to engage in military construction "without regard to any other provision of law" during a national emergency, 28 U.S.C. § 2808(a), Congress did not intend to protect local governments from speculative downstream economic consequences arising from deferred military construction. Moreover, allowing the County's suit to proceed here would lead to "absurd consequences" by enabling local governments to delay the expenditure of funds for emergency military construction projects by filing lawsuits raising generalized economic grievances. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176 (2011). In enacting § 2808, Congress could not have intended that result.

Nor can Plaintiffs escape this conclusion by asserting that they fall within the zone of interests of the Appropriations Clause. *Dalton* forecloses that constitutional claim and, in any event, § 2808 would still prescribe the relevant zone of interests that plaintiffs must satisfy. The zone-of-interests requirement must be applied "by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997). The Appropriations Clause provides that appropriations must be "made by Law," U.S. Const., art. I, § 9, cl. 7, and § 2808 is the "law" that Defendants are invoking. This case thus turns solely on § 2808, making it the "particular provision of law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175–76. Plaintiffs are wrong that Defendants

9

have invoked § 2808 as a "defense" to Plaintiffs' Appropriations Clause "claim," Pls. Supp. Br. at 9; rather, Plaintiffs' claim (whether "constitutional" or "statutory") is that Defendants exceeded the scope of their authority under § 2808. They must therefore show that they fall within that provision's zone of interests and for the reasons discussed above, they cannot make that showing.

III.   **The President's Determination of a National Emergency that Requires the Use of the Armed Forces Is Nonjusticiable.**

Section 2808's military construction authority is made available to DoD upon "the declaration by the President of a national emergency in accordance with the [NEA] that requires use of the armed forces[.]"  10 U.S.C. § 2808(a). The President's Proclamation and subsequent veto message complied with the requirements of the NEA, *see* 50 U.S.C. §§ 1621(a), 1631, explained why a national emergency exists at the southern border that requires the use of the armed forces, and specifically made § 2808 available to the Secretary of Defense. *See* Proclamation, 84 Fed. Reg. 4949 (Feb. 15, 2019); Veto Message, 2019 WL 1219481 (Mar. 15, 2019).

Plaintiffs' challenge to the President's national emergency declaration through § 2808 fails for the same reasons as their NEA claims. The President's decision to declare a national emergency is a nonjusticiable political question; Plaintiffs cannot challenge a statutorily authorized discretionary judgment of the President; and the Court should not impose either declaratory or injunctive relief against the President for his official conduct. *See* Defs. Mot. at 23–30; Defs.' Reply at 4–10. Further, to the extent Plaintiffs rely on the APA to challenge the President's national emergency declaration, that claim fails because the APA "does not expressly allow review of the President's action." *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton*, 511 U.S. at 476.

Section 2808 imposes an additional requirement beyond the NEA—that the national emergency "requires use of the armed forces"—but that does not change the conclusion that the President's determination here is nonjusticiable. There are no judicially manageable standards to evaluate the President's decision to deploy the armed forces to address a national emergency.

"[C]ourts lack the competence to assess the strategic decision to deploy" the armed forces "or to create standards to determine" whether use of the armed forces "was justified or well-founded." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) (en banc).  "To attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards would be to entangle the court in matters constitutionally given to the executive branch." *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1160 (D.D.C. 1991) (quoting *In re Korean Air Lines Disaster of Sept. 1, 1983*, 597 F. Supp. 613, 616 (D.D.C. 1984)), *aff'd on other grounds*, 957 F.2d 886 (D.C. Cir. 1992).  As the Supreme Court has explained, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 (1973) (holding that a case seeking to impose restrictions on the domestic deployment of National Guard forces raised nonjusticiable political questions).  Moreover, the Commander-in-Chief Clause of the Constitution textually commits control of the armed forces to the President.  *See* U.S. Const., art. II, § 2, cl. 1; *see Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950).  Accordingly, "it is the President who, as head of the Executive Branch and Commander in Chief . . . decides whether and when to deploy military forces, not this Court." *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 93 (D.D.C. 2016).

