**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **EL PASO COUNTY, TEXAS and** | § | |
| **BORDER NETWORK FOR HUMAN** | § | |
| **RIGHTS,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **EP-19-CV-66-DB** |
| | § | |
| **DONALD J. TRUMP,** *in his official* | § | |
| *capacity as President of the United States* | § | |
| *of America,* **et al.,** | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION

On this day, the Court considered Plaintiffs El Paso County, Texas, ("El Paso County") and Border Network for Human Right's ("BNHR") (collectively, "Plaintiffs") "Motion for Summary Judgment or, in the alternative, a Preliminary Injunction" ("Motion"), filed in the above–captioned case on April 25, 2019.   On June 10, 2019, Defendants Donald J. Trump, Patrick M. Shanahan, Kirstjen M. Nielsen, David Bernhardt, Steven T. Mnuchin, William Barr, John F. Bash, and Todd T. Semonite (collectively, "Defendants") filed their "Memorandum in Support of the Government's Cross–Motion to Dismiss or for Summary Judgment, and Opposition to Plaintiffs' Motion for Summary Judgment and a Preliminary Injunction" ("Cross-Motion").   On July 10, 2019, Plaintiffs filed a Reply.   The Defendants filed their Reply on July 31, 2019.   The Court held a hearing on the Motion and Cross-Motion on August 29, 2019.

On September 10, 2019, Plaintiffs filed their "Supplemental Brief in Light of Notice of Decision by the Department of Defense to Authorize Border Barrier Projects Pursuant to 10 U.S.C. § 2808."   On September 20, 2019, Defendants filed their "Supplemental Brief Addressing Border Barrier Construction Pursuant to 10 U.S.C. § 2808."   On September 24,

2019, Plaintiffs filed their Reply.    After due consideration, the Court is of the opinion that the

Plaintiffs' Motion shall be granted.

## BACKGROUND

This case presents questions regarding whether the proposed plan for funding

border barrier construction exceeds the Executive Branch's lawful authority under the

Consolidated Appropriations Act ("CAA"), the Appropriations Clause of the Constitution, the

Military Construction Act – 10 U.S.C. § 2808 ("§ 2808"), the Funding for Counterdrug

Activities – 10 U.S.C. § 284 ("§ 284"), and the National Emergency Act ("NEA").

In 2017, President Trump requested $999 million in congressional appropriations

for "the first installment of the border wall."    Budget Request, Pl.'s Mot. 5, ECF No. 55–6.    A

Republican–controlled Congress instead provided the Department of Homeland Security

("DHS") with $341.2 million "to replace approximately 40 miles of existing primary pedestrian

and vehicle border fencing along the southwest border."    CAA, Pub. L. No. 115–31, 131 Stat.

135, 434 (2017).    In 2018, President Trump requested $1.6 billion in congressional

appropriations for 74 miles of new or replacement border wall.    FY 2018 Budget in Brief, Pl.'s

Mot. 3, ECF No. 55–7.    In response, Congress appropriated $1.571 billion for new border

security technology and new and replacement fencing in specified areas on the southern border.

CAA, Pub. L. No. 115–141 (2018) (to be printed at 132 Stat. 348, 616).

In January 2019, President Trump formally requested $5.7 billion for fiscal year

2019 "for construction of a steel barrier for the Southwest border."    Letter to Appropriations

Chairman 1, ECF No. 55–28.    On February 14, 2019, Congress passed the 2019 CAA.    Pub. L.

No. 116–6 (2019) (to be printed at 133 Stat. 13).    The CAA provides $1.375 billion for "the

construction of primary pedestrian fencing" in "the Rio Grande Valley Sector."    CAA §

230(a)(1).   And it states that none of the funds appropriated by the Act can be used "for the construction of pedestrian fencing" in any other areas of the border.   *Id.* § 231.   A component of the CAA, § 739 of the Financial Services and General Government Appropriations Act, states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116–6, div. D, § 739.   On February 15, 2019, President Trump signed the CAA into law.

Also on February 15, 2019, the President issued a proclamation declaring that a national emergency exists at the southern border.   *See* Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States, 2019 WL 643819, at *1 (Feb. 15, 2019) ("Proclamation").

The proclamation itself states:

> The current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency.   The southern border is a major entry point for criminals, gang members, and illicit narcotics.   The problem of large–scale unlawful migration through the southern border is long–standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.   In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending.   If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate.   In response to the directive in my April 4, 2018, memorandum and subsequent requests for support by the Secretary of Homeland Security, the Department of Defense has provided support and

3

resources to the Department of Homeland Security at the southern
border.    Because of the gravity of the current emergency situation,
it is necessary for the Armed Forces to provide additional support to
address the crisis.

Proclamation No. 9844, 84 Fed. Reg. 4, 949.

In addition to declaring a national emergency, the President announced a plan, to
be carried out by Defendant Acting Secretaries of Defense and Homeland Security, to use funds
that Congress appropriated for other purposes to build a border wall.    Most relevant, President
Trump directed those Acting Secretaries to use: (1) $2.5 billion of the Department of Defense
("DOD") funds appropriated for Support for Counterdrug Activities under § 284; and (2) $3.6
billion of DOD funds appropriated for "military construction projects" under § 2808.    *President
Donald J. Trump's Border Security Victory*, White House Fact Sheet (Feb. 15, 2019) ("Fact
Sheet"), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-
security-victory/.

On September 3, 2019, Defendants gave the Court notice that the DOD has made
a final determination to build eleven border wall projects using $3.6 billion in military
construction funds under 10 U.S.C. § 2808.    Notice of DOD Decision, ECF No. 112.    And on
September 5, 2019, Defendants gave notice identifying the military construction projects that
Congress had already appropriated money for that will now lose funding in order to build those
eleven wall projects.    Supplemental Notice of DOD Decision, ECF No. 114.    Most relevant for
this case: the DOD will divert $20 million away from a planned military construction project at
Fort Bliss in El Paso County, and one of the new wall projects will take place in southern New
Mexico, in El Paso County's close vicinity.    2808 Deferrals in United States Territories 2, ECF
No. 114–1.

4

## LEGAL STANDARDS

The parties have filed cross-motions for summary judgment.   Rule 56 of the Federal Rules of Civil Procedure mandates entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).   Defendants agree with Plaintiffs that this case presents questions of law for the Court to resolve that do not require further factual development through discovery.   In these circumstances, the Court should enter either summary judgment for Defendants based on the parties' moving papers or dismiss the First Amended Complaint under Federal Rule of Civil Procedure 12.

Furthermore, the Court must dismiss a case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction if it lacks the statutory or constitutional power to adjudicate the case.   *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).   The party asserting subject–matter jurisdiction has the burden of proving it exists by a preponderance of the evidence.   *See New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 327 (5th Cir. 2008).

