# EXHIBIT 2

I, Rafael F. Pazos, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. I am a Colonel in the United States Army, and I am currently the Commanding Officer for the South Pacific Border District ("Border District") for the U.S. Army Corps of Engineers ("Corps"), South Pacific Division. I am stationed in Phoenix, Arizona.

3. The Border District's primary mission is to plan, design, and construct Department of Defense-approved border barrier projects on the southern border of the United States.

4. In my capacity as the Commanding Officer of the Border District, I have overall responsibility for, and authority over, the Border District and its operations, consistent with relevant policy, regulations, and laws. In this respect, my responsibilities include providing oversight, direction, and management of all systems and personnel, including contracting officers, involved in executing the Border District's mission.

### I.     Background

5. In the course of my duties, I currently oversee performance of work on the following four border barrier construction projects under contract that are funded under the authority of 10 U.S.C. § 2808: the Yuma 2 and Yuma 10/27 projects ("Yuma 2 and 10/27"); the San Diego 4 project ("San Diego 4"); and the Yuma 3 project ("Yuma 3"). There are three contracts for construction of these projects.

- Yuma 2 and 10/27 were awarded on November 6, 2019, under one contract for border barrier work along the southern border of the Barry M. Goldwater Range ("BMGR"). The Yuma 2 project will replace approximately 2.3 miles of pedestrian fencing, and the Yuma 10/27 project will provide approximately 31 miles of new secondary pedestrian fencing. Ground disturbing activities for this contract have begun. Substantial construction activities were expected to begin on December 17, 2019.

- San Diego 4 was awarded on November 19, 2019 and will provide approximately 1.5 miles of new primary pedestrian fencing and approximately 2 miles of new secondary pedestrian fencing in California. Substantial construction activities were scheduled to begin on January 30, 2020.

- Yuma 3 was awarded on December 2, 2019, and will replace approximately 31 miles of vehicle barriers with new pedestrian fencing in Arizona. The Government has not yet

issued a Notice to Proceed for this project.[1] Substantial construction activities were scheduled to begin on February 15, 2020.

6. In addition, three other Section 2808 projects are currently in the solicitation phase. These three projects are the Yuma 6 project ("Yuma 6"), El Paso 2 project ("El Paso 2"), and El Paso 8 project ("El Paso 8"). There are two solicitations for these projects.

- Yuma 6 will provide approximately 1 mile of new primary pedestrian fencing and approximately 2.5 miles of new secondary pedestrian fencing in Arizona and California. The solicitation for Yuma 6 was issued on November 7, 2019, and the contract was expected to be awarded on December 13, 2019.

- El Paso 2 consists of three segments. The second and third segments will replace approximately 13 miles of vehicle barriers with new pedestrian fencing in New Mexico. El Paso 8 consists of approximately 6 miles of new primary pedestrian fencing and approximately 6 miles of new secondary pedestrian fencing. The solicitation for the second and third segments of El Paso 2 and the new primary pedestrian fencing for El Paso 8 was issued on November 16, 2019, and the contract was expected to be awarded on December 20, 2019.

7. The first segment of El Paso 2 and the new secondary pedestrian fencing for El Paso 8, as well as four other Section 2808 projects, are still in the early phases of planning. The four additional projects are "San Diego 11," "El Centro 5," "El Centro 9," and "Laredo 7." The San Diego 11 project will provide approximately 3 miles of new secondary pedestrian fencing in California. El Centro 5 will provide approximately 1 mile of new secondary pedestrian fencing in California. El Centro 9 will provide approximately 12 miles of new secondary pedestrian fencing in California. Laredo 7 will provide approximately 52 miles of new primary pedestrian fencing in Texas. These projects involve private land and require the Government to obtain access over, or ownership in, the land. The Government has been actively working to acquire the property interests necessary to proceed with these projects.