## IV.    The Border Barriers Are Military Construction Projects.

Even if the Court had the authority to review the Secretary of Defense's § 2808 decision, the requirements of § 2808 have been satisfied.  Section 2808(a) authorizes the Secretary to "undertake military construction projects."   The term "military construction" in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road . . . ."  10 U.S.C. § 2801(a).  The planned border barriers constitute "construction" being undertaken by DoD and thus fall within that definition so long as they are undertaken "with respect to a military installation."

The locations of the planned border-barrier projects fall within the broad definition of "military installation," which includes "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department[.]" *Id.* § 2801(c)(4). Two of the projects are on the Goldwater Range, an existing military installation in Arizona. With respect to the remaining project areas, DoD has the authority to obtain administrative jurisdiction of the requisite land and either convert that land into a new military installation or add it to an existing military installation in accordance with DoD's regulations governing property acquisition. *See* DoD Instruction 4165.14, *Real Property Inventory and Forecasting*, DoD Instruction 4165.71, *Real Property Acquisition*. And the Secretary of Defense has directed the Acting Secretary of the Army to apply for and accept administrative jurisdiction of real property from other Federal agencies and acquire the non-Federal real property necessary to undertake the § 2808 projects. *See* AR at 3, 9–10, 30–31; *see also* Ex. 2 (announcement of land transfer to DoD). There is thus no merit to Plaintiffs' argument that the projects are not "military construction." All of the planned construction will be undertaken "with respect to a military installation," whether on "a base, camp, post, station, yard, center" or as part of another "activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(a).

Nor is there any question that DoD has the authority to acquire land necessary for § 2808 projects, given that § 2808 authorizes "military construction," a defined term that includes "any acquisition of land." 10 U.S.C. § 2801(a). Section 2808 further authorizes the Secretary of Defense to undertake military construction projects (which includes land acquisitions) "without regard to any other provision of law." This broad language—a variant of a *non obstante* or "notwithstanding" clause—sweeps aside all statutory and regulatory provisions that might otherwise constrain the authority provided by § 2808. *See Am. Fed'n of Gov't Emps., Local 3295 v. Fed. Labor Relations Auth.*, 46 F.3d 73, 76 (D.C. Cir. 1995). The clause thus provides "a sweeping dispensation from all legal constraints," and "indicate[s] that Congress intended agencies to enjoy 'unfettered discretion.'" *Id.* at

76; *see United States v. Elashi*, 789 F.3d 547, 552 (5th Cir. 2015). Accordingly, land acquisition authorized by § 2808 need not comply with any otherwise-applicable statutory restrictions.

In addition, for land currently controlled by other federal agencies, Congress has authorized land transfers between federal agencies, although such transfers are not subject to statutory constraints because of § 2808's *non obstante* clause. The Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.*, authorizes the Secretary of the Interior to make "withdrawals" of land, *id.* § 1714(a), including the "transfer[ of] jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department, bureau or agency," *id.* § 1702(j). Further, the Property Act, 40 U.S.C. §§ 101 *et seq.*, authorizes GSA to transfer excess real property between agencies. *See id.* § 521; *Valley Forge Christian Coll.*, 454 U.S. at 466. Finally, for any non-federal land, the federal government's power of eminent domain has long been used to acquire property for military installations. *See, e.g., Cameron Dev. Co. v. United States*, 145 F.2d 209, 209 (5th Cir. 1944). Eminent domain "appertains to every independent government. It requires no constitutional recognition; it is an attribute of sovereignty." *Boom Co. v. Patterson*, 98 U.S. 403, 406 (1879).

## V.     The Border Barrier Projects are Necessary to Support the Use of the Armed Forces.

Section 2808 also requires that the military construction projects must be "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). Here, the administrative record amply supports the Secretary of Defense's determination that the eleven border barrier projects are "necessary to support the use of the armed forces." *See* AR at 1–11; 42–75; 97–137.