To survive a motion to dismiss under Civil Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).   A complaint that "tenders naked assertions devoid of further factual enhancement" is insufficient.   *Id.*   (internal citation and alteration omitted).   At the summary–judgment stage, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts'" to establish their standing.   *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).   When evaluating plaintiffs' standing,

5

courts must "take as true" the factual evidence plaintiffs submit.   *McCardell v. Dep't of Hous.*

*& Urban Dev.*, 794 F.3d 510, 520 (5th Cir. 2015); *see Lujan*, 504 U.S. at 561.

Finally, Plaintiffs have requested a preliminary injunction, which is a matter of

equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."   *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008).   "A plaintiff seeking preliminary injunctive relief must establish that [it] is

likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the

public interest."   *Id.* at 20.

## ANALYSIS

Plaintiffs make several claims in their Amended Complaint and seek summary

judgment, as well as permanent declaratory and injunctive relief, because the President's

Proclamation is unlawful.   Considering the Supreme Court's recent decision in *Donald J.*

*Trump, President of the United Sates, et al. v. Sierra Club, et al.*, the Court will not further

address either parties' arguments regarding the statutory authority of DOD Secretary Shanahan

to spend under § 8005.   *See* No. 19A60, 2019 WL 3369425, at*1 (2019).   The Supreme Court

granted a stay in Defendants' favor and reasoned "that the Government has made a sufficient

showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting

Secretary's compliance with [§] 8005."   *Id.*   The DOD Appropriations Act, § 8005, authorizes

the Secretary of the Department of Defense to transfer the $2.5 billion for § 284 Support for

Counterdrug Activities.   Thus, the Court finds Plaintiffs' argument that the DOD Secretary

exceeded his statutory authority under § 284 unviable.   In addition, the Court will not address

the Plaintiffs' arguments regarding the Treasury Forfeiture Funds, as Plaintiffs abandoned these

6

claims at oral argument.   Hr'g Tr. 67–68, ECF No. 115.

Apart from the aforementioned § 284 and Treasury Forfeiture Funds arguments, Plaintiffs argue that the Proclamation exceeded the President's authority under the National Emergency Act ("NEA").   Mot. 19, ECF No. 54.   Alternatively, according to Plaintiffs, the NEA is unconstitutional if it authorizes the President's Proclamation because it runs afoul of the nondelegation doctrine and the Take Care Clause of the Constitution.   *Id.* at 26.   Next, the Plaintiffs assert that Defendants' use of the funds to build a border wall violates the CAA, the Appropriations Clause of the Constitution, and the Administrative Procedure Act ("APA").   *Id.* at 33, 45–46.

Defendants counter that all Plaintiffs' claims fail because Congress intended to preclude judicial review of national emergency declarations, that the challenge presents a nonjusticiable political question, and that Plaintiffs cannot obtain equitable relief against the President.   Cross–Mot. 20 and 23, ECF No. 95.   Regarding Plaintiffs' alternative argument, Defendants argue that the nondelegation challenge to the NEA is meritless.   *Id.* at 30. According to Defendants, Plaintiffs' claims based on the APA are unsuccessful because they have not satisfied the APA's requirements for review of agency action and they fail on the merits.   *Id.* at 44 and 49.   Finally, Defendants argue that Plaintiffs fail to state a claim under the CAA because nothing in the CAA modifies or disables the use of the permanent statutes at issue in this case.   *Id.* at 54.

Prior to the Court's discussion of the merits of these claims and counterclaims, the Court will address standing.   Plaintiffs claim they have standing because El Paso County is the "object" of the Defendants' Proclamation to build a border wall in the community.   Mot. 10,

ECF No. 54.   Furthermore, El Paso County has suffered reputational and economic injuries. *Id.* at 11–13.   For its part, BNHR asserts organizational standing.   *Id.* at 14.

Defendants counter, first, that Plaintiffs cannot challenge either the Proclamation or § 284 because the alleged reputational harm is not an injury in fact, it is not fairly traceable to the Defendants' action, it is too speculative, and it is not redressable by a favorable outcome. Cross–Mot. 35–39, ECF No. 95.   Second, according to Defendants, the pecuniary injuries are not sufficiently concrete or imminent, and even if they were, they are not traceable to the Proclamation and subsequent actions.   *Id.* at 40.   Third, Plaintiffs' cannot establish standing to sue under § 2808.   *Id.* at 34.

Finally, Defendants argue that BNHR lacks standing because there is no nexus between the organizational activities and the Defendants' conduct, rather BNHR relies on an "abstract social interest."   *Id.* at 41–42.   According to Defendants, not only is "stigmatization" not a cognizable injury for Article III standing, but other alleged harm to the quality of life of BNHR members is not sufficiently concrete or imminent.   *Id.* at 43.   As discussed below, the Court finds that the Plaintiffs do have standing and are entitled to summary judgment based on their CAA claim.

## I.   PLAINTIFFS HAVE STANDING.

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000).

8

At the summary judgment stage, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts'" to establish their standing.  *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).  When evaluating plaintiffs' standing, courts must "take as true" the factual evidence that plaintiffs submit.  *McCardell*, 794 F.3d at 520; *see Lujan*, 504 U.S. at 561. Thus, El Paso County has standing, and BNHR has standing both as an organization and because its members have suffered a concrete injury.

**1.  El Paso County Has Standing.**

El Paso County has standing to sue Defendants because they are the "object" of the border wall construction, and they have suffered concrete reputational and economic injury. Although either reputational or economic injury alone would suffice to justify El Paso County's day in federal court, the Court will address the viability of each in turn.

a.  El Paso County Is the Object of the Proclamation to Build a Border Wall.

When a plaintiff "challeng[es] the legality of government action," the "nature and extent of facts that must be averred" to establish standing "depends considerably upon whether the plaintiff is [itself] an object of the action" at issue.  *Lujan*, 504 U.S. at 561–62.  If it is, "there is ordinarily little question that the action . . . has caused [it] injury, and that a judgment preventing . . . the action will redress [that injury]."  *Id.*; *see Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 518 (5th Cir. 2014) ("It follows from *Lujan* that if a plaintiff is an object of a government regulation, then that plaintiff ordinarily has standing to challenge that regulation.").