8. In addition to contracts for the construction projects identified above, I am aware that the Corps also has contracts for real estate land acquisition services. The South Pacific Division, Sacramento District, received $400,000 to issue task orders under a Single Award Task Order Contract to procure title work under Section 2808. Before the injunction, the Corps had issued five task orders obligating and committing $151,980 of the $400,000 received. To date, the contractor has completed approximately half of the work and has submitted invoices to the Corps in the amount of $25,200 which remain unpaid.

---

[1] A Notice to Proceed is a written notice to the contractor to proceed with some or all of the work as specified in the contract. It fixes the time for the commencement of the work and, if appropriate, will fix the time for completion of the work.

9. The Government has also entered into support contracts for Section 2808 construction. Because Yuma 2 and 10/27 are located on a military munitions range, a munitions debris and removal contract was awarded on November 27, 2019, and $797,061 was obligated. To date, the contractor has incurred $24,383 in costs, all of which remain unpaid. In addition, the Government awarded a contract for aerial imaging of boundary surveys on November 21, 2019, and $278,350 was obligated. To date, the contractor has incurred $139,175 in costs, all of which remain unpaid.

10. All of the work under the contracts discussed above is funded, and can only be funded, by unobligated military construction funds made available pursuant to 10 U.S.C. § 2808.

## II. Harms to the Government

### A. *Harms from Contract Suspension*

11. On December 11, 2019, and in compliance with the Court's permanent injunction, I directed the South Pacific Border District to cease all contract and construction-related activities, including land acquisition, in connection with Yuma 2, Yuma 10/27, Yuma 3, San Diego 4, Yuma 6, El Paso 2, El Paso 8, El Centro 9, El Centro 5, San Diego 11, and Laredo 7. Accordingly, the contracting officers for Yuma 2 and 10/27, San Diego 4, and Yuma 3 directed the contractors to suspend all work on those contracts in the identified sectors, pursuant to Federal Acquisition Regulation ("FAR") Clause 52.242-14, SUSPENSION OF WORK (APR 1984). With respect to the remaining projects, no further efforts will be undertaken to enter into any contracts for those projects until otherwise permitted.

12. It is my understanding that all real estate land acquisition task order contracts issued by the Corps' South Pacific Division, Sacramento District, have also been suspended. In addition, suspension of the land acquisition will result in irreparable harm because there are incurred costs and outstanding payments of approximately $50,000.

13. In addition, it is my understanding that the munitions debris and removal contract as well as the contract for aerial imaging of boundary surveys have been suspended. Suspension of the munition debris and removal contract will result in irreparable harm because there are incurred costs and outstanding payments of approximately $25,000.

14. As Commander of the South Pacific Border District, I have been made aware by the contracting officers that suspending the work on Yuma 2 and 10/27, San Diego 4, and Yuma 3 in response to the injunction will cause significant immediate and irreparable harm to the Government as described more fully below:

15. Under FAR Clause 52.242-14, a contractor is entitled to an adjustment for any increase in the cost of performance of the contract (excluding profit) necessarily caused by an unreasonable period of time during which the contract is suspended or delayed. The unreasonableness of a

suspension or delay is determined based upon the totality of the circumstances, including the duration of the delay. In this case, despite the suspension of work, the contractors will nevertheless continue to incur costs for every day that the contracts are suspended. For the Yuma 2 and 10/27 contract, the Government estimates that these costs are likely to include significant costs for equipment the contractors must keep ready for use at multiple locations, costs for security to keep the equipment and materials from being stolen or vandalized, labor costs for the personnel managing the contract, labor costs for the personnel who have been trained and are dedicated to execute the tasks under the contracts (workers whom the contractors would be reluctant to release due to the risk of not being able to rehire them), and potential costs associated with storing construction materials. Further, there will likely be increased market prices on labor, materials, and equipment (*e.g.*, steel and concrete). The Government will be obligated to reimburse these additional costs, which would not have been incurred but for the Court's injunction. Moreover, the Government will be obligated to reimburse these additional costs from funds that would otherwise be spent on actual barrier construction.