The Secretary's determination that these projects are necessary to support the use of the armed forces in connection with the national emergency at the southern border is entitled to substantial deference from this Court. *See Bynum v. FMC Corp.*, 770 F.2d 556, 562 (5th Cir. 1985) (emphasizing the importance of "judicial restraint in military matters" because "interference by civilian courts with military authority inevitably raises both questions about judicial competency in this area and separation

of powers concerns"). The Supreme Court has traditionally been reluctant to intervene in the conduct of military affairs. *See, e.g., North Dakota v. United States*, 495 U.S. 423, 443 (1990); *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988); *Chappell v. Wallace*, 462 U.S. 296, 300 (1983); *Gilligan*, 413 U.S. at 10; *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953). This reluctance rests on both separation of powers concerns as well as the principle that judges "are not given the task of running the Army," *Orloff,* 345 U.S. at 93, and are "ill-equipped" to determine the impact of judicial intrusion on military decisionmaking, *Chappell*, 462 U.S. at 305. Indeed, the Supreme Court instructs courts not to second-guess "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force." *Gilligan*, 413 U.S. at 10; *see Farmer v. Mabus*, 940 F.2d 921, 924 (5th Cir. 1991).

Here, based on a comprehensive and detailed analysis from the Chairman of the Joint Chiefs of Staff, among others, the Secretary of Defense concluded that the border barrier projects will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry. *See* AR at 1–11; 42–75; 97–137. Consequently, the projects will reduce the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers. *See id.* For example, barriers will reduce the areas where migrants can cross easily, thereby impeding entries onto the live-fire Goldwater Range as well as reduce the need for DoD personnel to operate mobile surveillance camera sites in other areas along the border and enabling more efficient use of DoD personnel. *See, e.g., id.* at 42–46; 59–75. The barriers serve as force multipliers and allow DoD to support DHS more effectively. *See* AR at 9. Given the extensive record supporting the ways barriers will support the armed forces deployed to the southern border, the Court should defer to the "professional military judgment" of the Department of Defense. *See Gilligan*, 413 U.S. at 10.

## VI.   An Injunction of § 2808 Construction Would Be Inappropriate

Even if the Court agrees with Plaintiffs on the merits of their § 2808 arguments, a permanent

14

injunction should not issue.  Injunctions "do[] not follow from success on the merits as a matter of course."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).  In *Winter*, the Supreme Court found injunctive relief improper because the plaintiffs' "ecological, scientific, and recreational interests" in whale watching were "plainly outweighed" by the Navy's interest in conducting realistic training exercises.  *Id.* at 24–26.  *Winter* directs the proper outcome here, as well.  Even if Plaintiffs' injury-in-fact assertions establish standing, they are not "an adequate basis for equitable relief," particularly when weighed against Defendants' interests in supporting the use of the armed forces at the border.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983).

Finally, at the absolute most, the Court should enjoin only the use of funds associated with the Fort Bliss project.  It is a basic principle of Article III that "a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact."  *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quotation omitted).  As such, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  If the Court deems an injunction necessary, Plaintiffs can only obtain an injunction prohibiting DoD from using the $20 million associated with the project at Fort Bliss—relief that would fully remedy the County's asserted harm.  Sparing the County whatever harm it might suffer from use of military construction appropriations for a different project does not require—and thus provides no legal basis for—a sweeping nationwide injunction prohibiting border barrier construction across the southern border.

## <u>CONCLUSION</u>

For these reasons, the Court should dismiss Plaintiffs' complaint in full or grant summary judgment to the Government.  Should the Court grant summary judgment to the Plaintiffs, though, it should limit any injunction to funds associated with the project at Fort Bliss.

Dated:  September 20, 2019          Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ALEX HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ *Andrew I. Warden*
ANDREW I. WARDEN (IN Bar 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ *Michael J. Gerardi*
MICHAEL J. GERARDI (D.C. Bar No.
1017949)
KATHRYN C. DAVIS
LESLIE COOPER VIGEN
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St., NW, Rm. 12212
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the clerk using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

*/s/ Michael J. Gerardi*
Michael J. Gerardi