The Supreme Court in *Lujan* held the plaintiffs lacked standing to challenge the Secretary of the Interior's refusal to extend Endangered Species Act protections to animals abroad.  *Lujan*, 504 U.S. at 562.  The Supreme Court dismissed the case because the individual

9

plaintiffs expressed mere "some day intentions" and failed to produce evidence on summary judgment of "concrete plans" to visit the endangered animals abroad. *Id.* at 564–65 (internal quotation marks omitted). In contrast, the Fifth Circuit held that a plaintiff, a registered child sex offender, was the target of a local ordinance restricting where registered child sex offenders could live. *Duarte*, 759 F.3d at 518. There the plaintiff submitted evidence that, taken in the light most favorable to him, established that he had "concrete plans" to eventually reside in areas impacted by the local ordinance, unlike the plaintiffs in *Lujan*. *Id.*

The President's Proclamation is aimed at building a border wall along the southern border between El Paso County and Mexico. Thus, unlike the plaintiffs in *Lujan* who had only intentions of visiting a targeted area without any concrete plans, El Paso County is the "object" or target of the government action. Even more clearly than the plaintiff in *Duarte*, who merely had concrete plans to eventually reside in an impacted area, El Paso County itself is the impacted area of the government's action. The Court agrees with the Plaintiffs that because El Paso County is the object of the Proclamation, it has standing to bring this challenge.

        b. <u>El Paso County's Reputation Has Been Injured.</u>

Specifically, El Paso County has shown an injury to its reputation and has had to take affirmative steps to avoid harm. According to El Paso County Judge Samaniego ("Judge Samaniego"), El Paso County takes pride in its "reputation as a safe place to live, work, and visit," and as a vibrant "bilingual, bi–national, multicultural" community. Samaniego Decl. ¶¶ 3–4, ECF No. 55-26. But Defendants' actions have "falsely told the world the exact opposite:" "that El Paso County and the Southern border are crime–ridden and dangerous, that [its] immigrant community comprises criminals and drug traffickers . . ., that [its] proximity to Mexico is an existential threat, and that [it] can be rescued only through the blight of massive

wall construction and militarization." *Id.* ¶ 8; *see also id.* ¶ 10 ("I have already heard personally from people who have a false impression that El Paso County is a dangerous place and who do not want to come here [because of the President's Proclamation]."). And according to Chief Administrator of El Paso County Keller ("Ms. Keller"), Defendants' actions amount to a message "transmitted all over the world" that "all of [the County's] strengths are actually weaknesses" and that the County is "so endangered by immigrants and [its] closeness to Mexico that [it] need[s] a wall to protect [it]." Keller Decl. ¶ 6, ECF No. 55–25. Because of Defendants' actions, Ms. Keller now must "not only promot[e] El Paso's image, but actively defend[] it." *Id.* As Judge Samaniego explained, "every meeting anyone promoting El Paso has now must include extra efforts to persuade people that El Paso County is a good place to invest in and visit." Samaniego Decl. ¶ 11, ECF No. 55–25.

El Paso County asserts that they have standing because "injury to reputation can constitute a cognizable injury sufficient for Article III standing." *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003); *see Walker v. City of Mesquite*, 129 F.3d 831, 832–33 (5th Cir. 1997). "[W]here reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to challenge that action." *Foretich*, 351 F.3d at 1213. Even "the need to take . . . affirmative steps to avoid the risk of harm to [one's] reputation constitutes a cognizable injury." *Meese v. Keene*, 481 U.S. 465, 475 (1987); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154 (2010) (finding standing based on plaintiffs' need "to take certain measures to minimize the likelihood" of harm).

In *Meese*, for instance, the Supreme Court held that a plaintiff had standing, based on reputational injury, to challenge a federal law classifying films he wished to show as

11

"political propaganda." *Id.* at 472–77.   By forcing the plaintiff to "choose between exhibiting the films and incurring the risk that public perception of this [legal] scheme will harm [his] reputation," the law inflicted concrete injury.   *Id.* at 477.   And in *NCAA v. Governor of New Jersey*, which the Fifth Circuit has favorably cited for its standing analysis (*see Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015)), the court held that sports leagues had standing, based on reputational injury, to challenge a state law legalizing sports gambling.   730 F.3d 208, 220 (3d Cir. 2013), *rev'd on other grounds sub nom.*, 138 S. Ct. 1461 (2018).   The leagues had shown cognizable reputational injury because "they are harmed by their unwanted association with an activity they (and large portions of the public) disapprove of—gambling."   *Id.*

However, "[s]tanding is not available to just any resident of a jurisdiction to challenge a government message without a corresponding action about a particular belief." *Barber v. Bryant*, 860 F.3d 345, 355 (5th Cir. 2017) (rejecting "purported stigmatic injury"); *see also Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 284 (5th Cir. 1996) ("[N]o parent ought to be allowed to sue over a school policy with which he disagrees unless the policy has demonstrably injured him or his child."); *Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy)*, 534 F.3d 756, 764–65 (D.C. Cir. 2008) (Kavanaugh, J.) (allowing standing based on offense to a government message would "eviscerate well–settled standing limitations").   And to assert standing, more is required than alleging a "possible future injury."   *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).   Finally, the Court cannot indulge "speculation about 'the unfettered choices made by independent actors not before the court'" that cannot support standing.   *Id.* at 410, 414 n. 5 (quoting *Lujan*, 504 U.S. at 562).

The Court agrees with Plaintiffs that the Proclamation and subsequent government actions of obtaining funding from various sources to build a border wall between El

Paso County and Mexico incurs the risk of harm to El Paso County's reputation.   Like the leagues in *NCAA*, El Paso County has shown cognizable reputational injury on the ground that "they are harmed by their unwanted association with an activity they (and large portions of the public) disapprove of—" the construction of a border wall through executive action.   730 F.3d at 220.

Defendants' attempt to distinguish *Meese* and *NCAA* which each involved "self–effectuating" statutes from the current case, which involves the Proclamation as a catalyst for the statutory authority that appropriates the construction funds, is unpersuasive.   Even though the Proclamation is not self–effectuating, it directly authorizes actions under other statutes that give rise to an injury in fact.   Like *Foretich*, reputational injury derives from an unexpired and unretracted government action and El Paso County's "need to take . . . affirmative steps to avoid the risk of harm to [its] reputation constitutes a cognizable injury."   351 F.3d at 1213.

Furthermore, combined with the above–reasoned conclusion that El Paso County is the "object" of the government action, it is not speculative that El Paso has suffered an injury in fact to its reputation that is traceable to the Proclamation.   *See supra* 9.   El Paso County submitted affidavit testimony from Ms. Keller and Judge Samaniego who testified to taking affirmative steps to avoid the risk of harm to El Paso County's reputation.   *See supra 10–11.*

Unlike *Clapper* with its "highly attenuated chain of possibilities" involving five increasingly–speculative logical leaps between the government action under the Foreign Intelligence Surveillance Act and the fear that their communication with foreign contacts would be intercepted in the future, El Paso County's injury is far more direct.   *Clapper*, 568 U.S. at 408.   El Paso County is not indulging in speculation about the unfettered choices of unknown investors or tourists, rather El Paso County's reputation has been injured because, as in *Meese*,

the risk of harm to public perception is enough to constitute a concrete injury.