16. The prime contractor for Yuma 2 and 10/27 on BMGR had been conducting pre-construction ground disturbing activities since November 27, 2019. The contractor deployed field personnel, including engineers, project managers, quality assurance specialists, equipment operators, and laborers, usually working 10 hours per day, 5 days per week. Heavy equipment was mobilized to the site for clearing and grubbing, geotechnical drilling, extension of a construction water line, and construction of a temporary access road. The contractor had been conducting Lidar / topographic surveys. The contractor was also in the process of erecting a temporary concrete batch plant, as well as water delivery systems, temporary field offices, and supply yards for taking daily deliveries of steel and other material. Security cordons are in place to protect personnel and equipment. Given the significant scale of this effort, the suspension of work is now imposing, and will impose, inordinate costs on the Government, on the prime contractor and subcontractors, and on hundreds of individual construction workers.

17. For Yuma 2 and 10/27, the total costs expected to be incurred while the contract is suspended are currently estimated to be $24,995 per day (approximately $749,875 per month), assuming standard mitigation measures are taken.

18. For San Diego 4, the Government issued the Notice to Proceed on December 4, 2019. The contractor has deployed field personnel, including engineers, and project managers. The prime contractor has begun preparations and contracted with subcontractors, including those performing Lidar / topographic surveys. In addition, the contractor purchased performance and payment bonds and developed several deliverables that were required to be produced at the preconstruction conference. As such, the costs expected to be incurred while the contract is suspended are currently estimated at $6,500 per day (approximately $195,000 per month).

19. For Yuma 3, the contract was awarded on December 2, 2019. No ground disturbing activities have been initiated; however, there have been some minimal costs associated with the contractor's pre-construction activities. For example, the contractor purchased performance and

4

payment bonds and developed several deliverables, such as a safety plan and a security plan, that were required to be produced at the preconstruction conference. As such, the costs expected to be incurred while the contract is suspended are not easily ascertainable, but are expected to be minimal.

20. In total, the suspension of the Yuma 2 and 10/27, San Diego 4, and Yuma 3 contracts will cost the Government an estimated additional expense of approximately $944,875 per month, plus interest. Additional costs will be incurred for suspending the land acquisition task order contracts, as described above.

21. At present, there are no outstanding invoices for any work done on the Yuma 2 and 10/27, San Diego 4, and Yuma 3 contracts. The contractor performing the Yuma 2 and 10/27 contract last received a progress payment before Thanksgiving. Since that time, the Government estimates that the contractor has incurred approximately $8,500,000 in additional costs. There are no invoices for the San Diego 4 and Yuma 3 contracts because the contracts were awarded recently. (However, there are outstanding invoices for the associated real estate contracts.) Although the contractor for San Diego 4 has not submitted its first invoice, the Government nevertheless estimates that the contractor has incurred approximately $500,000 in costs for initial activities. Similarly, the contractor for Yuma 3 has not submitted its first invoice, but the Government estimates that the contractor has incurred approximately $1,100,000 in costs for initial activities.

22. Timely satisfaction of payments that the Government owes protects the solvency of the contractors, who are subject to millions of dollars in weekly costs to employees, subcontractors, and suppliers. These contractors rely on an expectation that the Government will pay its bills promptly; the injunction blocks the Government from fulfilling this essential contractual obligation. In particular, the contractor performing the Yuma 2 and 10/27 contract may be forced to self-finance the approximately $8,500,000 in costs incurred for border barrier work it has already completed, which will cause the Government significant reputational harm, diminish the appetite of builders for pursuing important federal contracts, and thus likely increase the future cost to the Government of similar construction projects.

23. Because the injunction does not prevent a contractor from requesting payment for work previously performed but does prevent the Government from paying for the work, the Government will be subject to penalties for failure to make prompt payment. The prompt payment interest penalty of 2.625 percent per annum will accrue if the Government is unable to pay invoices for progress payments within 14 days after receipt of a proper request or to pay invoices for final payment within 30 days after receipt of a proper request. See FAR 52.232-27 PROMPT PAYMENT FOR CONSTRUCTION CONTRACTS (JAN 2017) (citing to 5 C.F.R. Part 1315).