Finally, the Court disagrees with the Defendants' argument that El Paso County's reputational injury is self–inflicted.   *See* Resp. 38, ECF No. 95 (citing *Clapper*, 568 U.S. at 408; *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018); *Assoc. for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994)).   Again unlike *Clapper* where the standing inquiry was particularly rigorous because the court was asked to find the actions of the other branches of government unconstitutional, here the Court will not reach the constitutionality of the NEA nor whether use of the funds to build a border wall violates the Appropriations Clause.

Second, the Fifth Circuit in *Association for Retarded Citizens of Dallas* held that redirection of an organization's "resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." 19 F.3d at 244.   Here Defendants have not submitted any argument or evidence regarding El Paso County's redirection of resources to litigation or legal counseling expenses.   *See generally* Def.'s Cross–Mot., ECF No. 95.   Finally, unlike the plaintiff in *Zimmerman* whose desire to solicit funds did not establish an intent to accept funds above the proscribed limit in the challenged law, El Paso County has made concrete plans with objective evidence demonstrating an investment of time and resources to combat the Proclamation.   881 F.3d at 389–90; *see, e.g.*, Keller Decl. ¶¶ 9–11, ECF No. 55–25; Samaniego Decl. ¶¶ 11–12, ECF No. 55–26 ("I have spent approximately 30% of my time [as County Judge] . . . to defending El Paso's reputation."). El Paso County's reputational injury—though alone enough for standing—is also intimately tied to "a direct pecuniary injury that generally is sufficient to establish injury–in–fact" to be

addressed in the next section.   *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010) (quotations omitted).

### c.   El Paso County Has Suffered Economic Harm.

Any drop in the $4 million tax revenue El Paso County earns from tourism "would significantly damage the county's financial health."   Samaniego Decl. ¶ 5, ECF No. 55–26).   Ms. Keller explained, "[t]here is nothing more detrimental to a drive to bring in tourists than the perception that a community is chaotic and dangerous and that the tourists['] access to historical and scenic destinations will be impeded by construction."   Keller Decl. ¶ 8, ECF No. 55–25; *see also* Samaniego Decl. ¶ 6, ECF No. 55–26 ("[T]he President's Proclamation declaring an emergency at the Southern border is a serious threat to both tourism and economic development because of the false and negative impression of El Paso that it creates.").   Judge Samaniego likewise emphasized that recent meetings with "local business leaders" have indicated that Defendants' actions are "generating fears of potential investors that the community will be mired in a long–term state of chaos that includes . . . violent crime, the blight of construction, and impediments to crossing back and forth across the border."   Samaniego Decl. ¶ 11, ECF No. 55–26.

When a plaintiff suffers "a direct pecuniary injury" that, too, is generally "sufficient to establish injury–in–fact."   *K.P. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010); *see also Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("economic injury is a quintessential injury upon which to base standing").   For example, a municipality's "diminish[ed] . . . tax base" constitutes injury in fact.   *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979).   That is equally true where the economic injury stems from the "loss of a non–illusory opportunity" to obtain "a benefit."   *Ecosystem Investment*

*Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 292 (5th Cir. 2018); *see also Czyzewski*
*v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (finding standing where challenged action
deprived party of "a chance to obtain a settlement that respected [its] priority" in bankruptcy).

Even if we were to view Judge Samaniego and Ms. Keller's current fears of
construction and chaos as unpersuasive, more economic harm is "certainly impending" and may
constitute an injury in fact despite having "not yet materialized." *SBA v. Driehaus*, 573 U.S.
149, 158 (2014) (quotations omitted); *LeBlanc*, 627 F.3d at 122.   The longer the President's
Proclamation remains in effect, the more El Paso County's reputation will be tarnished in the
eyes of tourists and developers, and the more hours El Paso County officials will have to devote
to combating negative messaging, as opposed to "meeting directly with business leaders to bring
business to El Paso."   Samaniego Decl. ¶ 12, ECF No. 55–26.

Moreover, Defendants will divert $20 million away from a planned military
construction project at Fort Bliss in El Paso County, and one of the new wall projects will take
place in southern New Mexico, in El Paso County's close vicinity.   Supplemental Notice of
DOD Decision 3, ECF No. 114.   "Fort Bliss is the lifeblood of the El Paso economy,"
contributing billions of dollars and creating thousands of jobs.   Samaniego Decl. ¶ 15, ECF. No.
55–26.   Losing funds that had been appropriated for use at Fort Bliss "creates the imminent
prospect of economic harm to El Paso County."   *Id.* ¶ 16.   That loss of funds also represents a
missed opportunity to "obtain a benefit," which can also suffice to show injury in fact.   *N.E.*
*Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

d.   Causation and Redressability Have Been Shown.

While Defendants admit that negative impressions of the southern border or El
Paso County are associated with the Proclamation, they argue that El Paso County cannot

16

demonstrate causation.    Cross–Mot. 39, ECF No. 95.    Nor can El Paso County show how a favorable decision will redress its injury of lost business and tourism.    *Id.*

However, the causation element is satisfied because the County's reputational and economic injuries are "fairly traceable" to Defendants' actions.    *Bennett v. Spear*, 520 U.S. 154, 167 (1997).    The President's Proclamation expressly declares a "national emergency" on the "southern border"—including El Paso County—based on its status as a "major entry point for criminals, gang members, and illicit narcotics."    Proclamation 1, ECF 55–14.    And Defendants' desired deployment of the military to build a border wall reinforces El Paso County's image as dangerous and uninviting, while threatening to increase noise and congestion in the area.    *Id.*; *see also To Secure the Border and Make America Safe Again, We Need to Deploy the National Guard*, Department of Homeland Security (Apr. 4, 2018), https://www. dhs.gov/news/2018/04/04/secure-border-and-make-america-safe-again-we-need-deploy-national-guard.

As El Paso County officials explained, these precise actions bear a "causal connection" to the County's reputational and economic injuries described above.    *Driehaus*, 573 U.S. at 158; *see* Keller Decl. ¶ 6 ("The President's Proclamation . . . is an official government statement that damages El Paso County's ability to compete for business investment and tourism."), ¶ 10 ("Because of the President's Proclamation, we are now in the process of strategizing how to combat a falsely negative image."), ¶¶ 12–13 (impending wall construction will create a "massive construction zone," deterring "tourism and business development"), ECF No. 55–25; Samaniego Dec. ¶ 10 ("The President's Proclamation has falsely told the world the exact opposite of who we are and what we promote"), ¶ 16 (diversion of funds from Fort Bliss "creates the imminent prospect of economic harm"), ECF No. 55–26.