24. The additional expenses described above would not have been incurred but for the injunction. Therefore, to compensate for the additional costs in the event the injunction is not

stayed but is later vacated, the Government must suffer the irreparable harm of reducing barrier mileage, modifying barrier design to eliminate features (such as lighting, cameras, or sensors), or deferring more military construction projects in order to finance the additional court-imposed cost of the barriers. For example, the Corps estimates that border barrier length will decrease by approximately 0.6 miles for each day the contracts are suspended, given the absence of efficiencies that have yet to be identified or realized. Similarly, any period of suspension may result in the payment of acceleration costs to maintain project schedules in the event that the suspension is lifted. (Currently, the Corps has programmed 132 miles of border barrier under Section 2808 for completion by December 31, 2020.) For example, contractors will be required to remobilize to pre-existing levels of work. The Corps anticipates that it will take contractors approximately 45 days to remobilize, and these delays are unlikely to be absorbed into the schedule without the potential for substantial additional acceleration costs. In sum, suspension costs and the potential payment of acceleration costs to maintain project timelines in the event the injunction is vacated will result in increased project costs that will adversely affect the scope of the projects or otherwise require the deferral of additional military construction projects.

*B. Harms from Contract Termination*

25. If the contracts remain suspended for too long, the Government will be forced to reduce the scope of the contracts or terminate the contracts for the convenience of the Government. Currently, the contracting officer estimates that the cost to terminate the Yuma 2 and 10/27 contract as of December 11, 2019, to be at least $1,300,000, in addition to the daily suspension costs discussed above. The estimated cost to terminate the San Diego 4 contract as of December 11, 2019, is at least $100,000, in addition to the daily suspension costs discussed above. The estimated cost to terminate the Yuma 3 contract as of December 11, 2019, is at least $100,000, in addition to the daily suspension costs discussed above.

26. In the event the Government must terminate for convenience each of the three contracts now in performance and funded through Section 2808, fiscal laws may prevent later re-use of these funds for any purpose other than a replacement contract for the same border infrastructure. If these funds are unused or unusable, they would automatically return to the Treasury.

27. In addition, if the injunction is vacated after the contractors have demobilized, the costs of remobilizing manpower and resources will be significant. For example, given the tight labor market, contractors will face difficulties restoring manpower levels, and market prices for labor, supplies, materials, and equipment will likely increase. The Government will be obligated to reimburse these additional costs, which would not have been incurred but for the Court's injunction. As explained earlier, to compensate for these additional costs, the Government will suffer the irreparable harm of reducing barrier mileage, modifying barrier design to eliminate features (such as lighting, cameras, or sensors), or deferring more military construction projects).

### C. *Harms from Contract Reprocurement*

28. In the event a final judicial ruling favors the Government but comes after termination of these contracts, the Government would also face onerous administrative costs for procuring new contracts to complete the unfinished work left after termination. The Corps estimates this cost to be approximately $89,555 per contract, in addition to any market escalations in the cost for construction services.

29. The Government expects the costs of any re-procurement contracts to be significantly greater than the original contract costs, in part because the price of compensating replacement contractors willing to take the proven risk of project suspension and non-payment will be high. And, as stated above, prices for any re-procurement contracts will likely reflect increased market prices for labor, materials, and equipment (e.g., steel and concrete). The Government's need to pay these higher costs would be a burden that the Government would not have incurred but for the Court's injunction. Moreover, as explained earlier, the Government will be obligated to pay these additional costs by reducing barrier mileage, modifying barrier design to eliminate features (such as lighting, cameras, or sensors), or deferring more military construction projects

### III. **Compliance with Injunction: Wind Down and Caretaker Activities**

30. The Corps will not "use Section 2808 funds beyond the $1.375 billion in the 2019 Consolidated Appropriations Act for border wall construction," including any land acquisition expenses associated with such construction. In order to comply with the Court's injunction, the Government must incur considerable overhead costs associated with demobilizing and winding down operations ("wind down activities"). Once that process is complete, the Government must expend funds to maintain a minimal level of basic operations ("caretaker activities") to prevent irreparable loss to the government and ensure compliance with the Court's order. The Government is required to fund these costs with unobligated military construction funds made available by Section 2808. These wind down and caretaker activities are detailed below.