Finally, where, as here, a plaintiff challenges government action, "[c]ausation and redressability typically overlap as two sides of a causation coin." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017).   "After all, if a government action causes an injury, enjoining the action usually will redress that injury." *Id.*   That is true here.   As to El Paso County's reputational injuries, enjoining Defendants' actions will allow El Paso County officials to refocus their resources on improving tourism and commerce, not defending El Paso County against Defendants' attacks. *See Foretich*, 351 F.3d at 1214 (invalidating government action from which "reputational injury . . . derives" "provide[s] meaningful relief").   And as to El Paso County's pecuniary injuries, enjoining Defendants' actions will help restore El Paso County's image in the eyes of tourists and investors and forestall disruptive border wall construction. Accordingly, El Paso County has standing to bring its claims.

## 2.  BNHR Has Standing.

BNHR is a community organization headquartered in El Paso, Texas.   Decl. of Fernando Garcia ("Garcia Decl.") ¶¶ 2–3, ECF No. 55–27.   It consists of about 5,000 members who live and work in west Texas, metropolitan El Paso, and southern New Mexico. *Id.* at ¶ 4. BNHR's mission is to "organize border communities through human rights education" and "mobilize [its] members to advocate for positive change in policies" affecting "the immigrant community." *Id.* at ¶ 3.   To fulfill that mission, BNHR "educate[s] [its] own members about their rights" and "train[s] them to educate and organize other members of the immigrant community." *Id.*   It also works to forge bonds between its members and the area's law–enforcement officials. *Id.* at ¶ 10.   BNHR claims that the Proclamation has impaired its organization's mission and caused it to expend an additional $23,956 to combat the unlawful conduct. *Id.* at ¶¶ 16, 21; *see also id.* at ¶¶ 13, 37, ECF No. 55–27 (explaining that BNHR has

"divert[ed] resources" away from its core mission toward "counsel[ing] members who are fearful," "organizing [its] community in opposition to the President's declaration," and "opposing the illegal [border wall] construction.").

In addition to draining and diverting resources, BNHR had to cancel the signature event, "Hugs Not Walls," for one of its "major initiatives" to build trust between the immigrant community and law enforcement.   *Id.* at ¶ 32.   Defendants argue that there is an insufficient nexus between BNHR's organizational activities and the Proclamation because the Proclamation does not actually inhibit BNHR from carrying out its organizational mission, neither by imposing barriers nor by neglecting a legal duty.   Cross–Mot. 40, ECF No. 95.

"An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals."   *Fowler*, 178 F.3d at 356.   In *Havens Realty Corp. v. Coleman*, the Supreme Court held a "housing counseling service" whose organizational mission included "the investigation and referral of complaints concerning housing discrimination" met that test, enabling it to challenge defendants' "racial steering practices."   455 U.S. 363, 379 (1982).   Havens Realty Corporation sent testers to an apartment complex in order to determine whether it practiced unlawful "racial steering," and subsequently sued to challenge the practice it discovered.   *Id.* at 363.   The Supreme Court found sufficient the organization's allegation that it "had to devote significant resources to identify and counteract" defendants' unlawful practices. *Id.*   If defendants' "practices have perceptibly impaired [the organization's] ability to provide" its services, the Supreme Court explained, "there can be no question that the organization has suffered injury in fact."   *Id.*   "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."   *Id.*

Applying *Havens Realty*, the Fifth Circuit has announced the following rule: "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Fowler*, 178 F.3d at 360; *see also Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014). In *Scott*, the Fifth Circuit held that the Louisiana NAACP had standing to challenge Louisiana's alleged failure to comply with the National Voter Registration Act. 771 F.3d at 837. Because one NAACP member "devoted resources to counter[acting] [the State's] allegedly unlawful practices" by conducting "voter–registration drives," the NAACP "suffered injury in fact." *Id.*

In a similar vein, the Fifth Circuit held in *OCA–Greater Houston v. Texas* that an advocacy organization had standing to challenge a Texas law restricting the "interpretation assistance that English–limited voters may receive." 867 F.3d 604, 606 and 612 (5th Cir. 2017). The plaintiffs expended resources to educate members about the restrictions so they could rely on the interpreter of their choice at the polls. *Id.* at 612. Because the organization "went out of its way to counteract the effect of Texas's allegedly unlawful" restriction—for instance, by "educat[ing] voters" about it—the organization had suffered cognizable injury, even if that "injury was not large." *Id.*

However, absent such a direct impairment on its mission caused by the challenged action, standing does not exist whenever a public interest organization decides to spend money opposing a governmental policy of concern or the organization suffered a "setback to [its] abstract social interests." *Id.* (citing *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (explaining that "a mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself . . .") (internal quotations omitted)).

20

The Fifth Circuit rejected a claim of organizational standing in *NAACP v. City of Kyle*. 626 F.3d 233 (5th Cir. 2010). There the plaintiff tried to ground standing to challenge revised housing ordinances in a study it had commissioned regarding the impact of the revisions, as well as lobbying efforts designed to persuade the defendant municipality not to implement the revised ordinances, but did not explain how those efforts "differ from the HBA's routine lobbying activities," or "identif[y] any specific projects that the HBA had to put on hold or otherwise curtail in order to respond to the revised ordinances." *Id.* at 238. The *Kyle* court also reaffirmed that "redirect[ing] . . . resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Id.* (quoting *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000).

Here BNHR has explained how its current expenditures differ from its routine activities and, unlike the plaintiff in *Kyle*, it has not merely redirected resources to litigation and legal counseling in response to the Proclamation. In normal circumstances, BNHR dedicates its resources to "its core mission" of human rights education and "promoting immigration reform." Garcia Decl. ¶ 13, ECF No. 55–27. Because of Defendants' emergency declaration and attendant transfer of funds to build a wall, however, BNHR has had to "divert resources" away from that core mission, and toward "counsel[ing] community members who are fearful," "organizing [its] community in opposition to the President's declaration," and "opposing the illegal [border wall] construction." *Id.* at ¶¶ 13, 37.

In addition, BNHR has held and scheduled Proclamation–related weekend events that it would not otherwise hold and has increased the frequency of its "Know Your Rights" presentations approximately five–fold. *Id.* at ¶¶ 14–15. It has also hired another policy consultant (costing $14,400) to deal with its increased advocacy workload in light of the

21

Proclamation, and has sent delegations to discuss the Proclamation's effects with congressional members in Washington, D.C.   *Id.* at ¶¶ 16, 19.   In short, as the organization's Executive Director stated in his declaration, the Proclamation and Defendants' subsequent actions have "required BNHR to expend significant resources that could have, and would have, gone elsewhere," leading to a total of $23,956 in additional organizational expenses.   *Id.* at ¶¶ 16, 21.