### A. *Wind Down Activities*

31. The South Pacific Border District's operations center in Phoenix, Arizona is presently staffed with approximately 222 personnel, most of whom are deployed from Corps districts around the country. Of this number, approximately 180 individuals are working on both the Section 2808 and Section 284 border barrier programs, with approximately 42 individuals exclusively hired in support of the now enjoined Section 2808 program. Although it may be possible to transition some of the 180 affected personnel to work only on the Section 284 program, and thereby fund their work exclusively with Section 284 counterdrug funding, there are considerable administrative costs associated with such a transfer. If funding transfers are implemented for the 180 individuals, these costs are presently estimated to be $20,000. For those individuals deployed, yet unable to transition to the Section 284 program, as well as for those scheduled to return to their home office, government travel orders must be re-issued and

funded, and employee travel vouchers and expense reimbursements must be processed. The estimated cost of returning deployed employee personnel to home offices and to process employee travel vouchers and expense reimbursements is approximately $6,000.

B. *Caretaker Activities*

32. Once the primary demobilization effort is complete, the Government will need to expend funds to maintain a minimal level of basic operations associated with the Section 2808 contracts. Specifically, the Government must continue to expend funds to perform a small number of functions that are essential to protect government assets already on the ground, to minimize loss to the Government associated with existing assets and those anticipated for delivery, to ensure site safety and site security, and, consequently, to mitigate irreparable harm to the Government. The Corps expects to use personnel for the following caretaker activities as long as necessary while the injunction is in effect:

- Construction personnel will monitor the three Section 2808 projects and be available to accept materials that are in transit to the site and cannot be returned; document and monitor site conditions to assure safety and ensure contractors do not perform any work while suspended; provide security to prevent theft and vandalism; and perform associated reporting in connection with such activities. In the absence of such personnel, there would also be unquantifiable costs associated with the absence of construction site security to protect the Government from potential liabilities on the construction sites and to preserve government construction assets already onsite.

- Contract management personnel will monitor solicitations that have been interrupted to avoid or mitigate waste in the procurement process; ensure compliance with suspension or termination requirements; respond to requests for information from contractors; and perform Resident Management System[2] reporting.

- Program and resource management personnel will resource essential positions; provide oversight of spending to ensure that no funds are expended improperly, including in violation of the injunction; process and reconcile Corps expenses incurred prior to the injunction (e.g., employee labor corrections, travel vouchers, and cardholder charges); and otherwise assure fiscal compliance.

- Real estate personnel will respond to inquiries from private landowners who are in various stages of acquisition negotiations and will ensure compliance with the injunction.

---

[2] The Resident Management System is a comprehensive system for the expedient and effective management of construction contracts through tracking and documentation of all facets of a contract by Corps of Engineers' field offices and contractors.

- Internal review personnel will provide auditing oversight to ensure fiscal security and propriety. This includes personnel needed to comply with an ongoing DoD Inspector General audit of the solicitation of the Yuma 3 contract. USACE personnel at the operational level who respond to this audit must be paid for time spent on this audit with military construction funds provided for Section 2808.

- Legal personnel will respond to legal inquiries and otherwise provide legal oversight to ensure compliance with the law, including the Court's injunction.

33. Caretaker status requires the retention of at least 15 individuals to perform the functions listed above. The per diem cost of operating South Pacific Border District operations in Phoenix with a minimal office and field staff of this size to perform caretaker functions is approximately $118,000 per week, representing an approximate total of $236,000 for each bi-weekly pay period in a calendar year.

34. The only source of funds available for these wind-down and caretaker activities is unobligated military construction funds made available pursuant to 10 U.S.C. § 2808.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 16th Day of December 2019.

PAZOS.RAFAEL.FELIPE.1046196119
Digitally signed by PAZOS.RAFAEL.FELIPE.1046196119
Date: 2019.12.16 14:09:32 -07'00'

Rafael F. Pazos
Colonel, United States Army