Like the organizational plaintiffs in *Havens Realty*, *OCA–Greater Houston*, and *Scott*, BNHR has standing to challenge Defendants' actions.   As shown, BNHR has gone "out of its way to counteract" those actions by diverting resources from its traditional activities toward "counsel[ing]" and "organizing" community members in relation to the national emergency and border wall.   *OCA–Greater Houston*, 867 F.3d at 612; Garcia Decl. ¶¶ 13, 37, ECF No. 55–27.   And Defendants' actions have inflicted "demonstrable injury to the organization's activities" because those actions have forced BNHR to cancel initiatives, like the "Hugs Not Walls" campaign signature event, it would otherwise spearhead.   *Havens Realty*, 455 U.S. at 379; Garcia Decl. ¶ 32, ECF No. 55–27.

All BNHR's organizational injuries, moreover, have a "causal nexus" to Defendants' actions, and would be redressed if this Court were to enjoin those actions.   *See Scott*, 771 F.3d at 838–39.   Defendants raise the same arguments regarding causation and redressability as brought up against El Paso County, but BNHR similarly will be able to refocus their resources on their core mission after summary judgment and injunction in their favor.   *See supra* 18.   Thus, BNHR has standing and this case will not be dismissed for lack of subject matter jurisdiction.

### 3.  Plaintiffs Have Standing to Sue Under § 2808.

Finally, Defendants initially argued that Plaintiffs lacked standing to challenge §

2808 construction because the border barrier construction projects funded under § 2808 had not

been decided.    Rapuano Decl. ¶¶ 5–7, ECF No. 95–7.    At the time of Defendants' Cross–

Motion the process was still ongoing as to which specific military construction projects would be

authorized.    *Id*.    But on September 5, 2019, Defendants gave notice that the DOD had made

the final determination to divert $20 million away from planned construction on "Defense

Access Roads" at Fort Bliss, to be used on building a wall under § 2808.    Supplemental Notice

of DOD Decision 2, ECF No. 114.

      A federal district court recently rejected Defendant's same argument in *Sierra*

*Club v. Trump*, 379 F.Supp.3d 883, 907–08 (N.D. Cal. 2019) (reversed on other grounds).    A

"future" pecuniary injury may suffice so long as there is a "substantial risk that the harm will

occur."    *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).    Furthermore, though

standing may rest not rest on the independent actions of third parties, it may rest on "injury

produced by determinative or coercive effect upon the action of someone else."    *Bennett v.*

*Spear*, 520 U.S. 154, 169 (1997) (finding standing to challenge an agency's biological opinion

that "ha[d] a powerful coercive effect on the agency action . . . though the action agency was

technically free to disregard the Biological Opinion . . . [all were] keenly aware of the virtually

determinative effect of its biological opinions.").

      Especially considering the most recent developments, the Court agrees with the

Plaintiffs that they have standing to challenge Defendants' use of § 2808 funds.    Plaintiffs have

demonstrated a "substantial risk" that Defendants will rely on § 2808 to fund a border wall.

Reply 11–12, ECF No. 101 (quoting *Driehaus*, 573 U.S. at 158).    The Proclamation expressly

"invoke[s]" and "ma[kes] available" "the construction authority provided in [§] 2808 of title 10."

Proclamation 1, ECF No. 55–14.    And the same day the President issued his Proclamation, the

White House identified the amount of § 2808 funds "that will be available to build the border wall:" $3.6 billion.   Facts Sheet 4, ECF No. 95–5.   There is a substantial risk that the Acting Defense Secretary will follow the President's directive to use § 2808 funds to build a border wall, rather than disregard it.   *See Bennett*, 520 U.S. at 169.   The fact that the Acting Secretary is "technically free to disregard the" Proclamation is irrelevant in light of its "virtually determinative effect" on his actions.   *Bennett*, 520 U.S. at 170.

The Government's position is made more implausible by the fact that the DOD has taken significant steps toward building the border wall using § 2808 funds—namely identifying the deferred projects that will serve as sources of the funding.   *See supra* 22.   That diversion of funds substantiates the County's "direct pecuniary injury" that suffices for Article III standing.   *LeBlanc*, 627 F.3d at 122.   After all, it takes funds from the "lifeblood of the El Paso economy," and it eliminates jobs that new construction at Fort Bliss would have created. *See* Samaniego Decl. ¶¶ 14–16, ECF No. 55–26.   Such "economic injur[ies] [are] quintessential injur[ies] upon which to base standing."   *Texas Democratic Party*, 459 F.3d at 586.   There is a more than substantial risk that the DOD will use § 2808 funds on a border wall, at Fort Bliss's expense.   Having established that Plaintiffs have standing to challenge Defendants' actions, the Court turns to the merits.

## II.   THE PRESIDENT'S PROCLAMATION IS UNLAWFUL.

The Proclamation is unlawful because the funding plan violates the CAA generally and specifically violates § 739.   Because this disposes of the case, the Court will not address the other merits arguments raised, including the constitutionality of the Proclamation and the NEA, nor the Appropriations Clause and Administrative Procedures Act claims.[1]   Following

---

[1] Defendants do not repeat their arguments that Plaintiffs do not fall within the zone of interests of the CAA, and

Rule 56 of the Federal Rules of Civil Procedure, this Court will enter summary judgment

because "the movant [has shown] [ ] that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex*, 477

U.S. at 322–23; *Curtis*, 710 F.3d at 594.   Defendants agree with Plaintiffs that this case presents

legal questions for the Court to resolve without the need for further factual development.

Finally, Plaintiffs have requested a preliminary injunction, which is a matter of

equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."   *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008).   Defendants have countered that Plaintiffs cannot obtain equitable relief

against the President.   Cross–Mot. 20 and 23, ECF No. 95.   The Court has requested additional

briefing on this issue and will reserve judgment in this regard for a later date.

### 1. Defendants' Use of Funds to Build a Border Wall Violates the Consolidated Appropriations Act.

To resolve this case, the Court turns to one of the three golden rules of statutory

construction "'established from time immemorial'" that "'a more specific statute will be given

precedence over a more general one.'"   *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir.

2005) (quoting 1 Comp. Dec. 126, 127 (1894) and *Busic v. United States*, 446 U.S. 398, 406

(1980)).   This rule "appli[es] to appropriations bills."   *See id*.   Thus, "'[a]n appropriation for

a specific purpose is exclusive of other appropriations in general terms which might be

applicable in the absence of the specific appropriation.'"   *Id.* (quoting 4 Comp. Gen. 476, 476

(1924)).   Applying this rule, the D.C. Circuit has held, for instance, that Congress's specific

---

even if they did the Court agrees with the U.S. District Court for the Northern District of California, which reasoned
that when a plaintiff seeks equitable relief against a defendant for exceeding its statutory authority, the zone-of-
interests test is inapposite.   *Sierra Club*, 379 F.Supp.3d at 910.

appropriation of $1 million to Nevada for conducting "scientific oversight responsibilities" precluded a more general $190 million appropriation for "nuclear waste disposal activities" from being directed to Nevada.  *Id.*

Like the specific appropriation in *Nevada*, the CAA specifically appropriates $1.375 billion for border–wall expenditures and requires those expenditures to be made on "construction . . . in the Rio Grande Valley Sector" alone.  CAA §§ 230, 231.  Defendants' funding plan, by contrast, will transfer $6.1 billion of funds appropriated for other more *general* purposes—military construction, under § 2808, and counterdrug activities, under § 284.  Their plan therefore flouts the cardinal principle that a specific statute controls a general one and violates the CAA.  *See Nevada*, 400 F.3d at 16; *United States v. MacCollom*, 426 U.S. 317, 321 (1976).

Defendants counter by pointing out that the CAA does not modify any of the statutes at issue here and, therefore, Congress did not intend to disable the use of other available funding authorities.  *See* Cross–Mot. 54, ECF No. 95.  The DOD Secretary may exercise his discretion to spend because he is only cabined by the text of the appropriation.  *Id.* (citing *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) (quotation omitted).  In absence of CAA provisions that specifically alter the meaning or availability of "permanent statutes" like § 284 and § 2808, it cannot be inferred that Congress meant to restrict the use of other appropriated funds for similar purposes.  *Id.* at 54–55 (citing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) ("doctrine disfavoring repeals by implication applies with full vigor when the subsequent legislation is an appropriations measure")); *see also Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984) ("[W]hen appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly.").

26

However, Defendants' reliance on *Salazar v. Ramah Navajo Chapter* is misplaced.    At issue in that case is whether the Government must pay the full amount of contract support costs when Congress appropriates enough funds to pay in full any individual contractor's contract support costs, but not enough funds to cover the aggregate amount due every contractor.    *Salazar*, 567 U.S. at 185.    Consistent with longstanding principles of government contracting law, the Supreme Court held that the Government must pay each tribe's contract support costs in full.    *Id*.    Defendants rely on dicta in this case: "[i]n the absence of contrary language, the grant of a specific appropriation cannot be read to restrict the use of other appropriated funds for similar purposes pursuant to other statutory authority."    Cross–Mot. 54–55 (citing *Salazar*, 567 U.S. at 200), ECF No. 95.

But in *Salazar* the Supreme Court reasoned that because Congress merely appropriated a lump–sum amount (for tribes to pay contract support costs) without a statutory restriction on what could be done with those funds, a clear inference arose that Congress did not intend to impose legally binding restrictions.    567 U.S. at 200 (citing *Lincoln v. Vigil*, 508 U.S. 182, 192).    The Supreme Court cites *Lincoln v. Vigil*, which underscores the conclusion that "[t]he allocation of funds from a lump–sum appropriation is [an] administrative decision . . . committed to agency discretion.    After all, the very point of a lump–sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in . . . the most effective . . . way."    *Vigil*, 508 U.S. at 192.    However, the CAA is not a lump sum appropriation without restrictions, and Defendants do not profess it to be such.    *See* CAA § 230.    The CAA provides $1.375 billion for "the construction of primary pedestrian fencing" in "the Rio Grande Valley Sector."    CAA § 230(a)(1).    And it states that none of the funds appropriated by the Act can be used "for the construction of pedestrian fencing" in any of

the five other areas of the border.   *Id.* § 231.

Moreover, in *Salazar* and *Lincoln*, the Supreme Court makes much of the fact that the "indicia in committee reports and other legislative history as to how funds should or are expected to be spent do not establish any legal requirements on the agency."   567 U.S. at 200 (quoting 508 U.S. at 192).   Here we have far more than "indicia" or legislative history establishing Congressional expectations as to how the funds are spent: the plain text of the CAA restricts the amount and location of funding for border barrier construction.   *See* CAA §§ 230(a)(1), 231.

Defendants reliance on *Tennessee Valley Authority v. Hill* is similarly inapposite. 437 U.S. 153, 190 (1978) ("doctrine disfavoring repeals by implication 'applies with full vigor when . . . the subsequent legislation is an appropriations measure.'" (quoting *Committee for Nuclear Responsibility v. Seaborg*, 463 F.2d 783, 785 (1971))).   There the Supreme Court held that congressional appropriations to finish a dam that would eradicate an endangered species did not impliedly repeal the Endangered Species Act— "the most comprehensive legislation for preservation of endangered species ever enacted by any nation."   *Tennessee Valley Auth.*, 437 U.S. at 180, 184.   Defendants imply that Plaintiffs' argument requires a repeal of the Military Construction Act and Funding for Counterdrug Activities.   *See* Cross–Mot. 54–55, ECF No. 95. It does not.   *See* Mot. 33, ECF No. 54.   Plaintiffs argue, and this Court agrees, that the Proclamation and its use of the statutes has violated the CAA; repeal of § 284 and § 2808 is not necessary to reach this conclusion.   *Id.*

Finally, Defendants cite *Donovan v. Carolina Stalite Co.* for the proposition that "when appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly."   Cross–Mot. 55, (citing 734 F.2d 1547, 1558 (D.C.

28

Cir. 1984)).    However, the CAA does not conflict with any underlying authorizing legislation, rather the Proclamation's use of other legislation to commit additional funds to border barrier construction conflicts with the CAA.    *Compare* CAA § 230 *with* §§ 284, 2808.    *Donovan* relies on *Tennessee Valley Authority*, which is inapplicable as described above.    *See supra* 26.

Donovan also relies on *U.S. v. Langston*, which is illustrative of the problem with Defendants' argument in general: Congress did not need to be prescient and specifically "alter" or repeal § 284 and § 2808 in order to limit border barrier funding to the amount appropriated in the CAA.    *See* 734 F.2d at 1558 (citing 118 U.S. 389 (1886)).    In *Langston*, the salary of the minister to Haiti was originally fixed at the sum of $7,500.    118 U.S. at 394.    Then subsequent acts appropriated $5,000 for his benefit, but did not contain any language to the effect that such sum shall be "in full compensation" for those years, nor was there in either of the subsequent acts an appropriation of money "for additional pay," from which it might be inferred that Congress intended to repeal the act fixing his annual salary at $7,500.    *Id.*    Repeals by implication are not favored, and the Supreme Court—in 1886—was able to look to several precedents establishing this rule specifically in the context of appropriations for public officials' salaries. *Id.* at 392–93 (citing *U.S. v. Fisher*, 109 U.S. 143, 146 (1883); *U.S. v. Mitchell*, 109 U.S. 146, 149 (1883)).    In contrast, this case presents an unprecedented issue, albeit with a familiar solution that the *Langston* opinion recommends: the congressional language in the CAA itself reveals Congress's intent to limit the border barrier funding.    *See id.* and CAA § 739.    And nowhere is this made more apparent than in § 739 of the CAA detailed below.

### 2.   In Addition, the Proclamation Violates § 739.

CAA § 739 expressly forbids Defendants' funding plan.    § 739 states:

> None of the funds made available in this or any other appropriations
> Act may be used to increase . . . funding for a program, project, or

activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

§ 739 creates a general rule and an exception.   The general rule is that "[n]one of the funds made available" in an "appropriations Act" (including the CAA) "may be used to increase funding for a program, project, or activity" that was "proposed in the President's budget request for a fiscal year."   CAA § 739.   The exception is that appropriations may be used to increase such funding if that use is authorized by "the reprogramming or transfer provisions" of an "appropriations Act."

§ 739 prohibits Defendants' plan to fund the border wall because the plan is barred by that provision's general rule and the plan does not fall within its exception. Defendants' plan is barred by § 739's general rule, because it (1) seeks to use funds "made available in" an "appropriations Act"; (2) "to increase funding for a program, project, or activity"; (3) that was "proposed in the President's budget request for a fiscal year."

First, Defendants' plan seeks to use funds "made available in" an "appropriations Act."   CAA § 739.   It taps appropriated military construction funds under § 2808 and counterdrug support funds under § 284.   As the White House has acknowledged, all funds have been "appropriated by Congress."   Fact Sheet, https://www.whitehouse.gov/briefings-statements/president-donald-jtrumps-border-security-victory/.   The Military Construction Appropriation Acts dating back to 1982 "made available" the § 2808 military construction funds. *See, e.g.*, Pub. L. No. 97–106, 95 Stat. 1503; *see also* § 2808(a) (military construction projects "may be undertaken only within the total amount of funds that have been appropriated for military construction").   And the DOD Appropriations Act "made available" the § 284

counterdrug support funds.   *See* Pub. L. No. 115-245 (2019).   So while § 2808 and § 284

themselves are not appropriations act, which is why they do not fall within the § 739 exception

(detailed below, *infra* 31), they were "made available" by an appropriation act.

> Second, Defendants' plan also seeks to use these appropriations to "increase

funding for a program, project, or activity."   CAA § 739.   Construction of a wall along the

southern border is a singular "project" under that word's ordinary meaning.   *See* Merriam–

Webster's Dictionary 932 (11th ed. 2003) (defining "project" as "a specific plan or design").

Indeed, the Executive Branch has consistently referred to the wall in this manner.   In the first

days of his administration, the President signed an executive order stating that it is "the policy of

the executive branch" to construct "a physical wall on the southern border," defined as "a

contiguous, physical wall, or other similarly secure, contiguous, and impassable physical

barrier."   82 Fed. Reg. 8793–94, ECF No. 55–5, (2017).   Likewise, on the day of the

President's Proclamation, a White House fact sheet announced that the Executive Branch would

use over $6 billion in additional funds to "build the border wall."   Fact Sheet, https://www.

whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/.

> Third, funding for the border wall was "proposed in the President's budget

request for a fiscal year."   CAA § 739.   On January 6, 2019, President Trump formally

requested $5.7 billion for fiscal year 2019 "for construction of a steel barrier for the Southwest

border."   Letter to Appropriations Chairman 1, ECF No. 55–28.   And he was denied, which

led to the longest government shutdown in our country's history.   *See* Pl.'s Mot. 4–5, ECF No.

54; *see also Sierra Club*, 379 F.Supp.3d at 892.

> Next, Defendants' funding plan is not saved by § 739's exception: the funding

increases it proposes are not "change[s] . . . made pursuant to the reprogramming or transfer

provisions of this or any other appropriations Act."   Under federal law, an "appropriations Act" is an Act whose title begins: "An Act making appropriations."   2 U.S.C. § 622(5); 1 U.S.C. § 105.   Neither § 2808 nor § 284 begins with this language.   § 2808 is a provision of the Military Construction Codification Act, Pub. L. No. 97-124, 96 Stat. 153 (1982), which says nothing about appropriations in its title, nor makes any appropriations in its body.   And § 284 is a provision of the National Defense Authorization Act, Pub. L. No. 114-328, 130 Stat. 2000, 2381, 2497 (2016), which by title and substance is not an "appropriations Act."   *Cf.* Pub. L. No. 115-31, 131 Stat. 135, 229 (2017) (separate statute appropriating DOD funds).   The Proclamation violates § 739 of the CAA.

## CONCLUSION

El Paso County and Border Network for Human Rights have standing to sue Defendants.   Because the Proclamation seeks additional funds for border barrier funding in violation of the CAA generally and § 739 of the CAA specifically, it is unlawful.   There is no genuine dispute as to any material fact, so Plaintiffs are entitled to judgment as a matter of law.

**IT IS HEREBY ORDERED** that Plaintiffs El Paso County, Texas, and Border Network for Human Right's "Motion for Summary Judgment or, in the alternative, a Preliminary Injunction" is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Donald J. Trump, Patrick M. Shanahan, Kirstjen M. Nielsen, David Bernhardt, Steven T. Mnuchin, William Barr, John F. Bash, and Todd T. Semonite's "Cross–Motion to Dismiss or for Summary Judgment, and Opposition to Plaintiffs' Motion for Summary Judgment and a Preliminary Injunction" **IS DENIED**.

32

**IT IS FINALLY ORDERED** that Plaintiffs El Paso County, Texas, and Border Network for Human Right shall **FILE A PROPOSED PRELIMINARY INJUNCTION** specifying the scope of said injunction **WITHIN TEN DAYS OF THIS MEMORANDUM OPINION** and then Defendants Donald J. Trump, Patrick M. Shanahan, Kirstjen M. Nielsen, David Bernhardt, Steven T. Mnuchin, William Barr, John F. Bash, and Todd T. Semonite will be given an opportunity to **RESPOND WITHIN FIVE DAYS**.

**SIGNED** this ___11___ day of **October 2019**.

_____

**THE HONORABLE DAVID BRIONES**
**SENIOR UNITED STATES DISTRICT JUDGE**